**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **CRANBERRY PROMENADE, INC., et al.** | ) | **CASE NO. 2:09-1242-NBF** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **PLAINTIFFS RESPONSE TO** |
| | ) | **DEFENDANTS CONCISE** |
| **CRANBERRY TOWNSHIP et al.** | ) | **STATEMENT OF MATERIAL** |
| | ) | **FACTS AND PLAINTIFFS** |
| **Defendants** | ) | **STATEMENT OF MATERIAL** |
| | ) | **FACTS SUPPORTING** |
| | ) | **DENIAL OF MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |

NOW COME Plaintiffs, Cranberry Promenade Inc., NAP Associates, Inc., NAP Associates 2, Inc., and Thomas W. Petrarca and file the following Response to Defendants Concise Statement of Material Facts and Additional Facts Presented In Opposition to the Defendants' Motion for Summary Judgment:

1. In 2003 Plaintiffs owned two of the three parcels of land involved in this matter. See Exhibit B, outlining the tracts of land owned by Plaintiffs in 2003. That year Plaintiffs filed a Conditional Use Application and application for Preliminary Land Development Plan with the Township to develop the two parcels. See Exhibit R.

DENIED.  On May 14, 2003, Thomas Petrarca, Inc. (which is not Plaintiff in this case) filed a Development Application and Conditional Use Application with Cranberry Township to construct a 93,170 square foot retail plaza, a 3,860 square foot fast food restaurant, and a 4,115 square foot drive thru bank on one parcel of the property involved in this case.  At the time, the property was a KOA campground owned by Mr. and Mrs. Gantzer.  On October 6, 2003,

1

Plaintiff Cranberry Promenade, Inc. purchased the Gantzer parcel, an approximately 14.548 acre parcel of land.  See Defendants Exhibit 2. Gantzer Deed.

2. The Township denied Plaintiffs' 2003 applications. See Exhibit GG.

DENIED in that the 2003 applications were not "Plaintiffs' applications", but the applications of Thomas Petrarca, Inc.

3. Plaintiffs filed two land use appeals from the denials of the applications at docket numbers 2003-11211 and 2003-11212 in the Butler County Court of Common Pleas. See Exhibits C and D.

DENIED in that the 2003 appeals were not filed by "Plaintiffs", but by Thomas Petrarca, Inc.  and Cranberry Promenade, Inc.

4. On September 9, 2009, Plaintiffs' state court appeals were dismissed for Plaintiffs' failure to prosecute. See Exhibits C and D, true and correct copies of the aforementioned dockets.

DENIED in that the 2003 appeals were not filed by "Plaintiffs", but by Thomas Petrarca, Inc.  and Cranberry Promenade, Inc.

5. After acquiring a third parcel of land in 2006, Plaintiffs filed a second Conditional Use Application and application for Preliminary Land Development Plan on August 7, 2007. See Exhibits P and Q.

DENIED in that on July 20, 2005, Plaintiff NAP Associates, Inc., purchased from Turnblacer, Frey et al.  an approximately 2.869 acre vacant parcel of property. See Exhibit 3 Turnblacer Deed.   On May 8, 2006,  Plaintiff NAP Associates 2, Inc., purchased from Eakins an approximately 6.838 acre vacant parcel of property which was between the former Gantzer and former Turnblacer properties. See Exhibit 4 Eakin Deed.  By purchasing the Eakins property,

2

Plaintiffs created an assemblage of contingent properties that could be developed as a unit.  On August 7, 2007, Plaintiffs filed their first Conditional Use Application and Application for Preliminary Land Development.

6. Plaintiffs' 2007 Land Use Applications were denied. See Exhibits V and W.

ADMITTED.

7. Plaintiffs filed land use appeals from the denials which are pending in the Butler County Court of Common Pleas, consolidated at docket number AD-09-1 0619. See Exhibit OO.

ADMITTED.

8. Both State Court actions were stayed, over the objection of the Defendants. See Exhibit OO.

ADMITTED.

9. Mr. Root did not begin his term in office until 2008, and therefore, did not have any involvement in denying Plaintiffs' 2003 land use applications. See Exhibit KK, Root Deposition, p. 6.

DENIED in that the 2003 applications were not "Plaintiffs' applications", but the applications of Thomas Petrarca, Inc., otherwise ADMITTED.

10. Mr. Mazzoni did not begin his term in office until 2005 and therefore, did not have any involvement in denying Plaintiffs' 2003 land use applications. See Exhibit LL, Mazzoni Deposition, p. 5.

DENIED in that the 2003 applications were not "Plaintiffs' applications", but the applications of Thomas Petrarca, Inc., otherwise ADMITTED.

11. John Trant, Jr. serves as the Township's Chief Strategic Planning Officer. Mr. Trant did not assume that position until January 2007, and therefore, did not have any

involvement in the handling of Plaintiffs' 2003 land use applications. See Exhibit MM, Trant Deposition, p. 6.

DENIED in that the 2003 applications were not "Plaintiffs' applications", but the applications of Thomas Petrarca, Inc., otherwise ADMITTED.

12. Mr. Henshaw, while working with the Township for approximately 16 years, only began overseeing land use applications when he became the Director of Community Development in December 2006. See Exhibit NN, Henshaw Deposition, p. 6. Immediately prior to that position, Mr. Henshaw was a code administrator. *!d.* at p. 5.As such, he had no involvement in the handling of Plaintiffs' 2003 land use applications.

DENIED in that the 2003 applications were not "Plaintiffs' applications", but the applications of Thomas Petrarca, Inc., otherwise ADMITTED.

13. Cranberry Woods consists of an office park that houses Mine Safety Appliance and its most recent tenant, Westinghouse. The business park is located to the south of Route 228. The principal entrance is via Cranberry Woods Drive, a private road, which is across from Plaintiffs' property. See Exhibit A.

ADMITTED, except Plaintiffs are without knowledge as to whether Cranberry Woods Drive is a private or a public road.

14. Cranberry Commons consists of mostly retail shops with some restaurants, consisting of approximately 550,000 square feet of retail space. See Exhibit F, Resolution No.98-75. Cranberry Commons is located to the north of Route 228, immediately adjacent and to the east of Plaintiffs' property. There are two entrances to Cranberry Commons from Route 228. See Exhibit A.

ADMITTED.

15. Prior to those developments, Route 228 consisted of a two lane road from Route 19 to State Route 8. See Exhibit Z, Andree deposition, pp. 57-60. –

DENIED.  Testimony at citation states SR 228, was widened, but doesn't say at what points or mention Rt. 19 and SR 8 in relation to that widening.  At pg. 15 Andree states PennDOT was planning on widening the 228 corridor between 19 and Route 8.

16. As a result of the development of Cranberry Woods and Cranberry Commons, the two developers, in partnership with the Pennsylvania Department of Transportation (PennDOT) constructed the improvements to Route 228. *Id.*

ADMITTED, however, it is not established which improvements were made by Cranberry Woods and Cranberry Commons and which improvements were made by PennDOT.

17. Those improvements consisted of widening the road to a four lane road from Route 19 to the border of Cranberry and the Borough of Seven Fields. *Id.*

DENIED.  These parameters are not in Mr. Andree's testimony.

18. Both developers contributed millions of dollars to the funding of these improvements. *Id.* –

DENIED.  Andree did not testify as to how much money was contributed by the developers to the improvements and he did not mention millions of dollars.

19. Cranberry Woods, as part of its master plan, conditioned its applications upon a full build-out of the development. See Exhibit E, testimony of John Trant at Conditional Use Hearings, at CUR 698-699.

ADMITTED

20. While that full build-out did not occur in the 1990's, the traffic improvements made in part by Cranberry Woods in the 1990's were based upon full build-out of the office

park. *Id.* See also Exhibit G, Cranberry Commons/Cranberry Woods and Credco Developments Traffic and Access Study Final Report, Volume 1 of 2.

DENIED.  The traffic study anticipated a full-build out of 1.44 million square feet (12 buildings of 120,000 sq. ft. each).  However, the MSA/Westinghouse buildings total 1,895,808 square feet – 455,000 square feet *more* than anticipated in the traffic study.  See Exhibit 53 MSA/Westinghouse Square footage.  Even more construction is anticipated.  Further, the traffic study finding the road capacity to be adequate was premised on certain improvements to Route 228 being completed before final build-out, including a new entrance to I-79. See Exhibit G, Cranberry Commons/Cranberry Woods and Credco DevelopmentsTraffic and Access Study Final Report, Volume 1 of 2.  These anticipated road improvements did not, in fact, occur, nevertheless the Township permitted Westinghouse to proceed with construction without any new traffic studies.

ADMITTED.

22. McElroy Road connects Route 228 to Mars Road. Mars Road runs in an east/west direction immediately to the north of, among others, Petrarca's property. See Exhibit A.

ADMITTED.

23. Gary Sippel, an individual that owned property to the north of Route 228 filed a land use appeal from the approval for the Cranberry Commons land use application. See Exhibit H, a copy of Sippel's Land Use Appeal. –

ADMITTED.

24. As a result of a Consent Order, the Township was required to create an Official Map which allowed for full access to Mars Road from Route 228. See Exhibit I, a copy of the

Consent Order dated January 29, 1999.

DENIED. The Township, voluntarily as part of the Agreed Consent Order, agreed to create an official map. The consent order doesn't require "full access" it merely requires: "shall cause to be made and shall adopt an official map of a portion of the Township along Route 228, near the existing McElroy Road intersection, providing for a public connector road system from a point on Route 228 between I-79 and the Gantzer property, to a connecting point on Old Mars Road."  The Consent Order further provides at paragraph  6 that the land acquisition and road construction costs will be paid by Sippel or its successor or assigns:

> The Township, upon written request of Appellant, or its successor, or assigns, shall promptly acquire such portion of the property as designated by Appellant [Sipple] or its successor or assigns, which is part of the official map, by deed or by condemnation proceedings, provided that Appellant or its successor or assigns, agrees to pay the costs of acquisition of the necessary rights of way and construction and related costs in excess of the costs paid from other sources, such as Intervenor's contribution of $75,000.00, AND ALL County, State and Federal funds which may become available for acquisition and construction of the roads included in the official map….

25. The 2000 Official Map designated a northbound road on the border of the Gantzer Property and the Eakin property (both ultimately purchased by Plaintiffs), connecting Route 228 to Mars Road, across from the entrance to Cranberry Woods. See Exhibit J, a copy of the Cranberry Township 2000 Official Map.

ADMITTED.

26. In 2007, Cranberry's Official Map was revised. See Exhibit M, a copy of the transcript of the public hearing prior to the adoption of the 2007 Official Map and Exhibit N, a copy of the Ordinance adopting the 2007 Official Map.

ADMITTED.

27. Daniel Santoro, the former Assistant Township Manager, explained the differences between the 2000 and 2007 Official Maps and the reasons for the change; namely, PennDOT expressed dissatisfaction on two primary issues: the northbound I-79 ramp and the right-in and right-out access into the northern properties (this is a reference to McElroy Road). See Exhibit K, Daniel Santoro Deposition, pp. 100-107.

ADMIT that Santoro testified that these were the reasons for the change, DENY that these in fact were the reasons, rather the evidence demonstrates that the reason for the change was to amend the Official Map to include the road designed and desired by Simon, and to impose the Simon desired access road on the Plaintiffs property to prevent the Plaintiffs from developing their property prior to the Simon Mall development.

28. Specifically with reference to McElroy Road, PennDOT expressed concern of the proximity of the right-in and right-out road to the new I-79 northbound on-ramp. *Id.*

DENY that PennDOT said this, Admit that Daniel Santoro said that it was "a significant issue for them [PennDOT]" – when the new 1-79 ramp is built, however, the new I-79 northbound on ramp was *not* in fact ever built – the new I-79 northbound on ramp was simply an improvement desired by Simon to deal with the increased traffic that would be generated by their proposed Mall.

29. The elimination of the right-in/right-out would place more volume onto the 2000 Official Map road that ran across Petrarca's property to access the properties to the north. *Id.*

ADMIT that Dan Santoro said this, deny that it justifies any change to the Official Map in the absence of the Simon Mall development – Santoro is speaking of closing McElroy Road, and McElroy Road would not be closed to eliminate the right in right out unless the new I-79 on

ramp and flyover were built as part of the Simon road improvements, which did not occur. McElroy Road is not closed, but is still being used.

30. If the 2000 Official Map remained unchanged, the increased volume on the road over Petrarca's property would travel north and be forced to make a left hand turn at Mars Road to access whatever significant traffic generator ended up on the 118 acre parcel (whether that was a mall or otherwise). *Id.*

DENIED – Santoro's testimony does not specify "Mars Road", nor does he say "the 118 acre parcel" or "whether that was a mall or otherwise."

31. Through discussions with the Township's traffic engineers, the best scenario was to change the official map to alter the direction of the road that ran across Petrarca's property. *Id.*

ADMIT that Daniel Santoro said this in his deposition, but DENY that this actually occurred. The evidence showed that the actual reason for the change in the official map was to comply with the request of Simon, and the Official Map was changed to reflect the road designed by Simon. On December 21, 2006,Simon's Engineer, Bob Goetz, emailed Daniel Santoro a CAD (computer aided design) drawing of the Simon designed road to "use for your official map." See Exhibit 54, email from Bob Goetz to Dan Santoro 12/21/06. The Township Engineer, Jason Kratsas, testified that he received the CAD Drawing of the revisions to the official map prepared by Simon's engineer TransAssociates from Daniel Santoro, and followed Mr. Santoro's instructions to take the map through the adoption process without making any changes to it. See Exhibit 8, Deposition of Jason Kratsas, pgs. 10-12

32. The revised road would travel to the north and begin a westward movement to serve the major traffic generator. *Id.*

9

ADMIT.  The revised road would serve the major traffic generator, the Simon Mall, not the Plaintiffs' property.

33. This modification would eliminate the left turn conflict posed by the 2000 Official Map while at the same time allowing access to the properties to the north as envisioned by the 1995 Comprehensive Plan and as required by the Consent Order. *Id;* see also, Exhibits I and L.

DENIED.  There was no testimony by Mr. Santoro regarding a left turn conflict. The 2000 Official Map did not have a left turn conflict.  Further, the 1995 Comprehensive Plan shows the properties to the North being accessed by McElroy Road and a road between the cranberry Commons Property and the former Gantzer property,  it had no road whatsoever over the Petrarca properties to serve the properties to the North.

34. In July 2006, Mr. Santoro met with Mr. Petrarca and Daniel Daniluk, Esquire, to discuss the proposed revisions to the official map and to seek his input. See Exhibit L, Excerpt of Comprehensive Plan, pp. 50-54.

ADMIT that Mr. Santoro testified that he met with Mr. Petrarca and his unidentified counsel in 2006, however Mr. Petrarca denied that this alleged meeting occurred. See Exhibit 6 Deposition of Thomas Petrarca pg. 75.

35. Despite this overture, there is no evidence of record that Mr. Petrarca provided any input.

ADMIT that Mr. Petrarca did not give any input into the 2007 changes to the Official Map, however, this was because Mr. Petrarca was not advised of the planned changes to the Official Map.  See Exhibit 6 Deposition of Thomas Petrarca pg. 75, where he states that he doesn't recall meeting with Santoro in early 2007 to discuss revisions to the official map, or being asked for input concerning the 2007 official map. Jason Kratsas testified that he did not

notify Petrarca of the proposed revision to the Official Map.  See Exhibit 8 Deposition of Jason Kratsas, pg. 12.

36. Ultimately in early 2007 after a public hearing, the 2007 Official Map was adopted. See Exhibit M, a copy of the transcript of the public hearing prior to the adoption of the 2007 Official Map and Exhibit N, a copy of the Ordinance adopting the 2007 Official Map.

ADMITTED.

37. In March of 2007, Joel Aaronson, Esquire, one of Plaintiffs' prior attorneys, met with Township officials to discuss Mr. Petrarca's upcoming applications. The 2007 Official Map was discussed during this meeting. See Exhibit O, Deposition of Joel Aaronson, Esq., pp. 76-79.

DENIED.  The deposition does not reflect testimony by Mr. Aaronson that he met with officials to discuss Mr Petrarca's upcoming applications in March.

38. On August 7, 2007, Plaintiffs submitted two Land Use Applications. See Exhibits P and Q.

ADMITTED.

39. The proposed development at issue in the second set of Land Use Applications consisted of 127,317 square feet of community shopping center, large land development and large retail uses on approximately 24.2 acres in the C-3 (regional commercial) zoning district. *Id.*

DENIED that the 2007 applications were a second set of Land Use Applications, otherwise admitted.

40. The development consists of parcels with frontage along Route 228, which is classified as an arterial street. *Id.* The proposed development also consists of parcels with

11

frontage along Mars Road (Township RD#T722). *Id.*

    ADMITTED

    41. Petrarca's applications did not account for the 2007 Official Map road. See Exhibits P and Q.

    DENIED that the Plaintiffs applications did not "account" for the 2007 Official Map Road, Admit that the road for which Plaintiffs sought approval was not the road designed by Simon and shown on the 2007 Official Map.

    42. Plaintiffs did not seek a special encroachment permit pursuant to 53 P .S. § 10405, which would seek a deviation or relief from the requirement of an official map. See Exhibits P and Q; Exhibit 0, Aaronson deposition, p. 55.

    ADMIT that Joel Aaronson testified that no application for a special encroachment permit was filed, but state that Cranberry Township does not have an application for a special encroachment permit, *See* Exhibit 18, Deposition of Ron Henshaw pgs. 67-68. Further, under Cranberry Township Ordinance 27-315, a special encroachment permit application is not required to request a change from an official map when an applicant files a land development application.  See Exhibit 45, Cranberry Township Ordinance 27-315.

    43. To the knowledge of Jack Raudenbush, Plaintiffs' engineer, a feasibility study was not conducted with respect to determining whether Plaintiffs' property could not "yield a return" with the official map road. See Exhibit HH, Jack Raudenbush deposition, pp. 13-15.

    ADMIT that Raudenbush explained on page 13 that there wasn't an individual feasibility study, but Raudenbush testified that the amount of developable square footage was reduced as a result of following the official map road. See Exhibit 14, Deposition of Jack Raudenbush at 14. Further, the phrase "yield a return" does not appear anywhere in the portion of the transcript

cited.  Thomas Petrarca testified that the economics just didn't work with the road as shown on

the 2007 Official Map.  See Exhibit 6 Deposition of Thomas Petrarca pg. 169.  Supervisors

Mazzoni and Skorupan testified at their depositions that Mr. Aaronson had indicated at the

hearings before the Board of Supervisors on the Land Development Applications that it was

financially unfeasible to develop the property with the road in the location shown on the official

map.  See Exhibit 10 Deposition of Bruce Mazzoni pg. 13; Exhibit 16 Deposition of John

Skorupan at pg. 38.

44. Mr. Raudenbush admitted that there were multiple configurations of a building

layout that were possible for the development of Plaintiffs' land. *Id.* at p. 15.

ADMITTED.

45. Multiple meetings took place between the Township and Petrarca's representatives,

including Mr. Aaronson. During the course of the meetings, two significant deficiencies with the

applications went unaddressed: traffic mitigation and the Official Map road. See Exhibit E,

CUR700.

DENIED.  The testimony referenced indicates that legal counsel preferred to defer

discussion of the traffic mitigation and the official map road.  At his deposition, Mr. Trant

testified that none of the Township employees who met with Petrarca's representatives had any

authority to waive any requirements of the official map and the road on it.  See Exhibit 17

Deposition of John Trant at pg. 37.

46. After the submission of multiple revised plans, the Planning Advisory Commission

(hereinafter PAC) made a recommendation to deny the Applications. See Exhibit S, a copy of the

PAC denial.

ADMITTED.

47. The matter then proceeded to hearings before the Township Board of Supervisors. See Exhibits V and W.

ADMITTED

48. Under the Municipality's Planning Code, an applicant is entitled to present seven hours of testimony in support of the Application. 53 P.S. §10908(1.2); see also Exhibit 0, Aaronson deposition p. 80.

ADMITTED

49. Mr. Aaronson presented seven hours and made a request for an additional four hours for presentation of the applicants' case. *Id.*

ADMITTED

50. The additional request for four hours was granted. *Id.*

ADMITTED

51. The transcript of proceedings totals 747 pages for all of the hearings. The applicants submitted 114 Exhibits, amounting to 2,100 pages of documents. See Exhibit U (SHOULD BE EXHIBIT T), the Index from the Conditional Use Record filed in the Court of Common Pleas of Butler County; see also Exhibit V (SHOULD BE EXHIBIT U), the Index from the Certified Record from the Preliminary Land Development Application filed in the Court of Common Pleas of Butler County.

ADMITTED, AS PER CORRECTIONS

52. After the conclusion of the hearings, the Township Board of Supervisors denied Plaintiffs' applications. See Exhibits V and W, copies of the Resolutions denying Plaintiffs' applications.

ADMITTED

53. One of the two reasons for denial of the applications was failure to mitigate traffic. Plaintiffs submitted a Traffic Impact Study Report dated July 2007 wherein Charles Wooster, Plaintiffs' traffic engineer, opined that at the intersection of Route 228 and Cranberry Woods Drive, certain mitigation would be required on Route 228 as it relates to Petrarca's planned development. See Exhibit Y (SHOULD BE EXHIBIT X1), Wooster Traffic Impact Study, CUR. 820.

ADMITTED, AS PER CORRECTIONS

54. According to Mr. Wooster's report mitigation included:

• Construct an additional eastbound left turn lane on State Route 228 at the intersection to provide dual eastbound left turn ingress to the site drive. The turn lanes should provide 300 feet of vehicular storage, exclusive of bay tapers.
• Construct an additional westbound left turn lane on Route 228 at the intersection to provide dual westbound left turn ingress to Cranberry Woods Drive. The left turn lanes would provide 200 feet of vehicular storage, exclusive of bay tapers.
• Construct an auxiliary westbound right turn lane on Route 228 at the site drive. The auxiliary right turn lane should provide 200 feet of vehicular storage exclusive of bay tapers.
* * *
The developer IS committed to implementing these improvements.
See Exhibit X, pp. 22.

ADMITTED, however Mr. Wooster indicated in his report that these improvements were being planned by PennDOT as part of the SR 228 improvements, and that Plaintiffs would wait for those improvements to be made before opening the development.

55. During the application process, Plaintiffs proceeded to change course from agreeing that the above traffic mitigation was required to stating that no mitigation was required even assuming PennDOT never completed Route 228 improvements. [1] See Exhibit Y, Wooster [2] Conditional Use Hearing Testimony, pp. 5-6.

---

[1] PennDOT never agreed on a certain set of improvements to Route 228 and, as such, Plaintiffs are unable to demonstrate how PennDOT was going to mitigate Plaintiffs' traffic impact.  DENIED.
[2] The transcript erroneously refers to an individual named Chuck Lister, when in fact the person testifying was Chuck Wooster.  ADMITTED

DENIED.  There was no change in course.  As Mr. Wooster testified, because the Route 228 intersection was already in a failure condition, and PennDOT requires that mitigation be proposed if even a single additional vehicle is added.  However, as Mr. Wooster testified, the incremental additional vehicular traffic from Plaintiffs' proposed development would have no quantifiable effect on the Route 228 road network.  The additional traffic from the proposed Simon development of one million square feet would have a substantial impact on the Route 228 road network, and it was the Simon increase in traffic, not the Plaintiffs' traffic, that required mitigation.

56. However, during Mr. Wooster's examination in front of the Board of Supervisors, he testified as follows:

Q. The traffic impact was not significant, correct?
A. That's correct.
Q. And you and I can agree that there are traffic-related issues on the 228 corridor, correct?
A Today? Without any development?
Q. Today. Just in general.
A Sure.
Q. And we can agree that when the Petrarca development comes in adding even small amounts of traffic, that it just makes a bad situation worse, correct?
A. Potentially.
See Exhibit Y, Wooster testimony before Board of Supervisors, CUR 595-596.

ADMITTED

57. At the end of the day, Plaintiffs failed to provide a mitigation plan with respect to the traffic created by Petrarca's proposed development as required by Township Ordinance §§12.108.3 and 27.412.l.C. See Exhibit PP, a copy of the aforementioned Township Ordinances.

DENIED

58. Historically, there had been multiple developers seeking to build a mall in the northwestern quadrant of Route 228. See Exhibit Z, Jerry Andree Deposition, pp. 11-12; see also Exhibit K, Santoro deposition, p. 103.

ADMITTED

59. In 2003, Simon Property Group (hereinafter "Simon")-- the latest such developer - - expressed an interest to develop a large retail development in the northwestern quadrant of Route 228 to the west and north of Plaintiffs' proposed development. See Exhibit AA, Kathy Shields Deposition, p. 13.

ADMITTED

60. One of the issues faced by Simon was infrastructure improvements for its proposed development. *Id.* at 14.

ADMITTED

61. At the same time, PennDOT was planning significant infrastructure improvements to the entire Route 228 corridor-- from U.S. Route 19 to State Route 8. See Exhibit Z, Andree deposition pp. 14-16.

ADMITTED

62. One of Simon's consultants to its project was Delta Development Group. *Id.* at 18. Delta Development, among other things, specializes in securing public funding through various government sources.

ADMITTED

63. Delta Development had a contract with Simon starting in 2003. *Id.*

ADMITTED

64. Prior to January of 2007, Mr. Santoro was employed by Cranberry Township as an Assistant Township Manager. See Exhibit K, Santoro Deposition, p. 9.

ADMITTED

65. Following his departure from Cranberry Township, Mr. Santoro commenced employment with Delta Development Group. *Id.*

ADMITTED

66. Mr. Santoro testified that he did not recall having any meetings with Simon following his departure from the Township. See Exhibit K, Santoro Deposition, pp. 76-78.

ADMIT that Mr. Santoro testified that he did not work on the Simon project when he left Cranberry to work at Delta, however, DENY that this testimony is truthful. Jason Kratsas testified that he discussed the revisions to the official map road with Mr. Santoro after he went to work at Delta. See Exhibit 8, Kratsas Deposition pgs. 13-14.   Further, in the first month of his employment at Delta, Mr. Santoro helped Mr. Kratsas get the map revisions through the administrative process. See Exhibit 8, Kratsas Deposition pg. 15.   Mr. Santoro personally attended the Cranberry Township Planning Advisory Commission and presented the proposed revision of the official map. See Exhibit 27, Minutes of Planning Advisory Commission January 8, 2007.   On February 12, 2007, just over a month after he began working for Delta Development, Dan Santoro was copied on an email from Dennis Auker, one of the Principals of Delta, to Kathleen Shields concerning the revised funding matrix for the Simon road project. See Exhibit 28, email from Dennis Auker to Kathleen Shields 02/12/07.   In a November 21, 2007 email from Anthony Seitz at Delta to Kathleen Shields, Dan Santoro was identified as a "key attendee" from Delta on the Simon project for a meeting with the Township and PennDOT. See

Exhibit 30, Email chain between Jerry Andree, Kathleen Shields, Anthony Seitz and Kevin McKeegan  11/21/07.

67. The improvement of Route 228 and Simon's proposed project drew the involvement of State Senator Jane Orie, State Representative Darryl Metcalf, PennDOT, Pennsylvania Department of Community and Economic Development, Butler County Commissioners, a representative from the Governor's office as well as other interested parties. See Exhibit SS, Skorupan Deposition, p.l2; see also Exhibit MM, Trant deposition, p. 75.

ADMITTED.

68. On October 8, 2010, Plaintiffs' property was sold at a Sheriffs sale as a result of foreclosure proceedings initiated by Fifth Third Bank. See Exhibit BB, Docket No. 2009-10526.

ADMITTED.  The property was sold for $5.25 million at Sheriffs sale, as Plaintiffs could not make the payments on the mortgage when they were unable to get approval from Cranberry to develop the property.

69. On March 8, 2011, Echo Cranberry Associates, L.P., the purchaser of Plaintiffs' property, submitted Land Use Applications for the same parcels of land that were previously owned by Plaintiffs. See Echo Preliminary Land Development and Conditional Use Applications, attached as Exhibits CC and DD, respectively.

ADMITTED

70. Echo's Land Use Applications include the development of 198,769 square feet of retail space. *Id.*

DENIED – Echo's Land Use Applications are for 98,940 square feet of retail space – an 80,00 square foot Dick's Sporting Goods store and two retail shops totaling 18,940 square feet,

plus a 5,569 square foot gas station, a 6,300 square foot restaurant, and a 90,000 square foot three story office building.

71. Echo's applications contain the required roadway connecting Route 228 to Mars Road. See Exhibit EE, a CAD drawing of Echo's proposed development.

DENIED.  The roads proposed on the Echo development are substantially different from the 2007 Official map road, and include numerous modifications which were requested by Petrarca and denied by the Township.  The road is of a different width, 60 feet of right of way rather than 300 feet, a roundabout,  a curb cut allowing access to the western parcel which was not permitted on the Official map road,  a curb cut into the Dicks Sporting Goods location which was not permitted on the official map road, an additional curb cut onto Mars Road, and an additional right turn in from 228, which Petrarca had requested but Santoro testified the Township would not permit for safety reasons.  See Exhibit 20, Deposition of Daniel Santoro pp. 80-82.  Santoro testified:  "It is a very poor design to put a right turn in off of a right turn lane.  It creates a rear-end crash conflict that is an unacceptable design solution from a traffic engineering standpoint.  You don't put right-is off of right turn lanes….I don't recall the Township ever approving it." *Id.*

72. Echo's Traffic Engineer, Chuck Wooster - - the same traffic engineer consultant employed by Plaintiffs - - made recommendations concerning the traffic mitigation required for the proposed development. See Exhibit FF, Traffic Study for Echo.

ADMITTED

73. Echo's proposed development demonstrates that Plaintiffs' former property was not sterilized from development. See Exhibits CC, DD, EE and FF.

DENIED. The proposed Echo development is dramatically different from the Plaintiffs development proposal, and is not in compliance with the 2007 Official Map road restrictions and other restrictions imposed by the Township on the Plaintiffs development.  See 71 above.

74. The only basis upon which Mr. Petrarca could identify a conspiracy was because the Supervisors "denied me" with respect to his land use applications. See Exhibit II, Petrarca deposition, pp. 150-152.

DENIED.  On pages 139-146 of Mr. Petrarca's Deposition, he elaborates on what he sees as a conspiracy based on the way the chain of events unfolded and how he was treated differently from other landowners, and that the conspiracy was so they could obtain infrastructure improvements to 228.

75. Petrarca was unable to identify with any specificity information or sources of information supporting his claim. An example of this line of questioning and his response follows:

Q. In your Complaint you've alleged that Westinghouse was treated differently than you were. They're a similarly situated entity. What's the basis of that allegation?
A. Again, that's information that Joel Aaronson uncovered, my counsel. .. So, I mean, do I have factual black and white in writing differences? No, but I mean, you don't have to be a rocket scientist to figure out that, you know, one venture got in with a lot less legwork than what I was being put through.
See Exhibit II, Petrarca Deposition, p. 142-143.

DENIED.  Mr. Petrarca's testimony that was omitted above at the ellipses is as follows: "I believe in the Complaint it says something about the time line, okay, being whatever number of months, three or four months, for approvals verses 18 months on mine.  You know, traffic impact, they're a million square feet or thereabouts, 850, but they have an addition that's either under construction now or complete that would put them at about a million square feet verses 127,000 square feet."

ADDITIONAL FACTS PRESENTED BY PLAINTIFF

76.     On October 6, 2003, Plaintiff Cranberry Promenade, Inc. acquired the first property in this assemblage, two parcels totaling 14.548 acres, from Mr. and Mrs. Gantzer, paying $2.5 million.  *See* Exhibit 2,  Gantzer Deed;  Exhibit 5, Deposition of Thomas Petrarca 27.

77.     On July 20, 2005, Plaintiff NAP Associates, Inc. purchased two more parcels totaling 2.869 acres from Turnblacer, Frey and Ringeisen for $700,000.00. See Exhibit 3, Trunblacer Deed; and Exhibit 6, Deposition of Thomas Petrarca pg. 28.

78.     On May 8, 2006, Plaintiff NAP Associates 2, Inc., purchased from Eakins an approximately 6.838 acre vacant parcel of property which was between the former Gantzer and former Turnblazer properties. See Exhibit 4, Eakins Deed.

79.     Simon Property Group, (hereinafter "Simon") a national shopping center developer, acquired options in 2003 on a parcel of land northwest of the Plaintiffs property which was owned by Mr. Sippel.   *See* Exhibit 5, Deposition of Kathleen Shields, pg. 13; Simon parcel outlined in black on Exhibit 1.

80.     Kathleen Shields, Senior Vice President for Simon Property Group, was the developer of the Cranberry Mall project, (*See* Exhibit 5, Deposition of Kathleen Shields, pg. 11) in charge of the Cranberry project from the beginning.  *See* Exhibit 5, Deposition of Kathleen Shields, pg.13.

81.     Simon intended to develop a lifestyle mall on the property with approximately 950,000 square feet of retail space (hereinafter "Simon Mall").  *See* Exhibit 21,  Cranberry Town Center Project Overview.

82.     Simon and its consultants Delta Development and TransAssociates, and employees and officials of Cranberry Township, conspired to prevent Plaintiffs' from developing

their property, so that it would be available for a multi-lane access road to the Simon Mall, designed to Simon's specifications.  In the Spring of 2004, Kathleen Shields organized a group made of up "Simon, Delta, Simon's Traffic engineers [TransAssociates] and the Township [Ms. Shields specifically referenced Jerry Andree and Daniel Santoro].  *See* Exhibit 50, Letter from Kathleen Shields to Jerry Andree and Daniel Santoro, April 30, 2004.

83.     This group met at least monthly through Spring of 2009 to strategize a game plan. *Id.* Pg. 2 The group focused on three goals:  Obtaining public funding for the road improvements required to SR 228, preventing Plaintiffs from developing their property prior to Simon's development, and insuring Simon had whatever access it desired over the Plaintiffs property to the Simon Mall.

84.     Daniel Santoro was the Assistant Township Manager of Cranberry Township in charge of planning and development from 2000 to December 30, 2006.  *See* Exhibit 7, Deposition of Daniel Santoro, pgs. 8-9.  He was the point person for Simon at the Township from the time Simon first approached the Township about their proposed development.  See Exhibit 7, Deposition of Daniel Santoro pg. 28; Exhibit 5, Deposition of Kathleen Shields pg. 22.

85.     From 2003 until 2009 Kathleen Shields traveled from Simon's headquarters in Indianapolis to Cranberry approximately once a month and personally met with Santoro and other Township officials and employees, Delta and TransAssociates.  *See* Exhibit 5, Deposition of Kathleen Shields, pg. 102; Exhibit 7, Deposition of Daniel Santoro pg. 31.

86.     Ms. Shields also had telephone conversations with Township employees about the Simon project with some degree of frequency (*See* Exhibit 5, Deposition of Kathleen Shields, pg. 103) and communicated regularly with Township employees via email.  *See* Exhibit 5, Deposition of Kathleen Shields, pg. 8.

87.     From the beginning, Cranberry Township Officials and employees worked to make sure the Simon Mall would come to fruition, promoting Simon's Mall against the objections of PennDOT, and most importantly, preventing Plaintiffs from developing their property so that it would be available for Simon Mall's desired access.  In a November 2007 email, Jerry Andree, Cranberry Township Manager, told Kathleen Shields:  "We truly share the same frustration and the same goal."  *See* Exhibit 30,  Email chain between Jerry Andree, Kathleen Shields, Anthony Seitz and Kevin McKeegan.

88.     On January 24, 2007, John Milius, Chairman of the Cranberry Township Board of Supervisors wrote to Governor Rendell stating that failure to provide millions of dollars in additional funds could cause Simon to abandon the project resulting  in "dire consequences for our region."  *See* Exhibit 49, Letter from John Milius to Governor Rendell, January 24, 2007.

89.     To keep the project moving, Cranberry Township committed to "securing an additional $4.5 to $5.0 million to close the funding gap."  *Id.* To move the project along when Simon felt that PennDOT was not moving quickly enough, Cranberry Township even agreed to become the construction manager for the 228 improvements, in charge of bidding and construction. See Exhibit 37, Email 2/26/08 Kathleen Shields to Bob Goetz, John Trant et al.  The Township was willing to do this even though there would be "potential political ramifications of awarding such a big contract."  See Exhibit 64, Email 03/19/08 email chain between Kathleen Shields and John Trant.

90.     From the beginning, Mr. Santoro took the lead in promoting the Simon Mall. Between July 30-31, 2003, Tara Nicotra, Principal of Delta, and Kathleen Shields exchanged a series of e-mails discussing the PennDOT long-range plan for funding road improvements in Butler county. See Exhibit 66, Email chain between Tara Nicotra, Kathleen Shields et al.  Shields

and Delta agreed: "Dan [Santoro] will make the case for us" * * "Santoro is going to take the lead on this". *Id.*

91.    Cranberry Township Administrator, Jerry Andree, also was personally involved in numerous meetings and actively promoted the Simon Mall Development. On March 16, 2006, Jerry Andree and Dan Santoro met with Rick Hogg of PennDOT and expressed "the Townships desire to see the Simon project be developed."  Afterwards, Dan Santoro reported to Kathleen Shields:  "We think it went well with Rick. We are hopeful."  See Exhibit 74, Email chain with Dan Santoro, Anthony Seitz, Kathleen Shields.   On September 19, 2006, Jerry Andree and Dan Santoro and representatives of TransAssociates and Delta met with two Deputy Secretaries and seven other representatives of PennDOT to discuss the Simon Project. The meeting minutes indicate that Cranberry Township was completely aligned with Simon, stating:  "Andree noted Cranberry Township's commitment and support for the Simon project moving forward concurrently with the Route 228 Improvement Project. *Any highway infrastructure improvement alternative that does not include the Simon project will not be acceptable to the township*."   *See* Exhibit 67, Email from Dennis Auker to Kathleen Shields, attachment (emphasis added)

92.    Township Manager Andree repeatedly contacted state officials at Simon's request to demand that Simon's project be accommodated.   For example, on December 14, 2006, Kathleen Shields sent an email demanding action on the Simon project funding.  Eight minutes later, Jerry Andree responded stating he had spoken with the PennDOT District Engineer the day before, and was going to Speak with Secretary Yablonsky at Senator Orie's office about the Simon project.   See Exhibit 59, Email chain between Jerry Andree and Kathleen Shields, 12/14/06.

93.     Although Simon never had any legal interest in the Plaintiffs' property, from the beginning Simon planned that the main vehicular access to the Simon Mall would be a road originating at SR 228 across from Cranberry Woods Drive, bisecting the Plaintiffs property in a curve to the northwest into the Simon property.  *See* Exhibit 5, Deposition of Kathleen Shields pg.15-16, and Exhibit 21, Cranberry Town Center Project Overview. To serve the volume of traffic that would be generated by the Simon Mall development, Simon desired a road 300 feet wide, to accommodate multiple lanes of traffic.  The Simon access road would take up 4 to 4 ½ acres of the Plaintiffs 24 acre parcel.   *See* Exhibit 6, Deposition of Thomas Petrarca, pg. 115.

94.     On January 12, 2006, Bob Goetz from TransAssociates met with Dan Santoro, Jerry Andree, Cranberry Township Administrator, and Duane McKee, Cranberry Township Assistant Administrator, and representatives of HRG, the Township's engineering consultant, to discuss Simon's desired changes to the local road alignment.  Goetz "explained that the purpose of the revised local road alignment was to try and keep as much of the required R/W to construct the local roads on property that Simon has under contract and to avoid the McElroy self-storage buildings."  See Exhibit 34, Email Goetz to Shields 01/13/06 . Goetz "stated Simon's requirement to have a street (Town Center Dr.) aligned directly into the center."  *Id*.

95.     Simon and Cranberry Township employees and officials conspired to control Plaintiffs' property and prevent Plaintiffs from developing their land by amending the Cranberry Township official map to impose the Simon access road onto the Plaintiffs' property.   On November 2, 2000, Cranberry Township had adopted an official map of the portion of SR 228 including the property at issue here. The 2000 Official Map included an "area reserved for proposed public streets easements and public grounds", which was a generally straight road running from the intersection with 228 to Mars Road along the border between the properties

owned by Gantzer and the property owned by Eakins.  See Defendants Ex J Ordinance 2000-309, pg. 4, Official Map.

96.     The 2000 Official Map was adopted as the result of an agreed consent order in a lawsuit brought by Gary Sippel.  See Consent Order, Defendants Exhibit I  Mr. Sipple is the owner of the property on which Simon wished to develop the Mall.  None of the Plaintiffs' predecessors in interest were parties to the Sippel lawsuit.  *Id.* The Consent Order provided that upon request by Sippel, the Township would proceed with condemnation proceedings to acquire the land for the road, and Sippel would pay all costs of acquisition of the rights of way and road construction costs, with a contribution from Cranberry Commons, an adjoining property owner. *Id.*

97.     The road location on the 2000 Official Map was not in the location or size desired by Simon to access the Simon Mall.  *See* Exhibit 5, Deposition of Kathleen Shields at pg. 73.

98.      When Plaintiffs purchased the three parcels of property and began creating a development plan for their property, Simon and Cranberry Township Officials moved to ensure that the Plaintiffs could not act to develop their property in any way which would prevent Simon's desired Mall access.  Simon and the Cranberry Township Defendants conspired to amend the Official Township Map to burden Plaintiffs' property with the road in the location and width desired by Simon.  The access road was placed in the location and with the width and configuration that benefited Simon and which made Petrarca's development financially unfeasible.  See Exhibit 19, Deposition of Victor Hull pg 41-42.

99.     The road designed by Simon took a 300 foot swath of land through the Plaintiffs property.  See Exhibit 14, Deposition of Jack Raudenbush pgs. 41 and 80-82. The road on the 2000 Official Map followed an existing stream on the property, while the road designed by Simon

did not, further reducing the developable area.    See Exhibit 14, Deposition of Jack Raudenbush pgs. 28-29. The road had no curb cuts allowing access to the west portion of the Plaintiffs' property – completely preventing Plaintiffs from accessing the property purchased from Turnblacer and Frey.  Ms. Shields testified that curb cuts were not permitted for access into this portion of the Plaintiffs property because of stacking considerations (a line of traffic waiting to turn could cause a back-up).    See Exhibit 5, Deposition of Kathleen Shields pg 70. With the road shown on the official Map, several acres of the Plaintiffs property could only be accessed from the Simon development.   *Id.*

100.    Within months after purchasing the last parcel for the Plaintiffs' proposed development, Petrarca met with Daniel Santoro at Cranberry Township to discuss the Plaintiffs' proposed development.    See Exhibit 35, email chain between Daniel Santoro and Kathleen Shields, and Bob Goetz, July 3-7, 2006.  Petrarca requested "a copy of the most recent design of the road network and how it relates to their property."  *Id.*

101.    After meeting Mr. Petrarca, Daniel Santoro emailed Kathleen Shields and informed her of the meeting, and indicated that he wanted to discuss at their upcoming meeting "the ramifications and approach for dealing with this as we move forward."   *Id.* Santoro also requested that Simon provide him a map of the local road improvements to give to Petrarca as he did not think he had the most recent version. *Id.*

102.    Upon receiving this email from Santoro, Ms. Shields immediately contacted Bob Goetz and Dennis Auker at Delta Development, and asked them to provide information that she could use in discussions with Dan Santoro to delay the Petrarca development.   *Id.* email from Shields to Goetz and Auker.  Ms. Shields stated

> *I do not want the Petrarca Development to get a significant head start on us*—it will be one more trraunch of tenants that become unavailable to Simon (we've already

been negatively impacted by key tenants that have tone to the Continental site on 19)  ***We will be pushing the Township to be very demanding in what they require the developer to contribute to mitigate their own traffic requirements (like contributing right of way and possibly funding the earlier construction of some of the local roads).***  But I want to know what we believe PennDOT's position will be on allowing them to proceed before improvements are made on 228.

I'd like to know your thoughts before I speak with Dan [Santoro] early next week.

 *Id*. (emphasis added)

103.    Cranberry Township did exactly what Ms. Shields requested.  The Township was very demanding in what they required from the Plaintiffs.  The Township required Plaintiffs to pay for all local road improvements, including the access road for the Simon Mall, even though under the consent order (of which Plaintiffs were unaware) Sippel or his successor was required to pay for the road access they desired. The Township required Plaintiffs to pay for off-site improvements, including improvements at the intersection of Mars and Franklin Roads, one-half mile away from the property.   See Exhibit 14 Raudenbush Deposition at pg. 38-39; 44.

104.    The Township dragged out the review process for Plaintiffs development proposal by requiring Plaintiffs to address review comments that were pretextual, changed over time, cited inapplicable ordinances, had already been fully responded to, or were given at the last minute. See Exhibit 14, Raudenbush Deposition pgs 50-71; 78-80 and Exhibit 11, chart prepared by Jack Raudenbush showing the comments received from the Township which were pretextual, cited inapplicable ordinances, had already been fully responded to, or were given at the last minute.

105.    The conspirators determined that the best way to insure that Petrarca could not get a head start on Simon, and to ensure Simon had the road access they desired over Petrarca's property, was to amend the Official Map to reflect the Simon access road.  Simon's Engineer, TransAssociates, created a CAD (computer assisted design) plan of the road over Petrarca's property that Simon desired.  On December 21, 2006, Bob Goetz of TransAssociates, Simon's engineer, emailed Daniel Santoro, the Assistant Cranberry Township Manager, a drawing

entitled "Simon Local Road Plan" *to be used for the official map.* *See* Exhibit 54, 12/21/2006 Email from Bob Goetz of TransAssociates to Daniel Santoro.

106.    Mr. Santoro gave Jason Kratsas, the Township Engineer, who was an employee under the supervision of Santoro, the Simon CAD drawing, and told him to take the map though the administrative process to obtain approval to amend the official map to reflect the Simon design. *See* Exhibit 8, Kratsas Deposition pgs. 10-11; Exhibit 7, Santoro Deposition pgs. 55-56. Kratsas did not make any changes to the TransAssociates CAD drawing. *See* Exhibit 8 Deposition of Jason Kratsas, pg. 11.

107.    Although the Simon road plan substantially impacted Plaintiffs' property, Mr. Kratsas did not contact Mr. Petrarca or Plaintiffs' representatives about the proposed revision to the official map road.  See Exhibit 8 Deposition of Jason Kratsas pg. 12.  Mr. Kratsas simply followed the administrative procedure to have the Simon design adopted as the official township map. *Id.*

108.    Only a week after instructing Mr. Kratsas to have the official township map amended to incorporate the Simon road, Mr. Santoro left Cranberry Township for employment with Delta Development, Inc.  See Exhibit 7, Deposition of Daniel Santoro pg. 68, Deposition of Jason Kratsas pg. 13.   Mr. Santoro became a principal in Delta, and runs the western Pennsylvania office of Delta Development.  See Exhibit 9, Deposition of Jerry Andree pg. 11. Mr. Santoro is the contact person for Cranberry Township at Delta Development.  *Id.*

109.    At the time Santoro went to work for Delta, Delta Development had lucrative contracts with *both* Simon and Cranberry Township to obtain public funds for road improvements.  Simon employed Delta as a consultant on the Cranberry Township project to secure public funding for infrastructure (road) improvements.  See Exhibit 5, Deposition of

Kathleen Shields pg.  10 . Simon employed Delta through a series of contracts from February 2003 until early 2009, under which Simon paid Delta $11,500.00 per month, plus a bonus payment for success.   See Exhibit 5 , Deposition of Kathleen Shields pgs. 20-21 and Exhibit 23 email chain between Kathleen Shields and Tara Nicotra April 2004.

110.    At the same time, Cranberry Township also employed Delta as a consultant to obtain funding to support infrastructure improvements, for a base fee ranging from $6,500.00 to $8,500.00 per month. See Exhibit 9, Deposition of Jerry Andree pgs. 10-11, and Exhibit 24 Consultant Agreement, December 2005, TWP 031006-10; and Exhibit 25 Consultant Agreement June 9, 2009, TWP 031000-031004. Cranberry Township also had contracts with Delta to provide other services, including a one year contract for community planning and economic development for   $112,320.00.   See Exhibit 26, Consultant Agreement June 28, 2007, TWP 031017-031028.

111.    Mr. Santoro testified that when he left his public employment with Cranberry Township on December 30, 2006, he had a personal services contract with Delta Development to serve as a consultant for Cranberry Township during the transition so that he could continue to work on several projects at the Township.    See Exhibit 7, Deposition of Daniel Santoro pgs. 68-69.

112.    Mr. Santoro testified that he did not do any work on the Simon project in the first year after he left Cranberry Township and went to work for Delta Development, (see Exhibit 7, Deposition of Daniel Santoro, pg. 77), however, the evidence contradicts Santoro's claim.   Jason Kratsas testified that he discussed the revisions to the official map road with Mr. Santoro after he went to work at Delta. See Exhibit 8, Deposition of Jason Kratsas pgs. 13-14. Further, in the first month of his employment at Delta, Mr. Santoro helped Mr. Kratsas get the map revisions

through the administrative process.  See Exhibit 8, Deposition of Jason Kratsas pg. 15.  Mr.

Santoro personally attended the Cranberry Township Planning Advisory Commission and

presented the proposed revision of the official map.  See Exhibit 27, Minutes of Planning

Advisory Commission January 8, 2007.  Santoro did not inform the Planning Advisory

Commission that the revision to the road on the official map was designed by Simon.  *Id.*

113.    Daniel Santoro continued to work on the Simon project at Delta Development. On

February 12, 2007, just over a month after he began working for Delta Development, Dan

Santoro was copied on an email from Dennis Auker, one of the Principals of Delta, to Kathleen

Shields concerning the revised funding matrix for the Simon road project.  See Exhibit 28, Email

from Dennis Auker to Kathleen Shields, 02/12/07.  In a November 21, 2007 email from Anthony

Seitz at Delta to Kathleen Shields, Dan Santoro was identified as a "key attendee" from Delta on

the Simon project for a meeting with the Township and PennDOT.  *See* Exhibit 30,  Email chain

between Jerry Andree and Kathleen Shields 11/21/07.

114.    Mr. Santoro's activities to promote the Simon project appear to violate 65 Pa.

C.S. §1103, the Pennsylvania Ethics Law.  This statute provides in pertinent part:

> (a)     Conflict of interest – No public official or public employee shall engage in
> conduct that constitutes a conflict of interest.
> * * *
> (c)     Accepting improper influence - No public official, public employee or
> nominee or candidate for public office shall solicit or accept anything of monetary value,
> including a gift, loan, political contribution, reward or promise of future employment,
> based on any understanding of that public official, public employee or nominee that the
> vote, official action or judgment of the public official or public employee or nominee or
> candidate for public office would be influenced thereby.
> * * *
> (g)     Former official or employee - No former public official or public
> employee shall represent a person, with promised or actual compensation, on any matter
> before the governmental body with which he has been associated for one year after he
> leaves that body.

115.   After Daniel Santoro left his employment with Cranberry Township and went to work for Delta, John Trant became the point person at the Township for the Simon Development.  See Deposition of Kathleen Shields pg. 78.  Trant spent 30-40% or more of his time on the Simon project for more than two years.  See Exhibit 17, Deposition of John Trant pgs. 77-78.  Mr. Trant has not had any other project in Cranberry Township in his entire employment that had the number of meetings and time involved as the Simon Mall project.  See Exhibit 17, Deposition of John Trant at pg. 77.

116.   Mr. Trant continued Mr. Santoro's efforts to bring the Simon project to fruition, at the expense of the Plaintiffs.   Mr. Trant favored Simon in ways both large and small.  For example, when Plaintiffs sought documents from Cranberry Township, they were required to complete public records requests, and requests for information concerning Simon were denied.   See Exhibit 43, Public Records request from Joel Aaronson for documents concerning Simon development and denial letters from Jerry Andree.

117.   In contrast, Cranberry Township employees provided Simon with documents concerning Plaintiffs' proposed development and even created new documents as requested by Simon.   See Exhibit 37, email from Kathleen Shields to Bob Goetz et al. 3/26/08. Kathleen Shields requested, "a plan which overlays, perhaps in three colors, the location of the original road that cut through the Petrarca property on the official map that was in place when we first got involved with the property; the road location on the current official map and the current alignment on the latest plans which I believe strays slightly from the current map."   Twenty-four hours later, John Trant created and provided the requested three color overlay, (See Exhibit 38, email from John Trant to Bob Goetz and Kathleen Shields 3/27/08 )

and a drawing overlaying the original official map with the current proposal.  See Exhibit 20, Email from John Trant to Kathleen Shields 3/28/08.

118.    Other Township employees and consultants were also working with Simon in ways that prevented them from fairly reviewing Plaintiffs' development application.  At the same time that attorney Neva Stanger was representing the Township in the hearing before the Board of Supervisors on Plaintiffs' Development applications, she was also involved in drafting a Development Agreement between Simon and the Township for the construction of the local road infrastructure, to be financed with more than 65 million dollars in public money, in order to fast track the construction for the benefit of the Simon mall development. Under the agreement, the local road improvements, including the Simon access road over the Plaintiffs property were defined, and the Township agreed that it would "enact and/or adopt such ordinances and/or resolutions as may be necessary to effect the purposes of this Agreement." See Exhibit 29,  Email correspondence 11/09/07 and attached agreement.  The Township would have been in violation of this agreement if they approved the Plaintiffs' proposed development with a road location anywhere other than desired by Simon.  This agreement reveals the hearing before the Board of Supervisors to have been a sham, with a forgone conclusion.

119.    The Township Supervisors also worked to exert pressure on PennDOT to provide the millions of dollars of funding Simon sought for their Mall.  In mid-2007, John Trant, Jerry Andree, and Dick Hadley, chairman of the Board of Supervisors, traveled to Harrisburg to make the case to PennDOT and the Department of Economic Development to obtain additional public funds for the Simon Mall project.  See Exhibit 17 Deposition of John Trant, pgs. 76-77. At the same time the Board of Supervisors was meeting to hear and decide the

Plaintiffs Land Development applications, the Supervisors were working to promote the Simon Mall development, a clear conflict of interest.  On January 31, 2008, Supervisors Root and Skorupan  (as well as Township Manager Jerry Andree) attended a meeting to show support for the Simon Property Group Project.  See Exhibit 57, Email from Bryan Hollihan (State Senator Jane Orie's office) to Root, Skorupan, et al. On October 10, 2008, Supervisors John Skorupan, Dick Hadley, Bruce Mazzoni, and David Root all attended a meeting organized by the Chamber of Commerce to support the Simon Development.  See Exhibit 60, Minutes of Route 228 Business Update Meeting ; See also Exhibit 58 list of confirmed Attendees to September 26, 2008 meeting including Supervisors John Skorupan, David Root and Bruce Mazzoni.

120.   On August 7, 2007, Plaintiffs filed with Cranberry Township applications for approval of Preliminary Land Development and Conditional Use Plans to develop a 134,000 square foot shopping plaza.  *See* Defendants Exhibits P1 and P2 and Q.  The design proposed by Plaintiffs in their application proposed a private access drive into the Plaintiffs' property, similar to the access drives into the adjoining Cranberry Commons retail development.  See Defendant's Exhibit P2, at pg. 5, compare with access drives into Cranberry Commons shown on Defendant's Exhibit 1.

121.   Cranberry Township staff informed Plaintiffs that they would require any plan to provide a road connecting Route 228 and Mars Road, so the Plaintiffs revised their plans and had Raudenbush Engineering submit a revised Site Plan with the requested connector road on or about September 24, 2007.  See Exhibit 52, Revised Preliminary Land Development Plan dated 09/24/07.  The road proposed by Petrarca generally followed the

location of the road shown on the 2000 Official Map and the existing natural stream on the property.  *Id.*

122.     Simon soon obtained a copy of Plaintiffs revised site plan, and Simon and Delta began working behind the scenes with Cranberry Township officials and employees to ensure that the Plaintiffs' development Plan would be rejected.  On November 1, 2007, Bill Ranek, Simon's civil engineer on the Mall project, emailed Bob Goetz at Delta and Kathleen Shields a copy of the Plaintiffs' Site Plan, stating*:  "Simon wants to provide a list of issues that make this plan unacceptable in the overall development scheme.  Your thoughts on the cross sections and location of the first intersection would be appreciated as well as any other observations you may have."*     See Exhibit 31, Email chain November 1-2, 2007 between Bill Ranek, Kathleen Shields, Bob Goetz (emphasis added)

123.     On that same date, Kathleen Shields emailed John Trant at Cranberry Township, setting up several meetings with Mr. Trant concerning the Simon development, and asking *"What is your deadline for responding to Petrarca –we have some comments we wanted to share with you on their site plan."*    See Exhibit 32, Email chain October 31-November 1, 2007 between Dennis Auker, Kathleen Shields, Bob Goetz, John Trant and others. (emphasis added)

124.     By the next month, Simon and Cranberry Township had agreed that Cranberry Township would take by condemnation whatever roadway Simon desired.   As Kathleen Shields reported to Bob Goetz on December 7, 2007:

> Bill –by the way…when speaking with John Trant today, he indicated that the Township would be willing to condemn more than the roadway plus the 14 feet of buffer if we need it for slope easements and support.  They can take whatever we need for the road.  They can't take any additional property that would be viewed as condemning for a private use, e.g. the parcel to the west of the Petrarca entry drive.  If that comes into the fold, it will be as part of the settlement negotiation in court after the quick take for the

roads.  But anything we need for slopes to support the road from existing grades if fair game. See Exhibit 36, email chain December 7, 2007 between Kathleen Shields, Bob Goetz, John Trant and others.

125.     Although Cranberry Township insisted that their concern with Plaintiffs' development proposal, and the reason for its rejection, was because it did not provide for construction of a road in the location shown on the 2007 official map, the evidence obtained in discovery shows that Simon was free to relocate the road on Plaintiffs property to whatever location they desired.  Numerous emails between John Trant and Kathleen Shields reflected that Simon repeatedly modified the road location to suit Simon's needs, and Cranberry had no objection to the Simon modifications.  See Exhibit 28, Email from Dennis Auker to Kathleen Shields 02/12/07 (pg 2); Exhibit 37, Email from Kathleen Shields to Bob Goetz et al 03/26/08; Exhibit 20, Email from John Trant to Kathleen Shields 03/28/08.

126.     The only concerns Cranberry officials and employees expressed about the changes were *not* that the changes adversely impacted the Township's road planning, but rather that they might reveal to the Plaintiffs that the Township had no interest in the road location separate from Simon.  For example, on March 28, 2008, John Trant wrote Kathleen Shields:

> The alignment of the Petrarca road has changed more than I had realized.  I now think we need to either come to a resolution on the local road issue prior to your approaching him, or we need to accept the fact that the alignment may change from the meets and bounds description that your current appraisal is based on and proceed anyway. See Exhibit 20, Email from John Trant to Kathleen Shields, 03/28/08.

127.     Similarly, on April 11, 2008, Simon had TransAssociates make additional changes to the road going over the Plaintiffs' property, and Kathleen Shields asked John Trant:  "Would it be your intent to change official map again or not?" Exhibit 39, Email chain between John Trant and Kathleen Shields, 04/11/08 to 04/14/08. Mr. Trant's response

is an admission by the Township that the reason for the Township's change to the official

Map was not to create a road system that would serve the needs of the township, as the

Township has maintained, but to put the Simon road on the Official Map before Plaintiffs

filed their Development Plan.  Trant stated:

> **We wouldn't change the official map because there is no benefit in doing so because it would be subsequent to Petrarca's submission of his plan.**  A change in alignment wouldn't affect our ability to condemn the property, but it will likely affect the value attached to the ROW.  We can talk at length later, but the best scenario is one in which you negotiate the purchase of the ROW from Petrarca following the new alignment.  I wouldn't structure it as a change on our end, rather an option that is more sensitive to what Petrarca wants to do on his site.  **If there is any perception that we changed our mind, he will seize on that.**  The alternative is reverting back to the current official map alignment, which will force dealing with the self storage property. *Id.* (emphasis added)

128.    A few days later, Ms. Shields sent an email to Bob Goetz, telling him not

to submit any updated traffic studies to the Township without her approval.  She stated:

> If you have a sketch of how the new road would sit on the Petrarca plan, could you send it to me.  We are meeting with Petrarca on Monday in Pittsburgh.  **The City [Township] is now very sensitized to the clear case Petrarca is building to argue that these roads serve Simon's purpose and not the Township's.**  We need to be careful about what we submit …Don't submit any updated traffic studies to the Township without first getting them to us.   See Exhibit 40, Email from Kathleen Shields to Bob Goetz, 04/17/08 (emphasis added).

129.    Cranberry Township and its officials and employees maintained that

Plaintiffs could not proceed with their development unless they mitigated their traffic impacts

on SR 228 and other township roads.  The Township claimed that this mitigation was

required because even the relatively small amount of additional traffic anticipated to be

generated by the Plaintiffs development would put the intersections in failing status, because

there was already so much traffic in the area.

130.    No such mitigation was required by Simon or Westinghouse, even though

their traffic studies revealed that the same intersections would degrade to failure with the

traffic anticipated to be generated by those developments.  HRG, the Townships' traffic engineer reviewed the "Addendum to the Final Comprehensive Traffic Study for Proposed Cranberry Town Center", analyzing the effect to traffic if the Simon Mall was built and SR was not widened with two additional lanes, in order to save money.  See Exhibit 41, email from Bob Goetz to John Trant and Kathleen Shields and letter from HRG to Duane McKee, Assistant Township Manager, 08/13/08 attached thereto.

131.     HRG found the intersections at SR 228 & Gantzer Drive would degrade to failing conditions, the intersection at SR 228 & Kristoffer Drive would degrade 2 levels of service to an unacceptable level E; and SR 228 and Interstate 79 will fail between 2017 and 2022, and traffic at other intersections would degrade.  Rather than rejecting the Simon plan, however, John Trant and HRG met with Simon, and HRG agreed to strike or modify their comments to support the proposed Simon development.  *See* Exhibit 41, email from Bob Goetz to John Trant, cc Kathleen Shields.

132.     Similarly, HRG reviewed the MSA/Westinghouse Development within Cranberry Woods on June 14, 2007.  This development is right across the street from the Plaintiffs' property, and was seeking Cranberry Township approval at the same time as the Plaintiffs. HRG determined that SR 228 could support the increased traffic volumes *assuming that the SR228 widening and laning included as part of the Simon and PennDOT improvement projects occurred.*   See Exhibit 42, letter from HRG to Paul Koza, Jr. PennDOT, 06/14/07. TWP 031730-031737.

133.     Cranberry Township approved the Westinghouse Land Development Application and authorized Westinghouse to proceed with the construction of one million square feet of office space, *without waiting for the SR228 widening*, which in fact did not

occur.  In contrast, Cranberry Township refused to approve Plaintiffs' development plan, even though Plaintiffs stated that they were requesting contingent approval and would not begin construction until the proposed widening of SR 228 was completed. See Deposition of Thomas Petrarca pg 140.  The Plaintiffs representatives met with representatives from Cranberry Township, including John Trant, who told them that they could apply for approval, contingent on the future development of 228 by PennDOT, but then subsequently, were told that procedure was not acceptable.  See Deposition of Victor Hull pg. 46.

Respectfully submitted,

/s/Cherry Lynne Poteet
Cherry Lynne Poteet, Esq. (PA #93223)
cpoteet@daniluklaw.com
DANIEL DANILUK, LLC
1129 Niles Cortland Road SE
Warren, Ohio  44484
Phone: (330) 609-9999
Attorney for Plaintiffs