IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRANBERRY PROMENADE, INC., NAP ASSOCIATES, INC., NAP ASSOCIATES 2, INC., and THOMAS W. PETRARCA, t/d/b/a THE PETRARCA COMPANIES, | ) ) ) ) | CASE NUMBER:  2:09-1242-NBF |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| CRANBERRY TOWNSHIP, RICHARD HADLEY, JOHN SKORUPAN, JOHN W. MILIUS, DAVE ROOT, BRUCE MAZZONI, RON HENSHAW and JOHN K. TRANT, JR., | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' "ADDITIONAL FACTS"

AND NOW, come the Defendants, Cranberry Township, Richard Hadley, John Skorupan, John W. Milius, Dave Root, Bruce Mazzoni, Ron Henshaw and John K. Trant, Jr., by and through their attorneys, Cipriani & Werner, P.C. and file the within Response to Plaintiff's "Additional Facts", stating as follows:

### ADDITIONAL FACTS PRESENTED BY PLAINTIFF

76.     On October 6, 2003, Plaintiff Cranberry Promenade, Inc. acquired the first property in this assemblage, two parcels totaling 14.548 acres, from Mr. and Mrs. Gantzer, paying $2.5 million. *See* Exhibit 2, Gantzer Deed; Exhibit 5, Deposition of Thomas Petrarca 27.

**ANSWER:**

**Admitted.  By way of clarification, Mr. Petrarca's deposition is Exhibit 6.**

77.     On July 20, 2005, Plaintiff NAP Associates, Inc. purchased two more parcels totaling 2.869 acres from Turnblacer, Frey and Ringeisen for $700,000.00. See Exhibit 3, Trunblacer Deed; and Exhibit 6, Deposition of Thomas Petrarca pg. 28.

**ANSWER:**

**Admitted.**

78.     On May 8, 2006, Plaintiff NAP Associates 2, Inc., purchased from Eakins an approximately 6.838 acre vacant parcel of property which was between the former Gantzer and former Turnblazer properties. See Exhibit 4, Eakins Deed.

**ANSWER:**

**Admitted.  By way of further response, Plaintiffs paid $2.45 million.**

79.     Simon Property Group, (hereinafter "Simon") a national shopping center developer, acquired options in 2003 on a parcel of land northwest of the Plaintiffs property which was owned by Mr. Sippel. Exhibit 5, Deposition of Kathleen Shields, pg. 13; Simon parcel outlined in black on Exhibit 1.

**ANSWER:**

**Admitted that Kathy Shields testified that Simon accepted an assignment of options from a prior developer who had tried to develop the site in 2003.  It is denied that any of the citations provided by Plaintiffs support that Mr. Sippel owns the subject property.**

80.     Kathleen Shields, Senior Vice President for Simon Property Group, was the developer of the Cranberry Mall project, (See Exhibit 5, Deposition of Kathleen Shields, pg. 11) in charge of the Cranberry project from the beginning. See Exhibit 5, Deposition of Kathleen Shields, pg.13.

**ANSWER:**

**Admitted.**

81.     Simon intended to develop a lifestyle mall on the property with approximately

950,000 square feet of retail space (hereinafter "Simon Mall"). See Exhibit 21, Cranberry Town

Center Project Overview.

**ANSWER:**

**Plaintiffs' Exhibit 21 is entitled "Cranberry Town Center Project Overview."  However, to the extent that Paragraph 81 attempts to characterize said document as a formal plan, said fact is denied. Simon did not submit a land development application to the Township.**

82.     Simon and its consultants Delta Development and TransAssociates, and

employees and officials of Cranberry Township, conspired to prevent Plaintiffs' from developing

their property, so that it would be available for a multi-lane access road to the Simon Mall,

designed to Simon's specifications. In the Spring of 2004, Kathleen Shields organized a group

made up of "Simon, Delta, Simon's Traffic engineers [TransAssociates] and the Township [Ms.

Shields specifically referenced Jerry Andree and Daniel Santoro]. See Exhibit 50, Letter from

Kathleen Shields to Jerry Andree and Daniel Santoro, April 30, 2004.

**ANSWER:**

**The first sentence does not contain a citation to the record and is argument of counsel.  The letter attached does not supports the facts contained in this paragraph.  Rather, said letter requests a meeting with the Township and "poses a lengthy list of issues and questions" for the Township and Simon Property Group's consultants to be addressed at a meeting with PennDOT.  There is no mention of Plaintiffs' property in the identified exhibit.**

83.     This group met at least monthly through Spring of 2009 to strategize a game plan.

Id. Pg. 2 The group focused on three goals: Obtaining public funding for the road improvements

required to SR 228, preventing Plaintiffs from developing their property prior to Simon's

3

development, and insuring Simon had whatever access it desired over the Plaintiffs property to

the Simon Mall.

**ANSWER:**

**Denied.  There is no evidence of record, including Exhibit 15, that the group identified by
the Plaintiffs met for the purpose of thwarting the development of the Plaintiff or met to
secure access to the "Simon Mall" (or met monthly for that matter).  The evidence cited by
Plaintiffs and Defendants clearly demonstrates that the meetings were focused on the Route
228 transportation improvement project.**

84.     Daniel Santoro was the Assistant Township Manager of Cranberry Township in

charge of planning and development from 2000 to December 30, 2006. See Exhibit 7, Deposition

of Daniel Santoro, pgs. 8-9. He was the point person for Simon at the Township from the time

Simon first approached the Township about their proposed development. See Exhibit 7,

Deposition of Daniel Santoro pg. 28; Exhibit 5, Deposition of Kathleen Shields pg. 22.

**ANSWER:**

**It is admitted that Daniel Santoro was the Assistant Township Manager of Cranberry
Township and had responsibilities included planning and development from 2000 to 2006.
It is further admitted that Mr. Santoro was the primary contact person for Simon.  To the
extent that Paragraph 84 implies that Simon submitted a proposed development to the
Township, said allegation is not supported by the citation contained therein and in fact no
land development plan was submitted by Simon to the Township.**

85.     From 2003 until 2009 Kathleen Shields traveled from Simon's headquarters in

Indianapolis to Cranberry approximately once a month and personally met with Santoro and

other Township officials and employees, Delta and TransAssociates. See Exhibit 5, Deposition

of Kathleen Shields, pg. 102; Exhibit 7, Deposition of Daniel Santoro pg. 31.

**ANSWER:**

**Denied.  Ms. Shields testified that she does not recall the number of times that she met with
individuals from Cranberry Township.  However, she noted that she was in Cranberry in
relation to the Route 228 improvement project approximately once a month.  Mr. Santoro
further testified that between the period of 2003 and the end of 2006, Mr. Santoro met with
Ms. Shields approximately ten times.  See, Exhibit K, Santoro deposition, page 32.**

4

86.     Ms. Shields also had telephone conversations with Township employees about the Simon project with some degree of frequency (See Exhibit 5, Deposition of Kathleen Shields, pg. 103) and communicated regularly with Township employees via email. See Exhibit 5, Deposition of Kathleen Shields, pg. 8.

**ANSWER:**

**Ms. Shields testified that she had telephone calls with some degree of frequency. However, it would depend upon the nature of the issues pending at the time and there were lulls between the communications. With respect to e-mails, Ms. Shields testified that e-mail was used "regularly". See, Exhibit 5, deposition of Kathleen Shields, page 8. However, the use of email was to communicate with a host of individuals related to the project. See Exhibit TT, Shields Deposition, p. 9.**

87.     From the beginning, Cranberry Township Officials and employees worked to make sure the Simon Mall would come to fruition, promoting Simon's Mall against the objections of PennDOT, and most importantly, preventing Plaintiffs from developing their property so that it would be available for Simon Mall's desired access. In a November 2007 email, Jerry Andree, Cranberry Township Manager, told Kathleen Shields: "We truly share the same frustration and the same goal." See Exhibit 30, Email chain between Jerry Andree, Kathleen Shields, Anthony Seitz and Kevin McKeegan.

**ANSWER:**

**There is no citation to the record in support of the first sentence and contains argument of counsel. That is because there is no evidence of record or otherwise to support counsel's assertion.  The second sentence contained in Paragraph 87 is contained in the exhibit, however, it is in relation to the PennDOT Route 228 Project.**

88.     On January 24, 2007, John Milius, Chairman of the Cranberry Township Board of Supervisors wrote to Governor Rendell stating that failure to provide millions of dollars in additional funds could cause Simon to abandon the project resulting in "dire consequences for our region." See Exhibit 49, Letter from John Milius to Governor Rendell, January 24, 2007.

**ANSWER:**

**Admitted. By way of further response, again the focus of the letter submitted to the Governor by the Township was in relation to PennDOT's Route 228 project.**

89.     To keep the project moving, Cranberry Township committed to "securing an additional $4.5 to $5.0 million to close the funding gap." Id. To move the project along when Simon felt that PennDOT was not moving quickly enough, Cranberry Township even agreed to become the construction manager for the 228 improvements, in charge of bidding and construction. See Exhibit 37, Email 2/26/08 Kathleen Shields to Bob Goetz, John Trant et al. The Township was willing to do this even though there would be "potential political ramifications of awarding such a big contract." See Exhibit 64, Email 03/19/08 email chain between Kathleen Shields and John Trant.

**ANSWER:**

**The first sentence is admitted. The second sentence is not supported by the exhibit identified. The third sentence is admitted, however, the reference to the "political ramifications" is in relation to the amount of the contract to be awarded. See Exhibit 64.**

90.     From the beginning, Mr. Santoro took the lead in promoting the Simon Mall. Between July 30-31, 2003, Tara Nicotra, Principal of Delta, and Kathleen Shields exchanged a series of e-mails discussing the PennDOT long-range plan for funding road improvements in Butler county. See Exhibit 66, Email chain between Tara Nicotra, Kathleen Shields et al. Shields and Delta agreed: "Dan [Santoro] will make the case for us" * * "Santoro is going to take the lead on this". Id.

**ANSWER:**

**There is no citation to the record in support of the first sentence and it constitutes argument of counsel, and no such evidence exists. The second sentence of Paragraph 90 is admitted. The third sentence of Paragraph 90 is admitted. By way of further response, the**

long range plan ("LRP") for funding the Route 228 project that was discussed in the e-mails was being requested by those other than Simon. See Exhibit 66.

91.     Cranberry Township Administrator, Jerry Andree, also was personally involved in numerous meetings and actively promoted the Simon Mall Development. On March 16, 2006, Jerry Andree and Dan Santoro met with Rick Hogg of PennDOT and expressed "the Townships desire to see the Simon project be developed." Afterwards, Dan Santoro reported to Kathleen Shields: "We think it went well with Rick. We are hopeful." See Exhibit 74, Email chain with Dan Santoro, Anthony Seitz, Kathleen Shields. On September 19, 2006, Jerry Andree and Dan Santoro and representatives of TransAssociates and Delta met with two Deputy Secretaries and seven other representatives of PennDOT to discuss the Simon Project. The meeting minutes indicate that Cranberry Township was completely aligned with Simon, stating: "Andree noted Cranberry Township's commitment and support for the Simon project moving forward concurrently with the Route 228 Improvement Project. Any highway infrastructure improvement alternative that does not include the Simon project will not be acceptable to the township." See Exhibit 67, Email from Dennis Auker to Kathleen Shields, attachment (emphasis added)

**ANSWER:**

**The first sentence of Paragraph 91 is denied. Plaintiffs fail to provide a citation to the record because no such evidence exists. With respect to sentence three, it is admitted that the identified quote is contained in the exhibit. However, it is impossible to identify what conversation is being referenced. It is admitted that on September 19, 2006, a meeting with the identified representatives took place. The purpose of the meeting was to discuss PennDOT's Route 228 Project. The partial quote identified by the Plaintiff is contained in the attachment to Exhibit 67, however, the remaining portion of the quote is material to its context: "the Simon proposal meets the Township's community development vision and provides the opportunity to more effectively manage growth and development along the Route 228 corridor in Cranberry Township." See page 2 of the attachment to the e-mail identified as Exhibit 67.**

92.     Township Manager Andree repeatedly contacted state officials at Simon's request to demand that Simon's project be accommodated. For example, on December 14, 2006,

Kathleen Shields sent an email demanding action on the Simon project funding. Eight minutes

later, Jerry Andree responded stating he had spoken with the PennDOT District Engineer the day

before, and was going to Speak with Secretary Yablonsky at Senator Orie's office about the

Simon project. See Exhibit 59, Email chain between Jerry Andree and Kathleen Shields,

12/14/06.

**ANSWER:**

**The first sentence of Paragraph 92 is denied, again, because no such evidence exists and the first sentence is simply unsupported argument. By way of further response, the sequence that Plaintiffs attempt to portray did not occur. Mr. Andree was carbon copied on the e-mail from Ms. Shields and responded that he already had a discussion concerning the PennDOT Route 228 Project funding issue. Plaintiffs misrepresent Mr. Andree's comments as though they were about Simon as opposed to PennDOT's Route 228 project. See Exhibit 59.**

93.     Although Simon never had any legal interest in the Plaintiffs' property, from the

beginning Simon planned that the main vehicular access to the Simon Mall would be a road

originating at SR 228 across from Cranberry Woods Drive, bisecting the Plaintiffs property in a

curve to the northwest into the Simon property. See Exhibit 5, Deposition of Kathleen Shields

pg.15-16, and Exhibit 21, Cranberry Town Center Project Overview. To serve the volume of

traffic that would be generated by the Simon Mall development, Simon desired a road 300 feet

wide, to accommodate multiple lanes of traffic. The Simon access road would take up 4 to 4 ½

acres of the Plaintiffs 24 acre parcel. See Exhibit 6, Deposition of Thomas Petrarca, pg. 115.

**ANSWER:**

**The first sentence of Paragraph 93 is not supported by the deposition of Ms. Shields. Ms. Shields was referencing one of the proposed layouts as contained in marketing material prepared by Simon. See Exhibit 5, pages 15 and 16 and Exhibit 21. Based upon Exhibit 21, the main vehicular access to the envisioned mall would be via the flyover from I-79. The road referenced by Ms. Shields at her deposition would be for traffic travelling westbound on Route 228. Additionally, the proposed road system contained in Simon's marketing materials contained in Exhibit 21 does not match the Cranberry 2007 Official Map. Compare Plaintiff's Exhibit 21 to Exhibit UU. The second sentence of Paragraph 93**

is denied. **Plaintiffs' portrayal of the 300 foot right of way reservations implemented by the official map is not a designed street or roadway. It is a reservation to be set aside for future access to be designed in accordance with the traffic needs of the development and the surrounding Rte 228 corridor development. Plaintiffs failed to provide any citation to the record to support the second sentence. By way of further response, a 300-foot right-of-way would accommodate a 12 lane road, which is significantly larger than either U.S. Route 19 or Route 228. See Exhibit VV, Affidavit of Jason Kratsas.**

94. On January 12, 2006, Bob Goetz from TransAssociates met with Dan Santoro, Jerry Andree, Cranberry Township Administrator, and Duane McKee, Cranberry Township Assistant Administrator, and representatives of HRG, the Township's engineering consultant, to discuss Simon's desired changes to the local road alignment. Goetz "explained that the purpose of the revised local road alignment was to try and keep as much of the required R/W to construct the local roads on property that Simon has under contract and to avoid the McElroy self-storage buildings." See Exhibit 34, Email Goetz to Shields 01/13/06. Goetz "stated Simon's requirement to have a street (Town Center Dr.) aligned directly into the center." Id.

**ANSWER:**

**The first sentence of Paragraph 94 does not contain a record citation, is unsupported argument, and is therefore denied. The remaining quotes contained in Paragraph 94 are contained within Exhibit 34. However, a contextual reading of Exhibit 34 shows that the quotes cited are in relation to the flyover containing a roundabout and Simon's desire to have that be a throughway—not a discussion concerning Mr. Petrarca's property.**

95. Simon and Cranberry Township employees and officials conspired to control Plaintiffs' property and prevent Plaintiffs from developing their land by amending the Cranberry Township official map to impose the Simon access road onto the Plaintiffs' property. On November 2, 2000, Cranberry Township had adopted an official map of the portion of SR 228 including the property at issue here. The 2000 Official Map included an "area reserved for proposed public streets easements and public grounds", which was a generally straight road running from the intersection with 228 to Mars Road along the border between the properties

owned by Gantzer and the property owned by Eakins. See Defendants Ex J Ordinance 2000-309,

pg. 4, Official Map.

**ANSWER:**

**The first sentence of Paragraph 95 is unsupported argument and does not contain a citation to the record because no such evidence exists in the record, and therefore the assertion is denied.  The remaining portion of Paragraph 95 in relation to the 2000 Official Map is admitted.**

96.     The 2000 Official Map was adopted as the result of an agreed consent order in a

lawsuit brought by Gary Sippel.  See Consent Order, Defendants Exhibit I.  Mr. Sipple is the

owner of the property on which Simon wished to develop the Mall. None of the Plaintiffs'

predecessors in interest were parties to the Sippel lawsuit. Id. The Consent Order provided that

upon request by Sippel, the Township would proceed with condemnation proceedings to acquire

the land for the road, and Sippel would pay all costs of acquisition of the rights of way and road

construction costs, with a contribution from Cranberry Commons, an adjoining property owner.

Id.

**ANSWER:**

**The Consent Order is a document which speaks for itself.  By way of further response, while it is admitted that the predecessors in interest to the property that was owned by Plaintiff were not parties to the Sippel law suit, said property owners were consulted by Daniel Santoro concerning the creation of the 2000 Official Map.  See Exhibit WW, Santoro deposition, pages 17-20.**

97.     The road location on the 2000 Official Map was not in the location or size desired

by Simon to access the Simon Mall. See Exhibit 5, Deposition of Kathleen Shields at pg. 73.

**ANSWER:**

**Denied. The citation to Ms. Shields' deposition does not support the statement of fact. Further, on page 73 of her deposition, Ms. Shields testified that extensive traffic analysis was done for Simon, Creative Realty and the Petrarca Project, which showed that traffic volumes were going to be significantly higher than originally anticipated.  As such, the official map needed to be updated to include a wider reservation of right of way  that could**

10

accommodate the anticipated traffic of at least three (possibly more depending upon how the land was sub-divided) projects in the quadrant. In sum, the road location was based on traffic studies. See also Exhibit K at 100-107, Santoro deposition.

98.     When Plaintiffs purchased the three parcels of property and began creating a

development plan for their property, Simon and Cranberry Township Officials moved to ensure

that the Plaintiffs could not act to develop their property in any way which would prevent

Simon's desired Mall access. Simon and the Cranberry Township Defendants conspired to

amend the Official Township Map to burden Plaintiffs' property with the road in the location and

width desired by Simon. The access road was placed in the location and with the width and

configuration that benefited Simon and which made Petrarca's development financially

unfeasible. See Exhibit 19, Deposition of Victor Hull pg 41-42.

**ANSWER:**

**The first and second sentences of Paragraph 98 do not contain a citation to the record, are unsupported argument. No record evidence supports these bald assertions. The third sentence of Paragraph 98 is denied. Plaintiffs' engineer admitted that there are possible development alternatives for the Plaintiffs. See Exhibit HH, Raudenbush deposition, pages 13-15. By way of further response, Echo's (the current developer) proposed development provides for additional square footage on the property and still conforms with the 2007 Official Map road. See Exhibits XX; See also Exhibit CC, DD and EE.**

99.     The road designed by Simon took a 300 foot swath of land through the Plaintiffs

property. See Exhibit 14, Deposition of Jack Raudenbush pgs. 41 and 80-82. The road on the

2000 Official Map followed an existing stream on the property, while the road designed by

Simon did not, further reducing the developable area. See Exhibit 14, Deposition of Jack

Raudenbush pgs. 28-29. The road had no curb cuts allowing access to the west portion of the

Plaintiffs' property – completely preventing Plaintiffs from accessing the property purchased

from Turnblacer and Frey. Ms. Shields testified that curb cuts were not permitted for access into

this portion of the Plaintiffs property because of stacking considerations (a line of traffic waiting

to turn could cause a back-up). See Exhibit 5, Deposition of Kathleen Shields pg 70. With the

road shown on the official Map, several acres of the Plaintiffs property could only be accessed

from the Simon development. Id.

**ANSWER:**

**The first sentence of Paragraph 99 is denied. The 2007 Official Map, which pre-dates Plaintiffs' land development application, had a 300 foot reserved portion in which a six lane road could fit. See Exhibit UU and Exhibit VV, Jason Kratsas' Affidavit. A six lane road would not require a 300 foot right-of-way. The 2007 Official Map is a planning document. See Exhibit VV. The 2007 Official Map shows a six lane road running under the section that is reserved. See Exhibit UU. The second sentence of Paragraph 99 is denied. See Echo's Land Development Application, which has now been referred to the Board of Supervisors by the Planning Advisory Commission. See Exhibit CC. There is no record evidence to support the third sentence of Paragraph 99. With respect to the fourth sentence on the issue of curb cuts, Kathy Shields did not state that curb cuts were not permitted, just that they were not shown on the map. Further, Ms. Shields does not testify that the "only" access would be from the Simon Development. See Exhibit 5, page 70.**

100.    Within months after purchasing the last parcel for the Plaintiffs' proposed

development, Petrarca met with Daniel Santoro at Cranberry Township to discuss the Plaintiffs'

proposed development. See Exhibit 35, email chain between Daniel Santoro and Kathleen

Shields, and Bob Goetz, July 3-7, 2006. Petrarca requested "a copy of the most recent design of

the road network and how it relates to their property." Id.

**ANSWER:**

**Admitted, with the exception that this Defendant does not have knowledge as to the sequence of the meeting in relation to when Plaintiffs purchased the "last parcel" for the proposed development, and this assertion is not material to the determination of the motion for summary judgment.**

101.    After meeting Mr. Petrarca, Daniel Santoro emailed Kathleen Shields and

informed her of the meeting, and indicated that he wanted to discuss at their upcoming meeting

"the ramifications and approach for dealing with this as we move forward." Id. Santoro also

requested that Simon provide him a map of the local road improvements to give to Petrarca as he did not think he had the most recent version. Id.

**ANSWER:**

**The quote attributed to Mr. Santoro is accurate in so far as it is a partial reflection of the e-mail. In context, Mr. Santoro's e-mail states, "I indicated that I would get them the most recent copy and forward on to them. We agreed that once they have had an opportunity to do some preliminary layout of their plan we would get back together to review their comments/concerns regarding the same. This will allow us to begin working with them on roadway design and their role in the roadway network as you and I had discussed." See Exhibit 35.**

102.   Upon receiving this email from Santoro, Ms. Shields immediately contacted Bob Goetz and Dennis Auker at Delta Development, and asked them to provide information that she could use in discussions with Dan Santoro to delay the Petrarca development. Id. email from Shields to Goetz and Auker. Ms. Shields stated

> *I do not want the Petrarca Development to get a significant head start on us*—it will be one more traunch of tenants that become unavailable to Simon (we've already been negatively impacted by key tenants that have tone to the Continental site on 19) *We will be pushing the Township to be very demanding in what they require the developer to contribute to mitigate their own traffic requirements (like contributing right of way and possibly funding the earlier construction of some of the local roads).* But I want to know what we believe PennDOT's position will be on allowing them to proceed before improvements are made on 228. I'd like to know your thoughts before I speak with Dan [Santoro] early next week. *Id.* (emphasis added)

**ANSWER:**

**Denied. As an initial matter, the discussion referenced in this additional "fact" is a discussion between Ms. Shields and her consultants and not between her and any of the Defendants. There is no reference in Ms. Shields' e-mail to engage in any activity that would delay Plaintiffs' development. The quoted portion is accurate. However, Ms. Shields is expressing a concern to her consultants over the loss of potential tenants and that Petrarca mitigate his own traffic impact. See Exhibit 35.**

103.   Cranberry Township did exactly what Ms. Shields requested. The Township was very demanding in what they required from the Plaintiffs. The Township required Plaintiffs to pay for all local road improvements, including the access road for the Simon Mall, even though

13

under the consent order (of which Plaintiffs were unaware) Sippel or his successor was required

to pay for the road access they desired. The Township required Plaintiffs to pay for off-site

improvements, including improvements at the intersection of Mars and Franklin Roads, one-half

mile away from the property. See Exhibit 14 Raudenbush Deposition at pg. 38-39; 44.

**ANSWER:**

**Again, the first three sentences of Paragraph 103 do not contain any citations to the record in support of the alleged factual statement, because there is no such support. The last sentence of Paragraph 103 is denied. Plaintiffs are unable to site to any document submitted by the Township to the Plaintiffs requiring offsite improvements to the intersection of Mars and Franklin Road. The Mars/Franklin improvements were not required traffic mitigation. To the contrary, Mr. Aaronson, Plaintiffs' former counsel, made the suggestion in a March 4, 2008 letter to the Township. See Exhibit YY.**

104.    The Township dragged out the review process for Plaintiffs development proposal

by requiring Plaintiffs to address review comments that were pretextual, changed over time, cited

inapplicable ordinances, had already been fully responded to, or were given at the last minute.

See Exhibit 14, Raudenbush Deposition pgs 50-71; 78-80 and Exhibit 11, chart prepared by Jack

Raudenbush showing the comments received from the Township which were pretextual, cited

inapplicable ordinances, had already been fully responded to, or were given at the last minute.

**ANSWER:**

**Denied. Plaintiff continually submitted revised plans that did not comply with Township requirements for land use applications. The Development Reports provided to the Township responded to changes that were continually being made by the Plaintiffs, which required the Township to respond. See Ron Henshaw's deposition testimony (See Reply Brief) and Development Report (these are attached to Plaintiffs' Complaint). Development report comments did not equate to deficiencies that would result in the denial or delay of a plan. See Exhibit SSS, Ron Henshaw Conditional Use Testimony, pp. 68-71. Two significant issues that went continually, and intentionally unaddressed by the Plaintiff were the official map reservation of right of way and the mitigation of the traffic impacts from the proposed development, which were the bases for the land development denial. See Exhibit W.**

105.   The conspirators determined that the best way to insure that Petrarca could not get

a head start on Simon, and to ensure Simon had the road access they desired over Petrarca's

property, was to amend the Official Map to reflect the Simon access road. Simon's Engineer,

TransAssociates, created a CAD (computer assisted design) plan of the road over Petrarca's

property that Simon desired. On December 21, 2006, Bob Goetz of TransAssociates, Simon's

engineer, emailed Daniel Santoro, the Assistant Cranberry Township Manager, a drawing

entitled "Simon Local Road Plan" to be used for the official map. See Exhibit 54, 12/21/2006

Email from Bob Goetz of TransAssociates to Daniel Santoro.

**ANSWER:**

**The first sentence of Paragraph 105 fails to cite to the record and is argument by counsel.
No record evidence exists that would support this conclusion. The suggestion of getting a
"headstart" defies common sense as Simon had no land development application pending
and Petrarca was well into the land development process. Moreover, Simon was
endeavoring to spearhead the Route 228 transporation improvements project, and
Petrarca was required to provide a mitigation plan for the traffic impact associated with its
own land development.    The second and third sentences of Paragraph 105  are not
supported by citations to the record. On December 21, 2006, Bob Goetz e-mailed Daniel
Santoro a CAD drawing which contained the statement, "I hope you can use for your
Official Map." See Exhibit 54.**

106.   Mr. Santoro gave Jason Kratsas, the Township Engineer, who was an employee

under the supervision of Santoro, the Simon CAD drawing, and told him to take the map though

the administrative process to obtain approval to amend the official map to reflect the Simon

design. See Exhibit 8, Kratsas Deposition pgs. 10-11; Exhibit 7, Santoro Deposition pgs. 55-56.

Kratsas did not make any changes to the TransAssociates CAD drawing. See Exhibit 8

Deposition of Jason Kratsas, pg. 11.

**ANSWER:**

**Denied. Mr. Santoro provided Mr. Kratsas, the Township Engineer, a copy of the CAD
drawing and instructed him to make the changes to the Official Map.  The CAD drawing
that was attached to Bob Goetz's e-mail was not provided by the Plaintiffs.  It is attached**

hereto as Exhibit ZZ.  The CAD drawing provided by TransAssociates is not the 2007 Official Map.  See Exhibit UU, a copy of the 2007 Official Map.  Changes were ultimately made as is evidenced by the differences between the two documents, which is consistent with Santoro's deposition testimony. .

107.    Although the Simon road plan substantially impacted Plaintiffs' property, Mr. Kratsas did not contact Mr. Petrarca or Plaintiffs' representatives about the proposed revision to the official map road. See Exhibit 8 Deposition of Jason Kratsas pg. 12. Mr. Kratsas simply followed the administrative procedure to have the Simon design adopted as the official township map. Id.

**ANSWER:**

**There was no "Simon Road Plan".  Plaintiffs' mischaracterization of the official map road, specifically, and the local road system generally is calculated to mislead the court and is without record support.. Further, it is denied that the proposed revisions to the road "substantially impacted Plaintiffs' property." Again,  this assertion is not supported in the record or by the cited Exhibit.  Mr. Kratsas did not individually contact Mr. Petrarca about the proposed revision to the Official Map beyond the statutory public notice requirement.  There is no statutory requirement in the  Official Map process by which the Township is required to notify individual property owners, such as the Plaintiffs prior to the adoption of an Official Map.  By way of further response, Mr. Petrarca was aware of the proposed change in the road designs as is evidenced by his attendance at a meeting with Mr. Santoro in July of 2006.  See Exhibit 35.**

108.    Only a week after instructing Mr. Kratsas to have the official township map amended to incorporate the Simon road, Mr. Santoro left Cranberry Township for employment with Delta Development, Inc. See Exhibit 7, Deposition of Daniel Santoro pg. 68, Deposition of Jason Kratsas pg. 13. Mr. Santoro became a principal in Delta, and runs the western Pennsylvania office of Delta Development. See Exhibit 9, Deposition of Jerry Andree pg. 11. Mr. Santoro is the contact person for Cranberry Township at Delta Development. Id.

**ANSWER:**

**The first sentence of Paragraph 108 is denied.  The cited Exhibit does not support the statement that Mr. Kratsas was instructed to amend the Official Map one week prior to Mr. Santoro leaving his employment with Cranberry Township.  The remaining two**

**sentences of Paragraph 108 are admitted, but they are not material to the disposition of the Motion for Summary Judgment.**

109.     At the time Santoro went to work for Delta, Delta Development had lucrative contracts with both Simon and Cranberry Township to obtain public funds for road improvements. Simon employed Delta as a consultant on the Cranberry Township project to secure public funding for infrastructure (road) improvements. See Exhibit 5, Deposition of Kathleen Shields pg. 10. Simon employed Delta through a series of contracts from February 2003 until early 2009, under which Simon paid Delta $11,500.00 per month, plus a bonus payment for success. See Exhibit 5, Deposition of Kathleen Shields pgs. 20-21 and Exhibit 23 email chain between Kathleen Shields and Tara Nicotra April 2004.

**ANSWER:**

**It is admitted that Delta Development had contracts with both Simon and Cranberry Township, which contracts speak for themselves and are not material to the disposition of the summary judgment motion. Defendants deny the characterization that said contracts were "lucrative."**

110.     At the same time, Cranberry Township also employed Delta as a consultant to obtain funding to support infrastructure improvements, for a base fee ranging from $6,500.00 to $8,500.00 per month. See Exhibit 9, Deposition of Jerry Andree pgs. 10-11, and Exhibit 24 Consultant Agreement, December 2005, TWP 031006-10; and Exhibit 25 Consultant Agreement June 9, 2009, TWP 031000-031004. Cranberry Township also had contracts with Delta to provide other services, including a one year contract for community planning and economic development for $112,320.00. See Exhibit 26, Consultant Agreement June 28, 2007, TWP 031017-031028.

**ANSWER:**

**Admitted, but not material**

111.     Mr. Santoro testified that when he left his public employment with Cranberry Township on December 30, 2006, he had a personal services contract with Delta Development to serve as a consultant for Cranberry Township during the transition so that he could continue to work on several projects at the Township. See Exhibit 7, Deposition of Daniel Santoro pgs. 68-69.

**ANSWER:**

**Admitted, but not material**

112.     Mr. Santoro testified that he did not do any work on the Simon project in the first year after he left Cranberry Township and went to work for Delta Development, (see Exhibit 7, Deposition of Daniel Santoro, pg. 77), however, the evidence contradicts Santoro's claim. Jason Kratsas testified that he discussed the revisions to the official map road with Mr. Santoro after he went to work at Delta. See Exhibit 8, Deposition of Jason Kratsas pgs. 13-14. Further, in the first month of his employment at Delta, Mr. Santoro helped Mr. Kratsas get the map revisions through the administrative process. See Exhibit 8, Deposition of Jason Kratsas pg. 15. Mr. Santoro personally attended the Cranberry Township Planning Advisory Commission and presented the proposed revision of the official map. See Exhibit 27, Minutes of Planning Advisory Commission January 8, 2007. Santoro did not inform the Planning Advisory Commission that the revision to the road on the official map was designed by Simon. Id.

**ANSWER:**

**Denied. Mr. Santoro testified that he did not attend meetings with Simon during his first year at Delta. He did not state that he did not do work on the Official Map process which is not a "Simon project, nor did he suggest that he would not work on the Route 228 transportation improvements project." See Exhibit 7, deposition of Daniel Santoro, page 77, lines 8 through 17. The second and third sentences of Paragraph 112 are admitted. The fourth sentence of Paragraph 112 is inaccurate  To the contrary, Exhibit 27, the minutes of the Planning Advisory Commission for January 8, 2007, state that Jason Kratsas and Daniel Santoro presented the revision to the Official Map.  The last sentence of**

**Paragraph 112 is not supported by the Exhibit identified, or any other exhibit or record evidence.**

113.    Daniel Santoro continued to work on the Simon project at Delta Development. On February 12, 2007, just over a month after he began working for Delta Development, Dan Santoro was copied on an email from Dennis Auker, one of the Principals of Delta, to Kathleen Shields concerning the revised funding matrix for the Simon road project. See Exhibit 28, Email from Dennis Auker to Kathleen Shields, 02/12/07. In a November 21, 2007 email from Anthony Seitz at Delta to Kathleen Shields, Dan Santoro was identified as a "key attendee" from Delta on the Simon project for a meeting with the Township and PennDOT. See Exhibit 30, Email chain between Jerry Andree and Kathleen Shields 11/21/07.

**ANSWER:**

**The first sentence of Paragraph 113 does not contain a citation to the record, and is therefore denied.  The second sentence of Paragraph 113 is inaccurate to the extent Plaintiffs again attempt to mislead the court as to the work begin done by Simon and others on PennDOT's Route 228 project, not on the proposed Simon land development.  It is admitted in the final sentence that "key attendee" from Delta would be Daniel Santoro, again referencing the PennDOT project.  However, there is no evidence of record as to whether this meeting took place or those who attended the same.**

114.    Mr. Santoro's activities to promote the Simon project appear to violate 65 Pa.

C.S. §1103, the Pennsylvania Ethics Law. This statute provides in pertinent part:

> (a) Conflict of interest – No public official or public employee shall engage in conduct that constitutes a conflict of interest.  * * *
>
> (c) Accepting improper influence - No public official, public employee or nominee or candidate for public office shall solicit or accept anything of monetary value, including a gift, loan, political contribution, reward or promise of future employment, based on any understanding of that public official, public employee or nominee that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.
> * * *
> (g) Former official or employee - No former public official or public employee shall represent a person, with promised or actual compensation, on any matter before the

governmental body with which he has been associated for one year after he leaves that body.

**ANSWER:**

**Denied. There is no evidence of record that Mr. Santoro represented Simon's interests to Cranberry Township. Furthermore, this paragraph constitutes unsupported legal argument of counsel.**

115.   After Daniel Santoro left his employment with Cranberry Township and went to work for Delta, John Trant became the point person at the Township for the Simon Development. See Deposition of Kathleen Shields pg. 78. Trant spent 30-40% or more of his time on the Simon project for more than two years. See Exhibit 17, Deposition of John Trant pgs. 77-78. Mr. Trant has not had any other project in Cranberry Township in his entire employment that had the number of meetings and time involved as the Simon Mall project. See Exhibit 17, Deposition of John Trant at pg. 77.

**ANSWER:**

**Denied. Mr. Trant's deposition testimony is that he spent 30%-40% of his time working on the PennDOT Route 228 Project, not on Simon's potential development. See deposition of John Trant, pages 74 through 78.**

116.   Mr. Trant continued Mr. Santoro's efforts to bring the Simon project to fruition, at the expense of the Plaintiffs. Mr. Trant favored Simon in ways both large and small. For example, when Plaintiffs sought documents from Cranberry Township, they were required to complete public records requests, and requests for information concerning Simon were denied. See Exhibit 43, Public Records request from Joel Aaronson for documents concerning Simon development and denial letters from Jerry Andree.

**ANSWER:**

**The first two sentences of Paragraph 116 are argument and not supported by a citation to the record, and therefore are denied. When Plaintiffs sought documents from Cranberry Township, they were required to complete public records requests. Plaintiffs'**

**characterization that the requests related to Simon were categorically denied is inaccurate and the basis for denials related to the improper nature of the request. See Exhibit 43 and the Township's response attached thereto. By way of further response, Plaintiffs could have appealed the denials if they felt that they were incorrect, and they did not**

117.    In contrast, Cranberry Township employees provided Simon with documents concerning Plaintiffs' proposed development and even created new documents as requested by Simon. See Exhibit 37, email from Kathleen Shields to Bob Goetz et al. 3/26/08. Kathleen Shields requested, "a plan which overlays, perhaps in three colors, the location of the original road that cut through the Petrarca property on the official map that was in place when we first got involved with the property; the road location on the current official map and the current alignment on the latest plans which I believe strays slightly from the current map." Twenty-four hours later, John Trant created and provided the requested three color overlay, (See Exhibit 38, email from John Trant to Bob Goetz and Kathleen Shields 3/27/08 ) and a drawing overlaying the original official map with the current proposal. See Exhibit 20, Email from John Trant to Kathleen Shields 3/28/08.

**ANSWER:**

**Denied. There is no evidence of record that Mr. Trant created the requested document. It is admitted that Mr. Trant provided such a document. The record is not clear as to how it was created and Plaintiffs' interpretation is not supported by the record. Moreover, Simon was required to submit a record request to obtain documents pursuant to the Right to Know Act and Township policy . See Exhibits AAA and BBB, record requests by Kevin McKeegan, counsel for Simon and Bob Goetz, a Simon Consultant. These requests were to obtain copies of Plaintiffs' submitted plans, and were not simply handed to Simon as Plaintiffs would have the Court believe.**

118.    Other Township employees and consultants were also working with Simon in ways that prevented them from fairly reviewing Plaintiffs' development application. At the same time that attorney Neva Stanger was representing the Township in the hearing before the Board of Supervisors on Plaintiffs' Development applications, she was also involved in drafting a

21

Development Agreement between Simon and the Township for the construction of the local road

infrastructure, to be financed with more than 65 million dollars in public money, in order to fast

track the construction for the benefit of the Simon mall development. Under the agreement, the

local road improvements, including the Simon access road over the Plaintiffs property were

defined, and the Township agreed that it would "enact and/or adopt such ordinances and/or

resolutions as may be necessary to affect the purposes of this Agreement." See Exhibit 29, Email

correspondence 11/09/07 and attached agreement. The Township would have been in violation

of this agreement if they approved the Plaintiffs' proposed development with a road location

anywhere other than desired by Simon. This agreement reveals the hearing before the Board of

Supervisors to have been a sham, with a forgone conclusion.

**ANSWER:**

**Denied. There is no evidence that Ms. Stanger was involved in drafting the Agreement
attached as part of Exhibit 29. To the contrary, said document was forwarded to Ms.
Stanger by counsel for Simon for her input. Furthermore, the document is a proposed
agreement between Simon, PennDOT and the Township related to the PennDOT Rt. 228
Project. Importantly, this document was not executed. Plaintiffs' legal conclusion about a
potential breach is not supported by a citation to the document or any other portion of the
record. The last sentence of Paragraph 118 constitutes unsupported legal argument, and is
therefore denied.**

119.     The Township Supervisors also worked to exert pressure on PennDOT to provide

the millions of dollars of funding Simon sought for their Mall. In mid-2007, John Trant, Jerry

Andree, and Dick Hadley, chairman of the Board of Supervisors, traveled to Harrisburg to make

the case to PennDOT and the Department of Economic Development to obtain additional public

funds for the Simon Mall project. See Exhibit 17 Deposition of John Trant, pgs. 76-77. At the

same time the Board of Supervisors was meeting to hear and decide the Plaintiffs Land

Development applications, the Supervisors were working to promote the Simon Mall

development, a clear conflict of interest. On January 31, 2008, Supervisors Root and Skorupan

(as well as Township Manager Jerry Andree) attended a meeting to show support for the Simon

Property Group Project. See Exhibit 57, Email from Bryan Hollihan (State Senator Jane Orie's

office) to Root, Skorupan, et al. On October 10, 2008, Supervisors John Skorupan, Dick Hadley,

Bruce Mazzoni, and David Root all attended a meeting organized by the Chamber of Commerce

to support the Simon Development. See Exhibit 60, Minutes of Route 228 Business Update

Meeting ; See also Exhibit 58 list of confirmed Attendees to September 26, 2008 meeting

including Supervisors John Skorupan, David Root and Bruce Mazzoni.

**ANSWER:**

**The first sentence of Paragraph 119 does not contain a citation to the record because none exists, is argument of counsel, and is therefore denied. Furthermore, PennDOT does not build malls, PennDOT attempts to build state roads. With respect to the second sentence of Paragraph 119, the cited deposition testimony of Mr. Trant does not support the factual statement contained therein. Mr. Trant testified that the meeting in Harrisburg was relative to PennDOT's Route 228 Project. The third factual statement concerning the Board of Supervisors' meeting does not contain a citation to the record because none exists, is improper argument and is therefore denied. The fourth sentence contained in Paragraph 119 relating to the meeting called by State Senator Jane Orie is denied. The purpose of Senator Orie's meeting was to discuss PennDOT's Route 228 project. The last sentence in Paragraph 119 related to the meeting by the Chamber of Commerce is not supported by the citations to the record. The minutes from that Chamber of Commerce meeting (the opening remarks by Ms. Susan Balla of the Chamber of Commerce) note that "the fate of the Route 228 project is still unknown and is currently under review by the State Agency. . .this Route 228 partnership includes the Chamber, the Township and all affected businesses in the corridor." Furthermore, the six page list of attendees attached to Exhibit 60 demonstrates the significance of PennDOT's Route 228 project.**

120.    On August 7, 2007, Plaintiffs filed with Cranberry Township applications for

approval of Preliminary Land Development and Conditional Use Plans to develop a 134,000

square foot shopping plaza. See Defendants Exhibits P1 and P2 and Q. The design proposed by

Plaintiffs in their application proposed a private access drive into the Plaintiffs' property, similar

to the access drives into the adjoining Cranberry Commons retail development. See Defendant's

Exhibit P2, at pg. 5, compare with access drives into Cranberry Commons shown on Defendant's

Exhibit 1.

**ANSWER:**

**It is admitted that on August 7, 2007, Plaintiffs filed applications for approval of preliminary land development and conditional use applications. It is unknown what Plaintiffs mean with the statement that their proposed access drive was similar to that of the adjoining Cranberry Commons retail development. To the extent that they both have access from State Route 228, it is admitted. The fact that a neighboring development also has an access drive is not material to the disposition of the motion for summary judgment.**

121.    Cranberry Township staff informed Plaintiffs that they would require any plan to

provide a road connecting Route 228 and Mars Road, so the Plaintiffs revised their plans and had

Raudenbush Engineering submit a revised Site Plan with the requested connector road on or

about September 24, 2007. See Exhibit 52, Revised Preliminary Land Development Plan dated

09/24/07. The road proposed by Petrarca generally followed the location of the road shown on

the 2000 Official Map and the existing natural stream on the property. Id.

**ANSWER:**

**It is admitted that Plaintiff submitted a revised site plan, among many others, and that the revision was similar to the 2000 official map alignment. The revision did not fall within the 2007 Official Map road reservation of right of way which was the legally adopted official map in existence at the time of the land development application.**

122.    Simon soon obtained a copy of Plaintiffs revised site plan, and Simon and Delta

began working behind the scenes with Cranberry Township officials and employees to ensure

that the Plaintiffs' development Plan would be rejected. On November 1, 2007, Bill Ranek,

Simon's civil engineer on the Mall project, emailed Bob Goetz at Delta and Kathleen Shields a

copy of the Plaintiffs' Site Plan, stating: "Simon wants to provide a list of issues that make this

plan unacceptable in the overall development scheme. Your thoughts on the cross sections and

location of the first intersection would be appreciated as well as any other observations you may

have." See Exhibit 31, Email chain November 1-2, 2007 between Bill Ranek, Kathleen Shields,

Bob Goetz (emphasis added)

**ANSWER:**

**The first sentence of Paragraph 122 does not contain a citation to the record, and is nothing but improper argument. There is no evidence of the Township's or any Township official's work "behind the scenes" to frustrate Plaintiffs' development, and since this is the essence of the alleged conspiracy, the Court should expect record evidence. Providing requesting parties with public records pursuant to valid Right to Know record request is not improper work behind the scene. The land development plan was denied by the Board of Supervisors in a public meeting as is set forth in the denial resolution. In response to the remaining portions of Paragraph 122, it is admitted that an e-mail chain exists between Simon and its consultants concerning Plaintiffs' site plan. There is no evidence of record that Simon provided any comments concerning Plaintiffs' plan to the Township. By way of further response, any comments by the Township concerning Plaintiffs' site plans are contained in the Development Report with citations to ordinances, regulations and statutes and in the denial resolution. See Development Reports attached to Plaintiffs' Complaint and the Resolution denying the development plan.**

123.    On that same date, Kathleen Shields emailed John Trant at Cranberry Township,

setting up several meetings with Mr. Trant concerning the Simon development, and asking

"What is your deadline for responding to Petrarca –we have some comments we wanted to share

with you on their site plan." See Exhibit 32, Email chain October 31- November 1, 2007 between

Dennis Auker, Kathleen Shields, Bob Goetz, John Trant and others. (emphasis added)

**ANSWER:**

**Denied. Exhibit 32 references setting up a single meeting, not several. See Exhibit 32.**

124.    By the next month, Simon and Cranberry Township had agreed that Cranberry

Township would take by condemnation whatever roadway Simon desired. As Kathleen Shields

reported to Bob Goetz on December 7, 2007:

> Bill –by the way…when speaking with John Trant today, he indicated that the Township
> would be willing to condemn more than the roadway plus the 14 feet of buffer if we need
> it for slope easements and support. They can take whatever we need for the road. They
> can't take any additional property that would be viewed as condemning for a private use,

e.g. the parcel to the west of the Petrarca entry drive. If that comes into the fold, it will be as part of the settlement negotiation in court after the quick take for the roads. But anything we need for slopes to support the road from existing grades if fair game. See Exhibit 36, email chain December 7, 2007 between Kathleen Shields, Bob Goetz, John Trant and others.

**ANSWER:**

**The first sentence of Paragraph 124 does not contain a citation to the record. However, the quote between Ms. Shields and Bob Goetz is quoted accurately. By way of further response, even if a condemnation proceeding were to take place relative to a road, it would not prevent the development of Plaintiffs' property. See Exhibits CC, DD and EE, Echo Development citations.**

125.    Although Cranberry Township insisted that their concern with Plaintiffs' development proposal, and the reason for its rejection, was because it did not provide for construction of a road in the location shown on the 2007 official map, the evidence obtained in discovery shows that Simon was free to relocate the road on Plaintiffs property to whatever location they desired. Numerous emails between John Trant and Kathleen Shields reflected that Simon repeatedly modified the road location to suit Simon's needs, and Cranberry had no objection to the Simon modifications. See Exhibit 28, Email from Dennis Auker to Kathleen Shields 02/12/07 (pg 2); Exhibit 37, Email from Kathleen Shields to Bob Goetz et al 03/26/08; Exhibit 20, Email from John Trant to Kathleen Shields 03/28/08.

**ANSWER:**

**The first sentence of Paragraph 124 does not contain a citation to the record. The basis for denial is set forth in the denial document. Further, Plaintiffs' admit that they did not commit to mitigate the traffic generated from the proposed development and did not honor the 2007 Official Map right of way reservation. Exhibit 28 does not support any of the statements contained in Paragraph 125. Those documents do not reflect alterations to any roadway based upon Simon's requests.**

126.    The only concerns Cranberry officials and employees expressed about the changes were not that the changes adversely impacted the Township's road planning, but rather

that they might reveal to the Plaintiffs that the Township had no interest in the road location

separate from Simon. For example, on March 28, 2008, John Trant wrote Kathleen Shields:

> The alignment of the Petrarca road has changed more than I had realized. I now think we
> need to either come to a resolution on the local road issue prior to your approaching him,
> or we need to accept the fact that the alignment may change from the meets and bounds
> description that your current appraisal is based on and proceed anyway. See Exhibit 20,
> Email from John Trant to Kathleen Shields, 03/28/08.

**ANSWER:**

**The first sentence of Paragraph 126 contains no citation to the record, is improper
argument, and is therefore denied. The quote contained in the March 28, 2008 e-mail
attached as Exhibit 20 is accurate, but taken out of context. Mr. Santoro explained, the
reasons for the change to the 2007 Official Map. See Exhibits K and Defendants' Concise
Statement of Material Facts, ¶27. Additionally, the Township's Traffic Engineer, HRG,
performed and analysis in relation to a change to the 2007 Official Map.**

127.    Similarly, on April 11, 2008, Simon had TransAssociates make additional

changes to the road going over the Plaintiffs' property, and Kathleen Shields asked John Trant:

"Would it be your intent to change official map again or not?" Exhibit 39, Email chain between

John Trant and Kathleen Shields, 04/11/08 to 04/14/08. Mr. Trant's response is an admission by

the Township that the reason for the Township's change to the official Map was not to create a

road system that would serve the needs of the township, as the Township has maintained, but to

put the Simon road on the Official Map before Plaintiffs filed their Development Plan. Trant

stated:

> We wouldn't change the official map because there is no benefit in doing so because it
> would be subsequent to Petrarca's submission of his plan. A change in alignment
> wouldn't affect our ability to condemn the property, but it will likely affect the value
> attached to the ROW. We can talk at length later, but the best scenario is one in which
> you negotiate the purchase of the ROW from Petrarca following the new alignment. I
> wouldn't structure it as a change on our end, rather an option that is more sensitive to
> what Petrarca wants to do on his site. If there is any perception that we changed our
> mind, he will seize on that. The alternative is reverting back to the current official map
> alignment, which will force dealing with the self storage property. Id.(emphasis added)

**ANSWER:**

**Plaintiffs' characterization of Exhibit 39 as an admission is inaccurate and is denied.  The quote contained in paragraph 127 does come from Exhibit 39.**

128.   A few days later, Ms. Shields sent an email to Bob Goetz, telling him not to submit any updated traffic studies to the Township without her approval. She stated:  If you have a sketch of how the new road would sit on the Petrarca plan, could you send it to me. We are meeting with Petrarca on Monday in Pittsburgh. The City [Township] is now very sensitized to the clear case Petrarca is building to argue that these roads serve Simon's purpose and not the Township's. We need to be careful about what we submit …Don't submit any updated traffic studies to the Township without first getting them to us. See Exhibit 40, Email from Kathleen Shields to Bob Goetz, 04/17/08 (emphasis added).

**ANSWER:**

**It is admitted that the e-mail contains the quote contained in Paragraph 128 between Simon and its consultants.  No one from the Township was copied on this e-mail exchange. Furthermore, it is not material to the disposition of the Motion for Summary Judgment, as it relates to conversations between Simon and its consultants.**

129.   Cranberry Township and its officials and employees maintained that Plaintiffs could not proceed with their development unless they mitigated their traffic impacts on SR 228 and other township roads. The Township claimed that this mitigation was required because even the relatively small amount of additional traffic anticipated to be generated by the Plaintiffs development would put the intersections in failing status, because there was already so much traffic in the area.

**ANSWER:**

**Paragraph 129 does not contain any citations to the record.  Notwithstanding, it is accurate that Cranberry Township maintains that Plaintiffs could not proceed with their development because they failed to identify a mitigation plan with respect to the traffic created by their development.  See Defendants' Statement of Facts, Number 55 and**

28

**Plaintiffs' response admitting that "PennDOT requires that mitigation be proposed if even a single additional vehicle is added."**

130.    No such mitigation was required by Simon or Westinghouse, even though their traffic studies revealed that the same intersections would degrade to failure with the traffic anticipated to be generated by those developments. HRG, the Townships' traffic engineer reviewed the "Addendum to the Final Comprehensive Traffic Study for Proposed Cranberry Town Center", analyzing the effect to traffic if the Simon Mall was built and SR was not widened with two additional lanes, in order to save money. See Exhibit 41, email from Bob Goetz to John Trant and Kathleen Shields and letter from HRG to Duane McKee, Assistant Township Manager, 08/13/08 attached thereto.

**ANSWER:**

**Denied. Plaintiffs' statement concerning mitigation by Simon is inaccurate. Simon never submitted a plan to Cranberry Township for which the Township could require mitigation. When Cranberry Woods was approved, it was approved with a certain number of "trips" pursuant to a master-planning effort.   Cranberry Woods along with the Cranberry Commons developments mitigated their traffic impact by contributing to the widening of Route 228 in the 1990s.  See Plaintiffs' Exhibit 42.  That widening assumed the use of all of its "trips" even though there was not a full build out of the master plan at the time and those "trips" were not  actually used at the time.  When it came time for the Westinghouse development, calculations were performed by traffic engineers on the amount of square footage of office space that could be built based upon the remaining "trips" that were available under the Cranberry Woods master plan.  See Plaintiffs' Exhibit 42.   That allowed for the development of up to one million square feet of office space.  *Id.*  The type of land use determines the number of trips that are utilized.  For example, a storage warehouse would generate fewer trips yet could be extremely large in size, whereas smaller square footage uses such as a medical complex would generate a higher number of trips because of the increased traffic associated with that use.**

**Notwithstanding the above, Westinghouse is not subject to the same HOP regulations and traffic mitigation requirements as Plaintiffs because Westinghouse's property does not front Route 228.**

131.    HRG found the intersections at SR 228 & Gantzer Drive would degrade to failing conditions, the intersection at SR 228 & Kristoffer Drive would degrade 2 levels of service to an unacceptable level E; and SR 228 and Interstate 79 will fail between 2017 and 2022, and traffic

at other intersections would degrade. Rather than rejecting the Simon plan, however, John Trant

and HRG met with Simon, and HRG agreed to strike or modify their comments to support the

proposed Simon development. See Exhibit 41, email from Bob Goetz to John Trant, cc Kathleen

Shields.

**ANSWER:**

**Denied. There was no Simon plan to reject.  Comment 2 contains the following:  "Also notable is that this study intersection also failed as proposed by the original PennDOT funded project, which is now being incorporated by this developer's improvement."  This evidences that there was no change between PennDOT's original proposal related to its Route 228 improvement project and what Simon was considering.  See Comment 2 in the attachment to Exhibit 41.**

132.    Similarly, HRG reviewed the MSA/Westinghouse Development within Cranberry

Woods on June 14, 2007. This development is right across the street from the Plaintiffs'

property, and was seeking Cranberry Township approval at the same time as the Plaintiffs. HRG

determined that SR 228 could support the increased traffic volumes assuming that the SR228

widening and laning included as part of the Simon and PennDOT improvement projects

occurred. See Exhibit 42, letter from HRG to Paul Koza, Jr. PennDOT, 06/14/07. TWP 031730-

031737.

**ANSWER:**

**The first sentence of Paragraph 132 is admitted.  The second sentence is denied.  The Westinghouse development is not located directly across the street as implied by the Plaintiffs.  By way of further response, the Exhibit referenced by Plaintiffs does not state what is alleged in Paragraph 132.  See also response to Paragraph 130 above.**

133.    Cranberry Township approved the Westinghouse Land Development Application

and authorized Westinghouse to proceed with the construction of one million square feet of

office space, without waiting for the SR228 widening, which in fact did not occur. In contrast,

Cranberry Township refused to approve Plaintiffs' development plan, even though Plaintiffs

stated that they were requesting contingent approval and would not begin construction until the proposed widening of SR 228 was completed. See Deposition of Thomas Petrarca pg 140. The Plaintiffs representatives met with representatives from Cranberry Township, including John Trant, who told them that they could apply for approval, contingent on the future development of 228 by PennDOT, but then subsequently, were told that procedure was not acceptable. See Deposition of Victor Hull pg. 46.

**ANSWER:**

**The first sentence of Paragraph 133 does not contain a citation to the record. Plaintiff did indicated that it would accept a contingent approval which presupposed that the Rte. 228 improvements would be completed by other parties. However, a contingent approval under the circumstances presented by Plaintiffs still did not provide a mitigation plan for their proposed development. Plaintiffs failed to identify on their plans the mitigation that was required for their traffic. See Exhibit W, A-14 through A-21 and B-8 through B-13.**

## Additional Statements of Fact necessitated by Plaintiffs' Reply

134.   PennDOT first announced its project in 2001.  See Exhibit CCC.

135.   As part of PennDOT's Project and during the course of the project, it issued:

- Project News bulletins;  See Exhibit DDD.

- Memos from Public Involvement Coordinator to Community Advisory Committee and others;  See Exhibit EEE.

- Correspondence inviting participants to public officials meeting;  See Exhibit FFF.

- PennDOT's project description.  See Exhibit GGG.; and

- An April 13, 2007 letter from PennDOT to the Township announcing it selected a design alternative for Route 228.  See Exhibit HHH.

See Exhibits DDD through HHH.

136.    Once a design was chosen, state representatives began to hold additional meetings focusing on funding for the PennDOT Project.  See Exhibit III (letters from officials).

137.    Wooster also identifies mitigation required due to the Petrarca project even if the PennDOT Project is completed by a third party.[1]  See Exhibit JJJ, Chuck Wooster Conditional Use testimony, pp. 30 and 31.

138.    Plaintiff, Thomas W. Petrarca, testified that Thomas W. Petrarca, Inc. is the parent company to the myriad of corporate identities he has established through the years. Petrarca Deposition, Exhibit KKK, pages 7-22.

139.    The timeline set forth by the Defendants reveals that the connector road predates Petrarca's ownership in the subject property.  See Exhibit LLL, Trant Conditional Use, pp. 54-60.  The Route 228 Corridor Study prepared by HRG in January 1994 also discusses the need for a north/south connector road.  See Exhibit MMM; see also Exhibit NNN, Route 228 Area Transportation Study-Consideration of 2003 Conditions, August 1995.

140.    Mr. Kratsas testified in response to Mr. Aaronson's examination that the road reservation contemplated a minimum of four and maximum of seven.  See Exhibit 30, Jason Kratsas Conditional Use Testimony, CUR 537.

141.    Plaintiffs' engineer did not seek clarification from the Township concerning the reserved street.  See Exhibit PPP, Raudenbush deposition, pages 81-82. .

---

[1] Plaintiffs response to number 55 of Defendants' Concise Statement of Material Facts confirms this point and points out the flaw in their own argument.  Plaintiffs recognize that "PennDOT requires that mitigation be proposed if even a single additional vehicle is added."  Plaintiff's Response to Defendants' Concise Statement, No. 55.  Unless Plaintiffs were not expecting any customers or tenants' employees to their planned retail shops to arrive by vehicle, mitigation was required.

142.    It should be noted that Echo's proposed connector road is within the reservation and it was able to propose substantial development space beyond what Petrarca sought to develop with the same land.  See Exhibit XX, Echo's most recent plans.

143.    Each time Plaintiffs would submit a revised report to the Township, a Development Report would be created noting the deficiencies of the revised plan with citations to the applicable ordinance or statute.  See Exhibit QQQ, Henshaw Deposition, pp. 79-81.  The applicant would receive a copy of the Development Report prior to the Planning Advisory Commission meeting that would be discussing the application.  *Id.*

Date:  July 15, 2011

Respectfully submitted,

CIPRIANI & WERNER, P.C.

BY:     */s/ Philip J. Sbrolla*
MARK R. HAMILTON, ESQUIRE
PA I.D. #29919
PHILIP J. SBROLLA, ESQUIRE
PA I.D. #90231
650 Washington Road, Suite 700
Pittsburgh PA  15228

(412) 563-2500

Attorney for the Defendants
CRANBERRY TOWNSHIP, RICHARD
HADLEY, JOHN SKORUPAN, JOHN W.
MILIUS,    DAVE    ROOT,    BRUCE
MAZZONI, RON HENSAW, JOHN K.
TRANT, JR