**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRANBERRY PROMENADE, INC., NAP ASSOCIATES, INC., NAP ASSOCIATES 2, INC., THOMAS W. PETRARCA, d/b/a THE PETRARCA COMPANIES, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 09-1242 Judge Nora Barry Fischer |
| CRANBERRY TOWNSHIP, RICHARD HADLEY, JOHN SKORUPAN, JOHN W. MILIUS, DAVE ROOT, BRUCE MAZZONI RON HENSHAW, JOHN K. TRANT, JR., | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

I.   INTRODUCTION

This action arises from a failed commercial development at a site located in Cranberry Township, Pennsylvania.  Dissatisfied with the denial of their land use applications by Cranberry Township, Plaintiffs Thomas W. Petrarca, a sophisticated real estate developer, and his companies, Plaintiffs Cranberry Promenade, Inc., NAP Associates 2, Inc. and NAP Associates, Inc., initiated this lawsuit against Defendant Cranberry Township (the "Township"), and several of its elected officials and employees, including Defendants Richard Hadley, John Skorupan, John W. Milius, Dave Root, Bruce Mazzoni, Ron Hensaw, and John K. Trant, Jr. (collectively, "Individual Defendants"). (Docket No. 1).  Plaintiffs maintain that the Township and the Individual Defendants denied their land use applications for the Shoppes at the Woods in favor of a potential larger development by Simon Property Group ("Simon").  (*Id.*).  Plaintiffs assert that the denials resulted from the Defendants improperly changing the Township's Official Map

1

to reserve a road over Plaintiffs' properties in a location that suited the needs of Simon's potential development.  (*Id.*).

Plaintiffs' claims include the following: alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO") against the Individual Defendants; § 1983 claims of procedural due process, substantive due process, equal protection against all of the Defendants; and, civil conspiracy under Pennsylvania law, also against the Individual Defendants.  (*Id.*).  Defendants have moved for summary judgment regarding all of Plaintiffs' claims, arguing that Plaintiffs have failed to present sufficient evidence from which a reasonable jury could find in their favor at trial.  (Docket Nos. 68, 69).  Plaintiffs maintain that summary judgment is inappropriate.  (Docket Nos. 72, 79, 90).

For the reasons that follow, after considering the parties' arguments and viewing the evidence of record in the light most favorable to Plaintiffs, Defendants' motion for summary judgment is granted.

II.  FACTUAL BACKGROUND

Unless otherwise specified, the facts of record are uncontested.  Viewed in the light most favorable to Plaintiffs, they are as follows.  *See Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

A.  *Early Development of Route 228 Corridor in Cranberry Township*

Cranberry Township, Butler County, is situated north of the City of Pittsburgh and is an area that has "experienced tremendous growth in both residential and non-residential land development" since the early 1980s.  *Fisher v. Viola*, 789 A.2d 782, 784 (Pa. Cmwlth. Ct. 2001).  In the early 1990s, the Township engaged Herbert, Rowland & Grubic, Inc. ("HRG") to develop a comprehensive planning study of the Route 228 Corridor – an area which then-consisted of

undeveloped commercial property between Interstate 79 ("I-79") and Franklin Road.   (Docket No. 78-17, Def Ex. MMM at 4).   I-79 and Franklin Road both run north-to-south through Cranberry Township.   (*Id*.).   State Route 228 ("SR 228") runs east-to-west between those two roads.   (*Id*.).   At that time, SR 228 was a two-lane highway and only 24 feet wide.   (*Id*.).   However, the Pennsylvania Department of Transportation ("PennDot") had started preliminary planning to expand a 4.5 mile section of SR 228, including the portion between I-79 and Franklin Road, into a five-lane highway to support expected development.   (*Id*. at 5).   As part of this study, the authors recommended that the Township consider establishing a north-south connector road from SR 228 to two east-west roads which run parallel to the north of SR 228, Old Mars Road and Rowand Road.   (*Id*. at 22).

Two major developments along the Route 228 Corridor were in the planning phase at that time: Cranberry Woods, a large office park, which is located to the south of SR 228 and Cranberry Commons, a strip mall, which is located to the north of SR 228.   (Docket No. 73 at ¶¶ 13, 14).   A potential third development was contemplated to the north and west of Cranberry Commons by CREDCO.   (*Id*. at ¶ 20).   A campground owned by the Gantzer family was situated on the property located directly to the west of Cranberry Commons, with acreage that also fronted SR 228.   (Docket No. 73 at ¶¶ 1, 20, 76).   Two additional properties situated to the west of the Gantzer campgrounds were owned by Turnblazer and Eakin.[1]   (Docket No. 73 at ¶¶ 5, 25, 78).   A traffic study prepared for Cranberry Township in 1998 by TriLine Associates, Inc. indicated that the proposed north-south road would travel through the Gantzer campground, enabling access from SR 228 to the CREDCO development.   (Docket No. 71-7, Ex. G, part 1 at 12).   Specifically, the traffic study states that: "[a]ccess to the planned Credco Development will

---

[1]      Plaintiffs eventually purchased the properties owned by Gantzer, Turnblazer and Eakin.   (Docket No. 73 at ¶¶ 77, 78); *see also*, § II.E., *infra*.

be provided through a future planned road at the existing driveway serving the Gantzer campgrounds (Pittsburgh North) on [SR] 228. The Gantzer Road will be directly opposite a new driveway proposed for the Cranberry Woods Development … and is proposed to be signalized." (*Id.*).

### B.   2000 Official Map

At some point prior to 2000, the Cranberry Commons development was approved. Gary Sippel owned property located to the north of Cranberry Commons and filed a land use appeal as a result of the grant of Cranberry Commons' land use application. (Docket No. 73 at ¶ 23). The matter was resolved and a Consent Order was entered by the Court of Common Pleas. (*Id*. at ¶¶ 23, 24). The Consent Order provides that Cranberry Township "shall cause to be made and shall adopt an official map of a portion of the Township along [SR] 228, near the existing McElroy Road intersection, providing for a public connector road system from a point on [SR] 228 between I-79 and the Gantzer property, to a connecting point on Old Mars Road." (*Id*. at ¶ 24). It also states, among other things, that Cranberry Township, upon written request of [Sippel or his assigns] shall promptly acquire the property rights to the right of way provided that [Sippel or his assigns] paid related costs in excess of $75,000. (*Id.*).

"The 2000 Official Map designated a northbound road on the border of the Gantzer Property and the Eakin property (both ultimately purchased by Plaintiffs), connecting [SR] 228 to Mars Road, across from the entrance to Cranberry Woods." (Docket No. 73 at ¶ 25). Both the Cranberry Commons and Cranberry Woods developments were completed. (*Id.* at ¶¶ 13, 14). "Cranberry Woods consists of an office park that houses Mine Safety Appliance and its most recent tenant, Westinghouse. The business park is located to the south of SR 228. The principal entrance is via Cranberry Woods Drive, […] which is across from Plaintiffs' property." (Docket

No. 73 at ¶ 13).  "Cranberry Commons consists of mostly retail shops with some restaurants, consisting of approximately 550,000 square feet of retail space.  Cranberry Commons is located to the north of [SR] 228, immediately adjacent and to the east of Plaintiffs' property. There are two entrances to Cranberry Commons from Route 228." (Docket No. 73 at ¶ 14).

### C.  Simon Obtains Options on Adjacent Property

Historically, there had been multiple developers seeking to build a mall in the northwest quadrant of SR 228.  (Docket No. 73 at ¶ 58).  In 2003, Simon, a national shopping center developer, acquired options on a parcel of land northwest of Plaintiffs' property. (Docket No. 77 at ¶ 79).  "Kathleen Shields, Senior Vice President for Simon, was the developer of the Cranberry Mall project, in charge of the Cranberry project from the beginning." (Docket No. 77 at ¶ 80).  "Simon intended to develop a lifestyle mall on the property with approximately 950,000 square feet of retail space."  (Docket No. 77 at ¶ 81).  One of the challenges facing Simon's proposed development was a need for traffic infrastructure improvements.  (Docket No. 73 at ¶ 60).  At the same time, PennDot was planning infrastructure improvements along the entire Route 228 Corridor, from Route 19 to Route 8.  (Docket No. 73 at ¶ 61).

Simon engaged a number of consultants in relation to this project, including Delta Development Group ("Delta"), starting in 2003.  (Docket No. 73 at ¶ 62, 63).  Delta specializes in securing public funding through various government sources.  (Docket No. 73 at ¶¶ 62, 63). Simon also contracted with Trans Associates, a traffic engineering firm.  (Docket No. 73 at ¶ 82). Simon never formally submitted a development plan to the Township for their properties. Instead, Simon's representatives engaged in various negotiations/conversations with Township officials and representatives of PennDOT to lay the groundwork before fully pursuing this development.

PennDOT was also involved in planning infrastructure improvements in the Route 228 Corridor throughout this time period.  (Docket No. 73 at ¶¶ 16, 67).  Township officials, state legislators and representatives from Simon involved in considerable correspondence regarding funding for the project.  (*Id.*). From the record, it is clear that Simon and the Township hoped that PennDOT would make a substantial investment in the infrastructure of the Route 228 Corridor.  (Docket No. 73 at ¶¶ 88, 89, 119).  The potential infrastructure investment would benefit both the Township and Simon.  Plaintiffs maintain that while PennDOT's project started independently of the development of the Simon Mall, at some point, the two projects merged.

### D.  Petrarca, His Companies & Their Entry Into Cranberry

Plaintiff Thomas Petrarca is an entrepreneur who has owned and operated a number of corporate entities, including the three corporate entities which are plaintiffs in this litigation.  At his deposition, Petrarca described himself as a real estate developer who was a "sophisticated odds maker" willing to take gambles "like Las Vegas."  (Docket No. 74-6, Pltf Ex. 6 at 15).  On May 14, 2003, Thomas Petrarca, Inc. (which is not one of the Plaintiffs in this case) filed a Development Application and Conditional Use Application with Cranberry Township to construct a 93,170 square foot retail plaza, a 3,860 square foot fast food restaurant, and a 4,115 square foot drive through bank on one parcel of the property involved in this case. (Docket No. 73 at ¶ 1).  This was the site of the former Gantzer Campgrounds.  (Docket No. 74-1).

On October 6, 2003, Cranberry Promenade, Inc. acquired two parcels totaling 14.548 acres from the Gantzer family for $2.5 million.  (Docket No. 77 at ¶ 76).  These adjoining parcels are located north of the Cranberry Woods development and of SR 228, and directly to the west of the Cranberry Commons development, fronting SR 228.  (Docket No. 74-1).   The Township denied Thomas Petrarca, Inc.'s 2003 applications.  (Docket No. 73 at ¶ 2).  Plaintiffs filed two

land use appeals from these denials in the Court of Common Pleas of Butler County.  (Docket No. 73 at ¶ 3).  These appeals were never fully adjudicated and ultimately dismissed for failure to prosecute on September 9, 2009.  (Docket No. 73 at ¶ 4).

### E.  Petrarca's Purchase of Additional Properties

Another entity owned and operated by Petrarca, NAP Associates, Inc., purchased two parcels totaling 2.869 acres from Turnblacer, Frey and Ringeisen for $700,000 on July 20, 2005. (Docket No. 77 at ¶ 77).  This land fronts SR 228 to the West of the former Gantzer Campgrounds but is not an adjacent property.  (Docket No. 74-1).  On May 8, 2006, Plaintiff NAP Associates 2, Inc. purchased 6.838 acres of property which is located between the former Gantzer and Turnblacer properties from Eakins for $2.45 million.  (Docket No. 77 at ¶ 78; Docket No. 74-1).  As a result of these acquisitions, Petrarca, through his entities, Cranberry Promenade, NAP Associates and NAP Associates 2, owned five contingent parcels of land totaling approximately twenty-four acres which front SR 228.  (Docket No. 74-1).  As Plaintiffs now owned five contingent parcels, they sought to develop a shopping center on the entire property.

### F.  Correspondence/Discussions Between Simon and Township / Petrarca and Township About Proposed Relocation of Reserved Road

Simon released marketing materials touting their proposed mall, Cranberry Town Center in June of 2003.  (Docket No. 75-1, Pltf. Ex. 21, at 13, 19-21).  Three depictions of the proposed development contained in those materials show a road starting from the intersection of Cranberry Woods Boulevard turning in a northwesterly direction and connecting to the entrance of the proposed mall.  (*Id.*).  Simon did not own any interest in the land upon which the reserved road was laid out at any time.

There was considerable support for the Simon project from public officials at the outset, as evidenced by a May 30, 2003 letter from State Senator Jane Claire Orie to then United States Congresswoman Melissa A. Hart and copied to United States Senators Rick Santorum and Arlen Spector. (*Id.* at 36). As is detailed in her letter, Senator Orie recognized that the proposed Simon mall would be a boon for Butler County and Cranberry Township, bringing jobs and increased tax revenue to the Route 228 Corridor and she accordingly sought millions of dollars in federal funding to support improvements to I-79 and SR 228 surrounding the mall. (*Id.*).

"Daniel Santoro was the Assistant Township Manager of Cranberry Township in charge of planning and development from 2000 to December 2006." (Docket No. 77 at ¶ 84). Santoro was the primary contact for the Township with Simon regarding its proposed mall. (Docket No. 77 at ¶ 84). In January of 2006, Simon's consultants, including Bob Goetz of Trans Associates, met with Dan Santoro, Jerry Andree and other individuals concerning the proposed Simon development. (Docket No. 75-14, Pltf Ex. 34). Goetz advised Shields in a follow up email that he had presented the revised road to the Townhip officials during the meeting and explained the purpose of the revised local road alignment. (*Id.*). Attached to his emails is a CAD drawing titled "Local Road R.O.W." which includes a map of the proposed road and specifically indicates the then-owners of the properties which would be affected by the realignment. (*Id.* at 2). This map shows Cranberry Promenade as in control of only the properties located at the former Gantzer campgrounds, denoted as "T" and "U" on the map. (*Id.*). These properties are minimally affected by the proposed road location. (*Id.*). However, the proposed road travels

substantially over the properties listed as owned by Frey and Eakin at "N", "M" and "R" on the map.[2]  (*Id.*).

Email communications from Santoro suggest that in June of 2006, he and other Township officials met with Petrarca and his representatives concerning Petrarca's planned development of his properties.  (Docket No. 75-15, Pltf. Ex. 35).  At the meeting, Plaintiffs requested copies of the proposed changes to the official map which included the location of the road preferred by Simon.  (*Id.*).  After the meeting, on July 3, 2006, Santoro emailed Kathy Shields and requested that Bob Goetz forward him a copy of the proposed changes so that he could provide it to Petrarca at a scheduled meeting on July 6, 2006.  (*Id.*).

Santoro testified that in July 2006, he met with Petrarca and his counsel, Daniel Danulik, Esquire, to discuss the proposed revisions to the Township's official map.  (Docket No. 73 at ¶ 34).  Santoro explained that Plaintiffs provided no input to the proposed changes.  (Docket No. 73 at ¶ 35).  Plaintiffs agree that they did not provide any input to the Township as to the proposed changes to the location of the road.  They claim that the reason that no input was provided was because Petrarca did not recall any meeting with Santoro during which the changes were discussed and that he was never advised of the changes.  (Docket No. 74-6, Pltf Ex. 6, p. 75).  However, the evidence provided by Plaintiffs confirms that their counsel, Victor Hull, Esquire, was provided with a proposed map produced by Trans Associates showing the right-of-way in the summer of 2006.  (Docket No. 81-15, Pltf Ex. 89).  To this end, Plaintiffs' engineer Raudenbush testified at the conditional use hearings that he believed that the map which was

---

[2]        As discussed in § II.E above, these are the properties that Plaintiffs acquired to complete their real estate holdings in the area.  Based on the timeline of Plaintiffs' transactions, this map inaccurately states that the properties marked as "M" and "N" were still owned by Frey, et al. because Plaintiffs purchased these properties in July of 2005.  However, the Eakins property had yet to be sold to Plaintiffs by the date of this map.

9

provided to Hull by Simon and admitted in those proceedings was "identical" to the electronic version of the 2007 Official Map later provided to him by the Township. (*Id.*).

On December 21, 2006, Goetz of Trans Associates emailed Santoro a CAD drawing titled "Simon Local Road Plan", which contained a map of the proposed road. (Docket No. 77 at ¶ 105; Def. Ex. ZZ). In his email, Goetz states that "I hope you can use for your official map." (Ex. 54). Santoro forwarded this email to Jason Krastas at the Township. (*Id.*). The parties dispute whether Santoro advised Krastas to make changes to the map or accept it "as is." (Docket No. 77 at ¶ 106). Defendants point to the differences in Goetz's submission versus the Official Map which was ultimately adopted. (Docket Nos. 89 at 48-9; 78-6, Def Ex. ZZ; Def. Ex. UU). However, Krastas testified that he did not personally make any changes to the map that was sent to him by Goetz. (Docket No. 77 at ¶ 106).

Later in December of 2006, Daniel Santoro left the employ of Cranberry Township to work for Delta. (Docket No. 77 at ¶¶ 84, 108). Initially, Santoro worked for Delta under a personal services contract to serve as a consultant for Cranberry during the transition. (Docket No. 77 at 111). This arrangement enabled him to continue to wrap up several projects he was involved in while still employed by the Township. (Docket No. 77 at ¶ 111). Santoro testified that he did not attend meetings with Simon during his first year at Delta as part of a contractual restriction. (Docket No. 77 at ¶ 112). However, he still continued to work on the official map revisions with Krastas and other Cranberry officials. (Docket No. 77 at ¶ 112).

Plaintiffs maintain that other evidence suggests that Santoro did not adhere to the contractual restriction that he was to avoid working on the Simon issues. (Docket No. 77 at ¶ 112). For example, he was copied on an email from Dennis Auker of Delta to Kathleen Shields on February 12, 2007 addressing the revised funding matrix for the Simon mall project. (Docket

No. 77 at ¶ 113).   Also, in a November 21, 2007 email, Dan Santoro is identified as a key attendee from Delta who was scheduled to attend a future meeting with the Township and PennDot, which, according to Plaintiffs was set to discuss the Simon project.   (Docket No. 77 at ¶ 113).   In sum, Plaintiffs argue that Santoro's engagement at Delta and continued involvement with matters related to the official map and Simon appear to violate the Pennsylvania Ethics Law, 65 Pa.C.S. § 1103.[3]   (Docket No. 77 at ¶ 114).   In turn, Defendants object to the assertion that Santoro violated the Pennsylvania Ethics Law in any fashion.[4]   (Docket No. 77 at ¶ 114).

Santoro has since become a principal in Delta and runs the Western Pennsylvania office.  (Docket No. 77 at ¶ 108).   During the time period in question, Cranberry Township and Simon had consulting contracts with Delta to assist in obtaining public financing for the infrastructure improvements.   (Docket No. 77 at ¶ 109).   Simon's contract provided that Delta would perform

---

[3]         The cited sections of the Pennsylvania Ethics Law, provide that:

> (a) Conflict of interest.--No public official or public employee shall engage in conduct that constitutes a conflict of interest.
> …
> (c) Accepting improper influence.--No public official, public employee or nominee or candidate for public office shall solicit or accept anything of monetary value, including a gift, loan, political contribution, reward or promise of future employment, based on any understanding of that public official, public employee or nominee that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.
> …
> (g) Former official or employee.--No former public official or public employee shall represent a person, with promised or actual compensation, on any matter before the governmental body with which he has been associated for one year after he leaves that body.

65 Pa.C.S. § 1103.   Further, section 1109(b) provides that "[a]ny person who violates the provisions of section 1103(d) through (j) … commits a misdemeanor and shall, upon conviction, be sentenced to pay a fine of not more than $1,000 or to imprisonment for not more than one year, or both."  65 Pa.C.S. § 1109(b).
[4]         This dispute is a legal rather than a factual one.   In this Court's estimation, the issue of whether Santoro violated the Ethics Law is not material to this case as such a violation is not a predicate felony which would support Plaintiffs' RICO claim.   *See* § V.B.2, *infra*.   Further, the parties have not presented any evidence showing that Santoro was actually charged with a violation of the Ethics Law, that any action was brought against him related to his activities at Delta, or that any judicial decision was rendered finding him in violation of this statute.   For these reasons, this dispute is not a genuine dispute which would prevent the entry of summary judgment against Plaintiffs. *See N.A.A.C.P. v. North Hudson Reg. Fire & Rescue*, --- F.3d ----, 2011 WL 6144188, at *7 (3d Cir. 2011) (quotation omitted) ("disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment").

such services in exchange for $11,500.00 per month, plus a bonus payment for success.  (Docket No. 77 at ¶ 109).  Cranberry engaged Delta for similar services, for a fee ranging from $6,500.00 to $8,500.00 per month.  (Docket No. 77 at ¶ 110).  At one point, Cranberry also had a one year contract requiring Delta to provide community planning and economic development services in exchange for $112,320.00.  (Docket No. 77 at ¶ 110).

John Trant succeeded Santoro and became the Township's point person on the Simon development and PennDot's SR 228 improvements.  (Docket No. 77 at ¶ 115).  Trant testified that during a two-year period, he spent 30-40% of his time working on these matters.  (Docket No. 77 at ¶ 115).  He further explained that he has not been involved in any other project with the Township that required as much time or his attendance at a number of meetings as did these matters.  (Docket No. 77 at ¶ 115).

### G.  2007 Official Map

Cranberry's Official Map was revised ("2007 Official Map") in 2007 largely in accordance with the proposed map earlier submitted by Goetz (on Simon's behalf) to Santoro.  (Docket No. 73 at ¶¶ 26, 36).  The north-south connector road that was on the 2000 Official Map was replaced with a road that traveled to the north and then west, to serve the projected major traffic generator, i.e., the Simon Mall.  (Docket No. 73 at ¶ 32).  Krastas did not personally advise Plaintiffs (including Petrarca) that the Township was intending to make revisions to the official map.  (Docket No. 77 at ¶ 107).  The Township fully complied with the notice requirements under Pennsylvania law for the advertisement, public notice and promulgation of the official map.  *See* § V.B.1.a., *infra*.  To this end, the proposed changes to the map were published in a local newspaper, i.e., the Butler Eagle.  (Docket No. 74-8, Pltf. Ex. 8 at 2).  A public hearing before the Planning Commission was held on January 8, 2007 during which

Krastas and Santoro (now a consultant at Delta) presented the 2007 Official Map.  (Docket No.

77 at ¶ 112).  The minutes from the hearing reflect that:

> **10. Ordinances:**
> **1.** Amendment to the Official Map for the Route 228 corridor
> Mr. Kratsas and Mr. Santoro advised that revisions were needed for the
> Official map of the Route 228 corridor. These changes were shown to the
> Commission.
>
> Mr. Barry[5] made a motion to recommend approval to the Board of
> Supervisors as presented.
>
> Mr. Morgan seconded the motion. The vote was unanimous.

(Docket No. 75-7, Pltf Ex. 27).  Later, at a meeting before the Board of Supervisors on February

22, 2007, Santoro did not appear.  (Docket No. 71-14, Def. Ex. M; Docket No. 71-15, Def. Ex.

N).  Kratas presented the amended map to the Board of Supervisors, a vote was taken and the

2007 Official Map was approved.  (Docket No. 71-14, Def. Ex. M).  On March 1, 2007,

Ordinance No. 2007-376 was promulgated adopting the 2007 Official Map and it was then

officially recorded.  (Docket No. 71-15, Def. Ex. N).

The Ordinance reflects that the Board of Supervisors "find[s] it necessary to adopt this

amended Official Map for the Route 228 area to address and accommodate efficient

transportation with the Route 228 corridor"; that "the Route 228 official map presented here is

consistent with the township's comprehensive plan"; and that "[t]he properties depicted as

proposed township property and/or rights-of-way shall be reserved for future taking or

acquisition for public use in perpetuity until actually acquired by the township." (*Id.*).  Plaintiffs

concede that they became aware of the adoption of the 2007 Official Map by March 5, 2007.

(Docket No. 89 at 33).

---

[5]     The presiding judge has no familial relation to Mr. Barry.

*H.  Plaintiffs' 2007 Land Use Applications*

On August 7, 2007, Plaintiffs filed applications for approval of Preliminary Land Development and Conditional Use Plans to develop a 134,000 square foot shopping plaza. (Docket No. 73 at ¶ 5).  Plaintiffs concede that their 2007 applications did not include the reserved road set forth on the 2007 Official Map.  (Docket No. 73 at ¶ 41).  Instead, after an initial amendment was made, Plaintiffs' proposals contained a north-south connector road positioned in a location consistent with the reserved road set forth on the 2000 Official Map. Plaintiffs also did not include an application for a special encroachment permit along with their other applications.  (Docket No. 74-19 at 3).  They did not include this permit based on advice of their former counsel, Joel Aaronson, Esquire of Reed Smith.  (*Id.*).

Petrarca testified that the economics of his development would "not work" with the reserved road running through his properties as depicted on the 2007 Official Map.  (Docket No. 74-6, Pltf Ex. 6 at 169).  Likewise, as Mazzoni and Skorupan recalled, Aaronson argued to the Board of Supervisors that a reserved road in this location made the property economically unfeasible for Plaintiffs.  (Docket No. 74-10, Pltf Ex. 10 at 13; Docket No. 74-16, Pltf Ex. 16 at 68).  But, Plaintiffs' engineer, Jack Raudenbush, admitted that Plaintiffs never conducted a feasibility study which included the reserved road from the 2007 Official Map for the properties. (Docket No. 73 at ¶ 43).  Raudenbush also testified that there were multiple configurations of buildings which were possible for the development of Plaintiffs' land.  (Docket No. 73 at ¶ 44).

Plaintiffs submitted multiple revised plans to the Township.  (Docket No. 73 at ¶ 46). During this time, Petrarca, his counsel, Aaronson, and Cranberry officials had several meetings discussing the applications and potential resolutions of the issues.  (Docket No. 73 at ¶ 45). Despite these meetings, two significant deficiencies were never rectified in the applications:

traffic mitigation and the location of the reserved road.  (Docket No. 73 at ¶ 45).  Trant testified that these issues were never resolved because Petrarca was represented by legal counsel, Aaronson, who "preferred at all or most of those meetings" to defer meaningful discussion "about the Petrarca traffic mitigation and the official map road alignment to a further date." (Docket No. 71-5, Def Ex. E at 4).  Petrarca also testified that he was willing to condition acceptance of the applications on the completion of the infrastructure improvements by PennDOT and that Trant advised him that the Township was willing to accept the plans based on the contingency.  (Docket No. 77 at ¶ 133).

"Each time Plaintiffs would submit a revised report to the Township, a Development Report would be created noting the deficiencies of the revised plan with citations to the applicable ordinance or statute."  (Docket No. 77 at ¶ 143).  Plaintiffs "would receive a copy of the Development Report prior to the Planning Advisory Commission meeting that would be discussing the application."  (Docket No. 77 at ¶ 143).  The Township advised Plaintiffs in the first of its Development Reports submitted on October 26, 2007 that Plaintiffs' applications were deficient because the layout of the buildings did not conform to the 2007 Official Map.  (Docket No. 1-1 at 24).  Specifically, the Development Report sent by Henshaw to Plaintiffs on October 26, 2007, stated that the developer needed to: "Identify Official Map Road on the site plan as adopted by Township Ordinance (Ordinance 2000-39, as amended by 2007-376)" and further noted that "[t]he connecting road, as proposed is not in alignment and does not serve the intended purpose of the Official Road Map."  (*Id.*).   Similar deficiencies were noted in subsequent Development Reports submitted on October 30, 2007, January 21, 2008, January 25, 2008, February 5, 2008, February 7, 2008, April 24, 2008, June 24, 2008, and August 27, 2008.

(*See* Docket Nos. 1-1; 1-2).  These deficiencies were never resolved and were cited among the bases for the denials of the applications in February and March of 2009.  (Docket Nos. 1-3; 1-4).

Plaintiffs' engineer, Raudenbush, testified that the reports would often be received at the last minute and included citations to inapplicable ordinances or inaccurate statements regarding the requirements of the cited ordinances.  (Docket No. 77 at ¶ 143; Pltf Ex. 88).  But, he offered no explanation regarding the failure of the applications to account for the reserved road.  (*Id.*).  Plaintiffs' position regarding the location of the reserved road on their properties is fully explained in a March 4, 2008 letter by their former counsel, Aaronson, to the Township.

> 3.  A Portion of the Proposed Shoppes of the Woods Development Is Shown to be Constructed on a Proposed Street Included on the Township's Recently Amended Official Map.
>
> The Township's recent approval of the amendment to the Township's official map laying out the referenced proposed street, was, and is, intended to benefit and accommodate the proposed Simon major shopping center development.  It is all too obvious, regardless of any Township assertions to the contrary, that the Township's obstruction of the Shoppes at the Woods development and the Township's sterilization of the Petrarca property is driven by the Township's single minded intention to "use" my client's property to accommodate the nearby proposed major Simon shopping center development, access to which has been designed by Simon's consultants to cut a swath through the middle of my client's property in the same location that the Township subsequently designated in its recent official map amendment.
>
> …
>
> Accordingly, I want to be clear that if the Shoppes at the Woods development is disapproved, **my client will not simply appeal that disapproval to the state court, but will also assert those and other claims against the Township and its officials in federal court, and will resist, if necessary to the United States Supreme Court, any attempt to condemn my client's property**.  Given recent statutory changes regarding the use of eminent domain, and changing judicial views, I think we would succeed.  In any event, based on my experience, the resolution of such a condemnation dispute will take several years during which, based

> on case law, the Township would not be entitled to possession of
> my client's property for any such Simon development access even
> assuming the Township would otherwise ultimately prevail in the
> condemnation proceeding which we believe it would not.

(Docket No. 78-5, Def Ex. YY at 4 (emphasis added)).

In conjunction with their applications, Plaintiffs submitted a traffic study prepared by traffic engineer, Chuck Wooster. (Docket No. 73 at ¶ 53). Mr. Wooster opined that certain mitigation of traffic would be required at the intersection of SR 228 and Cranberry Woods Drive, if Plaintiffs' proposed development was built. (Docket No. 73 at ¶ 53). Specifically, Mr. Wooster stated that the mitigation should include:

> • Construct an additional eastbound left turn lane on State Route
> 228 at the intersection to provide dual eastbound left turn ingress
> to the site drive. The turn lanes should provide 300 feet of
> vehicular storage, exclusive of bay tapers.
> • Construct an additional westbound left turn lane on Route 228 at
> the intersection to provide dual westbound left turn ingress to
> Cranberry Woods Drive. The left turn lanes would provide 200
> feet of vehicular storage, exclusive of bay tapers.
> • Construct an auxiliary westbound right turn lane on Route 228 at
> the site drive. The auxiliary right turn lane should provide 200 feet
> of vehicular storage exclusive of bay tapers.
> * * *
> The developer IS committed to implementing these
> improvements.

(Docket No. 73 at ¶ 54). Plaintiffs contend that Wooster also indicated in his report that these improvements were being planned by PennDOT as part of the SR 228 improvements, and that Plaintiffs would wait for those improvements to be made before breaking ground on their development. (*Id.*). Wooster also testified that there were traffic issues in the Route 228 Corridor without adding any further development and admitted that if the Plaintiffs' development were built, without any traffic mitigation, it would increase an already tenuous traffic situation. (Docket No. 73 at ¶ 57).

The Planning Advisory Commission made an initial recommendation to deny the Plaintiffs' applications. (Docket No. 73 at ¶ 46). Hearings were then held before the Township Board of Supervisors. (Docket No. 73 at ¶ 47). Pursuant to the Municipalities Planning Code ("MPC"), an applicant is entitled to present seven hours of testimony. 53 P.S. § 10908(1.2). (Docket No. 73 at ¶ 49). Plaintiffs' former counsel, Aaronson, requested that he be permitted an additional four hours of testimony. (Docket No. 73 at ¶ 49). This request was granted by the Board of Supervisors. (*Id*. at ¶ 50). A significant amount of evidence was presented at said hearings, consisting of 747 pages of transcripts, 114 exhibits, amounting to 2,100 pages of documents. (Docket No. 73 at ¶ 51).

On March 6, 2009, the Township Board of Supervisors denied Plaintiffs' applications, citing two primary deficiencies in same: (1) failure to conform to the 2007 Official Map; and (2) failure to mitigate traffic. (Docket No. 73 at ¶¶ 6, 52, 53). Chief among them, the Township stated that "The Developer failed to submit any proposed land development plans to the Township that include the reservation of the road right-of-way as shown on the Township Official Map, Ordinance 2007-376." The Township also found that Plaintiffs could not proceed with their development unless they mitigated traffic impacts on SR 228 and other roads. (Docket No. 77 at ¶ 129). Plaintiffs claim that the proffered reasons for the denial are merely a "pretext" hiding the true purpose of the Township to favor Simon's largest development plan over their own. (Docket No. 73 at ¶ 104).

I. *Correspondence Between Township and Simon Representatives During Pendency of Plaintiffs' Applications*

While Plaintiffs' applications were pending, Township officials and representatives of Simon continued to discuss the potential Simon Mall and Plaintiffs' development. At some point, Simon obtained a copy of Plaintiffs' proposal. (Docket No. 77 at ¶ 122). Then, on

18

November 1, 2007, after the Township had already advised Plaintiffs of numerous deficiencies in their applications, Bill Raneck, Simon's civil engineer on the Mall project, emailed a copy of Plaintiffs' plan to Kathy Shields and Bob Goetz.  (*Id.*).  Raneck advised that: "Simon wants to provide a list of issues that make this plan unacceptable in the overall development scheme. Your thoughts on the cross sections and location of the first intersection would be appreciated as well as any other observations you may have."  (Docket No. 77 at ¶ 122).  Later that day, Kathy Shields contacted John Trant by email, requested a meeting, and asked "[w]hat is your deadline for responding to Petrarca – we have some comments we wanted to share with you on their site plan."  (Docket No. 77 at ¶ 123; Pltf Ex. 32).  There is no evidence in the record before this Court regarding whether a meeting was held.  However, on December 1, 2007, Kathy Shields wrote to Bob Goetz that:

> Bill—by the way … when speaking with John Trant today, he indicated that the Township would be willing to condemn more than the roadway plus the 14 feet of buffer if we need it for slope easements and support.  They can take whatever we need for the road.   They can't take any additional property that would be viewed as condemning for a private use, e.g., the parcel to the west of the Petrarca entry drive.  If that comes into the fold, it will be as part of the settlement negotiation in court after the quick take for the roads.   But anything we need for slopes to support the road from existing grades is fair game.

(Docket No. 77 at ¶ 124).

On March 28, 2008, Trant wrote to Shields:

> The alignment of the Petrarca road has changed more than I had realized. I now think we need to either come to a resolution on the local road issue prior to your approaching him, or we need to accept the fact that the alignment may change from the meets and bounds description that your current appraisal is based on and proceed anyway.

(Docket No. 77 at ¶ 126).   On April 11, 2008, Shields wrote to Trant and asked "Would it be your intent to change official map again or not?"   (Docket No. 77 at ¶ 126).   Trant responded in the negative, commenting that:

> We wouldn't change the official map because there is no benefit in doing because it would be subsequent to Petrarca's submission of his plan. A change in alignment wouldn't affect our ability to condemn the property, but it will likely affect the value attached to the ROW. We can talk at length later, but the best scenario is one in which you negotiate the purchase of the ROW from Petrarca following the new alignment. I wouldn't structure it as a change on our end, rather an option that is more sensitive to what Petrarca wants to do on his site. If there is any perception that we changed our mind, he will seize on that. The alternative is reverting back to the current official map alignment, which will force dealing with the self storage property.

(*Id.*; Pltf Ex. 39).   On April 17, 2008, Shields then wrote to her consultant, Bob Goetz, the following:

> If you have a sketch of how the new road would sit on the Petrarca plan, could you send it to me. We are meeting with Petrarca on Monday in Pittsburgh. The City [Township] is now very sensitized to the clear case Petrarca is building to argue that these roads serve Simon's purpose and not the Township's. We need to be careful about what we submit …Don't submit any updated traffic studies to the Township without first getting them to us.

(Docket No. 77 at ¶ 127).

> *J.   Alleged Similarly Situated Developments & Township's Requirements on these Developers*

Plaintiffs claim that the Township did not require mitigation of traffic impact by Simon and/or Westinghouse in conjunction with their respective developments.   (Docket No. 77 at ¶ 130).   Defendants point out that Simon never submitted a formal plan for development, and since the development was never formalized by Simon, neither was the Township's official response to same.   (Docket No. 77 at ¶ 130).   Westinghouse submitted a formal plan to develop its present

headquarters in Cranberry Woods in 2007. (Docket No. 77 at ¶¶ 132, 133). Regarding its plans, Defendants contend that the Cranberry Woods Development mitigated its traffic impact when the initial development, including Mine Safety Appliance's headquarters was built, and those developers contributed to the costs of widening SR 228. (Docket No. 77 at ¶ 130). Defendants also maintain that Westinghouse's development was not subject to the same traffic use restrictions as Plaintiffs' properties because Westinghouse's property does not front SSR 228. (Docket No. 77 at ¶ 130).

The Township's traffic engineer, HRG, reviewed the MSA/Westinghouse Development within Cranberry Woods on June 14, 2007. "HRG determined that SR 228 could support the increased traffic volumes assuming that the SSR 228 widening and laning included as part of the Simon and PennDOT improvement projects." (Docket No. 77 at ¶ 132). Plaintiffs argue that Westinghouse's development was approved despite the fact that its plan was conditioned on the infrastructure improvements which were never completed. (Docket No. 77 at ¶ 132). And, they complain that their applications were denied despite the fact that they were willing to condition approval on future infrastructure improvements. (*Id*.).

### K.  Litigation Initiated By Plaintiffs

While their land use applications were pending, Plaintiffs filed a Mandamus and Declaratory Judgment action against the Township in the Court of Common Pleas of Butler County. (Docket No. 32-1 at 2-3).[6] In this action, Plaintiffs sought "deemed approval" of their development applications "by reason of the Township's failure to conduct proper hearings with respect thereto, and a declaration that certain future street right of way reservations designated by

---

[6]     The Court quotes from the "Motion to Stay State Court Proceedings Pending Disposition of Related Federal Action" filed by Plaintiffs, through their former counsel, Aaronson, in the Court of Common Pleas of Butler County, Pennsylvania in February of 2010. (Docket No. 32-1). Defendants previously attached this brief on this Court's docket in response to Plaintiffs' motion to stay this proceeding in May of 2010. (*Id*.).

the Township on the Township's Official Map … had lapsed and were void by operation of the law under the MPC." (*Id.*). Plaintiffs also filed land use appeals from the denial of their 2007 Land Use Applications in the Butler County Court of Common Pleas. (Docket No. 73 at ¶ 7). There, Plaintiffs sought a reversal of the Township's decisions to deny their applications. (*Id.*). Plaintiffs initiated the present lawsuit seeking money damages in September of 2009.[7] (Docket No. 1). Plaintiffs then moved to stay the state court actions. (Docket No. 73 at ¶ 8; Docket No. 32-1). The Court of Common Pleas granted the stay over the objection of Defendants. (Docket No. 73 at ¶ 8). Defendants appealed the order staying the cases but the Commonwealth Court quashed their appeal. (Docket No. 71-44, Def Ex. OO). Therefore, those cases remain stayed. (Docket No. 73 at ¶ 8).

  L. *Fifth Third Bank Foreclosure on Plaintiffs' Properties / Echo's Proposed Development*

  At some point while this case was pending, Plaintiffs defaulted on their mortgage held by Fifth Third Bank. (Docket No. 73 at ¶ 68). Petrarca testified that the default was the result of a financial evaluation of his companies conducted by the bank and its determination that a change in the financial condition of the companies triggered default under the terms of the mortgage agreements. (Docket No. 96-4). After declaring default, Fifth Third Bank initiated foreclosure proceedings against Plaintiffs and their properties. (*Id.*). On October 8, 2010, the five parcels were sold for $5.25 million at a Sheriff's Sale to Echo Cranberry Associates, L.P. ("Echo"). (*Id.* at ¶¶ 68, 69).

  Echo is presently in the process of developing the properties which were formerly owned by Plaintiffs. (*Id.* at ¶ 69). Echo submitted Preliminary Land Development and Conditional Use Applications to the Township on March 8, 2011. (*Id.*). The development plans propose

---

[7]  The pertinent procedural history of this case is detailed in the following section. *See* § III, *infra*.

approximately 200,000 square feet containing a mix of retail space, a gas station, restaurant and an office building.  (*Id*. at ¶ 70).  The anchor tenant with Echo's planned development is the world's largest Dick's Sporting Goods.  (*Id*.).  Echo has engaged Chuck Wooster – Plaintiffs' former traffic engineer – as its own traffic engineer consultant.  (*Id*. at ¶ 72).  And, Mr. Wooster has made recommendations concerning the traffic mitigation required for the proposed development.  (*Id*.). The parties dispute whether Echo's plans precisely comport to the 2007 Official Map and the road contained therein which bisects the Subject Properties.  (Docket Nos. 71-32, Def Ex CC; 71-33, Def. Ex. DD; 71-34, Def Ex. EE).  However, this dispute is not material to the disposition of the present motion for summary judgment.

III. PROCEDURAL HISTORY

Plaintiffs initiated this action by filing their Complaint against Defendants on September 11, 2009.  (Docket No. 1).  The Court then ordered Plaintiffs to submit a RICO case statement in accord with Local Rule 7.1(B) of the Local Rules of Court for the Western District of Pennsylvania.  (Docket No. 3).  After receiving an extension of time to do so, Plaintiffs submitted their RICO case statement on September 30, 2009.  (Docket No. 8).

Defendants moved to dismiss all of Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Docket No. 14).  Said motion was fully briefed and the Court entertained oral argument from counsel on January 20, 2010.  (Docket No. 24).  The Court issued a Memorandum Order on February 22, 2010, granting, in part, and denying, in part, Defendants' motion to dismiss.  (Docket No. 28).  Under this Memorandum Order, the Court dismissed Plaintiffs' RICO and civil conspiracy claims against Cranberry Township, with prejudice, but denied the motion with respect to the remainder of Plaintiffs' claims.  (*Id*.).

The case then proceeded through discovery as to Plaintiffs' claims against the Individual

Defendants under RICO, § 1983 and civil conspiracy as well as Plaintiffs' § 1983 claims against

Cranberry Township.   (Docket No. 29).   The parties were afforded a full twelve months to

conduct discovery in this case given the number of potential witnesses as well as the voluminous

documentary evidence expected by both sides.   (Docket No. 25).   In April of 2010, Plaintiffs

moved to stay these proceedings so that they could have the opportunity to negotiate the sale of a

portion of their property to PennDOT.   (Docket No. 31).   Defendants objected to the stay

because they believed that such negotiations would be unfruitful due to their view that Plaintiffs

had an "overinflated value" of their property and because Plaintiffs had also sought and received

stays in the appeals from the Township's denial of their land use applications in the Court of

Common Pleas of Butler County.   (Docket No. 32).   After hearing oral argument from counsel,

the Court granted the motion to stay but ordered that Plaintiffs' present counsel[8] file a status

report regarding discovery.   (Docket No. 41).   Settlement negotiations with PennDOT and

between the parties were unsuccessful.   (Docket Nos. 44, 45, 47, 48, 49).   The stay was lifted and

discovery concluded on May 12, 2011, except for some limited document production issues.

(Docket No. 67).

Defendants filed the pending motion for summary judgment, brief in support, concise

statement of material facts and appendix on May 31, 2011.   (Docket Nos. 68, 69, 70, 71).

Plaintiffs responded with their brief in opposition, response to Defendants' concise statement of

---

[8]     Plaintiffs were formerly represented in this action by attorneys from Reed Smith LLP, including John McIntyre, Esq. and Joel Aaronson, Esq. – who likewise represented them in dealings with the Township and in the Court of Common Pleas of Butler County.   Shortly after the motion to stay was filed, these attorneys and Reed Smith LLP sought leave of Court to withdraw as counsel.   (Docket No. 40).   Said motion was granted and present counsel entered their appearances at that time.   (Id.).   Later, during discovery, Reed Smith and Aaronson filed a motion for a protective order regarding a subpoena served on them.   (Docket No. 56).   The Court convened a status conference with counsel for the parties and Reed Smith and Aaronson, during which the Court strongly suggested that the attorneys meet and confer in an effort to resolve the potential disputes.   (Docket No. 58).   Thereafter, counsel reported that the matter was amicably resolved.   (See Text Order, 4/1/11).

material facts and appendix.  (Docket Nos. 72, 73, 74, 75).  Within their submission, Plaintiffs advanced additional facts for the Court's consideration.  (*Id*.).  In turn, Defendants filed their reply brief, response to Plaintiffs' additional facts and supplemental appendix on July 15, 2011.  (Docket Nos. 76, 77, 78).  On July 29, 2011, Plaintiffs submitted a sur-reply brief, response to Defendants' additional facts and supplemental appendix.  (Docket Nos. 79, 81, 82).

The Court then held oral argument regarding the pending motion on August 4, 2011.  (Docket No. 89).   During the argument, Plaintiffs, for the first time, suggested that the Defendants were less than forthcoming with their initial responses to document requests.  (*Id*.).  In fact, Plaintiffs' counsel acknowledged that she had not raised the matter in any motion filed within the discovery period.  (*Id.*).  At the conclusion of the hearing, the Court ordered that the parties submit further briefing on the matter.  (*Id.*).

Plaintiffs responded with a brief arguing that summary judgment should be denied based on the Defendants' alleged failure in discovery and provided further argument supporting their earlier position  that the motion for summary judgment should be denied. (Docket No. 90).  They also submitted additional evidence in support of both positions.  (Docket No. 91).  Defendants took issue with Plaintiffs' submission of additional evidence and moved to strike same.  (Docket No. 92).  After considering a brief in opposition from Plaintiffs (*see* Docket No. 93), the Court denied Defendants' motion to strike and ordered them to submit any supplemental brief and further evidence by September 1, 2011.  (Docket No. 94).  Pursuant to this Order, Defendants filed their supplemental brief and supporting appendix on September 1, 2011.  (Docket Nos. 95, 96).   In their supplemental brief, Defendants argue that Plaintiffs failed to timely raise their discovery issues and otherwise contend that the entry of summary judgment in their favor remains appropriate.   (Docket No. 95).

As all briefing has concluded, the motions are now fully briefed and ripe for disposition.

IV. MOTION FOR DISCOVERY SANCTIONS

Initially, Plaintiffs contend that the Court should deny Defendants' motion for summary judgment under Rule 37 of the Federal Rules of Civil Procedure as a sanction for Defendants alleged failure to produce all documents responsive to their requests for production of documents during discovery. (Docket No. 90). Specifically, they assert that certain emails obtained via third party discovery on Simon and Kathleen Shields should have been produced by Defendants much earlier in this case. (*Id.*). The Court construes Plaintiffs' requests as a motion for discovery sanctions. (*Id.*). In response, Defendants deny that they failed to produce all responsive documents in their possession and further maintain that Plaintiffs' argument should be rejected because they failed to timely pursue any objections to the discovery production during the lengthy discovery period afforded to the parties in this case. (Docket No. 95). After careful consideration of the parties' positions, the Court is not persuaded by Plaintiffs' argument given the facts and circumstances of this case.

Plaintiffs rely on Rule 37(b)(2), which provides, in pertinent part, that "**if a party … fails to obey an order to provide or permit discovery** … the court … may issue further just orders" including, among other things, directing that certain facts are established for purposes of this action; prohibiting the disobedient party from supporting or opposing designated claims or defenses; or "striking pleadings in whole or in part." Fed.R.Civ.P. 37(b)(2)(A). [9] However,

---

[9]    Rule 37(b)(2) provides, as follows:

> (A) *For Not Obeying a Discovery Order*. If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)-- **fails to obey an order to provide or permit discovery**, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

courts have recognized that sanctions under Rule 37(b) are only authorized if a party violates a court order compelling the production of discovery issued under Rule 37(a).  *See Brown v. Merline*, Civ. No. 05-2824 (RBK), 2006 WL 2038494, at \*2 (D.N.J. Jul. 19, 2006) ("absent a preexisting order to compel, the sole recourse of a party seeking interrogatories or production of documents is to obtain a court order pursuant to Rule 37(a)"); *see also R.W. International Co. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir.1991) ("[Rule 37]'s language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed."); *Cf. Hewlett v. Davis*, 844 F.2d 109, 113 (3d Cir. 1988) ("Rule 37(b)(2) offers a wide range of sanctions for noncompliance with an *order to compel discovery*.") (emphasis added).

Here, Plaintiff did not challenge the Defendants' discovery production in any fashion prior to the close of discovery on May 12, 2011.  (*See Docket Report, CA 09-1242*).  To this end, they did not: file a motion to compel the production of additional documents responsive to their initial discovery requests; move to reopen the depositions of any of the witnesses previously deposed; or seek any extension of the discovery period for these purposes.[10]  (*Id.*).  Indeed,

---

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
(iii) striking pleadings in whole or in part;
(iv) staying further proceedings until the order is obeyed;
(v) dismissing the action or proceeding in whole or in part;
(vi) rendering a default judgment against the disobedient party; or
(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed.R.Civ.P. 37(b) (emphasis added).

[10]     This Court expects attorneys in all cases to cooperate during the discovery process and this Court's Practices and Procedures clearly state that motions to compel discovery are only considered if the attorneys certify that they met and conferred in an effort to resolve the disputes prior to bringing any discovery motions.  *See*

Plaintiffs' counsel admitted that they sat on their rights concerning discovery and did not seek to enforce them during the discovery period.[11] (Docket No. 89 at 19). Moreover, Plaintiffs admit that they obtained the documents from Simon on April 28, 2011 and used them in conjunction with their deposition of Simon representative, Kathleen Shields, on May 3, 2011. (Docket No. 90). Plaintiffs then used the documents again in opposition to Defendants' motion for summary judgment in June of 2011. (Docket No. 90). Since the Defendants' discovery production was never challenged during the discovery period, the Court has not issued any orders against Defendants under Rule 37(a) compelling the production of *any* discovery.[12] Because a Rule 37(a) order was never issued, Plaintiffs have failed to demonstrate that Defendants violated a Rule 37(a) order. Therefore, sanctions under Rule 37(b) are inappropriate, including the relief sought by Plaintiffs, i.e., the denial of the Defendants' motion for summary judgment. Accordingly, the Court will now fully consider the Defendants' motion for summary judgment.

## V. MOTION FOR SUMMARY JUDGMENT

### A. *Legal Standard*

The legal standard on a motion for summary judgment is well-settled. To this end, Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

*Practices & Procedures of Judge Nora Barry Fischer*, § II.N, *available at:* http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf (effective 3/23/10).

[11] Specifically, the Court and Plaintiffs' counsel had the following exchange:

> THE COURT: Why didn't you come back to court and ask to open up his deposition again?
> MS. POTEET: Well, Your Honor, we possibly should have done that.

(Docket No. 89 at 19).

[12] Due to Plaintiffs' failure to raise these issues during the discovery period, defense counsel was also not given the opportunity to meet and confer with Plaintiffs' counsel regarding the alleged deficiencies in the discovery production, to correct any such deficiencies, or to oppose any discovery motions. The extreme sanction of denying Defendants' motion for summary judgment is simply not warranted in this case after Plaintiffs themselves clearly failed to appropriately object to the discovery production in accordance with the Federal Rules of Civil Procedure, Local Rules of Court and this Court's Practices and Procedures.

law." Fed.R.Civ. P. 56(a) (2010).[13] Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

---

[13]     Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute," the "standard for granting summary judgment has not changed." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motions.  *See Toney v. Bledsoe*, 427 Fed .App'x 74, n. 5 (3d Cir.2011) (not precedential) (same).

### B.  Discussion

This is the second time that a dispositive motion in this case is before the Court. Previously, the Court denied most of the Defendants' arguments in support of their motion to dismiss and then afforded Plaintiffs the opportunity to discover evidence supporting their claims during a one year period for discovery. *See Cranberry Promenade, Inc., et al. v. Cranberry Township, et al.*, Civ. A. No. 09-1242, 2010 WL 653915, at *7 (W.D.Pa. Feb. 22, 2010). However, even after undertaking substantial discovery during the lengthy discovery period, Plaintiffs have failed to obtain evidence substantiating their allegations against the Defendants supporting their claims under § 1983 or RICO.  As a consequence, the Court will enter summary judgment in favor of Defendants as to Plaintiffs' federal claims and decline to exercise jurisdiction over the remaining state law civil conspiracy claim.  The Court's analysis supporting these rulings follows.

### 1.   § 1983 Claims

Plaintiffs have alleged a single section 1983 claim,[14] although they claim violations of three separate federal rights arising under the United States Constitution, those to procedural due

---

[14]     Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  § 1983 does not create substantive rights and in order to prevail on a claim under § 1983, a plaintiff must demonstrate an underlying violation of a federally protected right.  *See Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 679 (W.D.Pa. 2009) (citations omitted).

process; substantive due process; and equal protection of the laws.  (Docket No. 1).  The Court

will evaluate each of these separate claims, in turn.

a.   Procedural Due Process

The Fourteenth Amendment provides that a State may not "deprive any person of life,

liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1.  "A procedural

due process claim is subject to a 'two-stage' inquiry: (1) whether the plaintiff has 'a property

interest protected by procedural due process,' and (2) 'what procedures constitute "due process

of law."'  *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011) (quoting *Gikas v. Wash. Sch.

Dist.*, 328 F.3d 731, 737 (3d Cir. 2003)).  Here, Defendants do not challenge the first prong of

this test and essentially concede that their denial of Plaintiffs' land use applications affects a

property interest protected by procedural due process.  *Cf. Chainey v. Street*, 523 F.3d 200, 219

(3d Cir. 2008) ("ownership is a property interest worthy of [ … ] due process protection.").

Thus, the Court need not analyze whether the first prong of the claim is satisfied.  As to the

second step of the analysis, Defendants contend that they are entitled to summary judgment as to

Plaintiffs' procedural due process claim because Plaintiffs sought and obtained a stay of the

appeals they filed challenging the Township's land use decisions in state court.  (Docket No. 69

at 23-26).  Plaintiffs respond that their actions staying those cases should not foreclose their

procedural due process claims for money damages that they are pursuing in this case.  (Docket

No. 72 at 29-30).

The parties presented the Court with very similar arguments at the motion to dismiss

stage.  *Cranberry Promenade*, 2010 WL 653915, at *5.  At that juncture of the case, Plaintiffs

had yet to move to stay the land use appeals in state court and this Court denied Defendants'

motion to dismiss Plaintiffs' procedural due process claim.  *Id.*  In so holding, this Court

31

suggested that dismissal was inappropriate at that time because the record was not fully developed and the parties had not presented any arguments about whether a predeprivation process was due to Plaintiffs prior to the changes made by the Township to the Official Map in 2007, which potentially alleged a taking of Plaintiffs' property without due process of law. *Id.* However, the Court also noted that if such a predeprivation process was not required and only a postdeprivation process was necessary, that "an individual must generally avail himself of the postdeprivation process which is made available to him, unless those procedures are unavailable or patently inadequate, because the harm has yet to occur." *Id.* (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).  Thus, the Court did not foreclose Defendants' argument, raised again at summary judgment, that the Plaintiffs' failure to fully litigate their appeals of the Township's denial of their land use applications in the Court of Common Pleas of Butler County was fatal to their procedural due process claim.  It is clear to the Court now that the evidence of record does not support a procedural due process claim and that no genuine issue of material fact exists which would preclude summary judgment as to this claim.

At the outset, despite the Court's roadmap contained in the decision on the motion to dismiss, and the considerable opportunities to brief this motion which was afforded to them, Plaintiffs have not set forth a persuasive argument that any additional predeprivation process was due to them prior to the Township's adoption of the 2007 Official Map, including its relocation of the reserved road over Plaintiffs' properties, other than that which was provided.[15]  (*See* Docket Nos. 72, 79, 89, 90).  Further, they have not argued that the Township violated any applicable statutes or ordinances during its adoption of the revisions to the map.  (*Id.*).

---

[15]     Plaintiffs have not argued, for example, that they were entitled to a hearing prior to the Township's adoption of the 2007 Official Map.

In addition, the evidence that Plaintiffs have presented which arguably pertains to such a claim includes, at most, that: one of Simon's consultants, Bob Goetz of Trans Associates, provided Township employee, Daniel Santoro with a CAD drawing showing Simon's preferred location of the reserved road; Santoro left his position with the Township and joined Delta as a consultant; and, Santoro appeared at a later public hearing along with Township employee, Jason Krastas and presented the proposed changes to the board – which adopted Simon's preferred location of the road.  (Docket No. 77 at ¶¶ 105, 106, 112, 113, 114).  Plaintiffs argue that Santoro's presence at the meeting and involvement in Township matters within one year after he left the Township's employ violated a restriction placed upon him by the Pennsylvania Ethics Law, 65 Pa.C.S. § 1103.[16]  (*Id.* at ¶ 114).  The parties also dispute whether Petrarca or his representatives were personally made aware of the proposed changes by the Township prior to the enactment of the 2007 Official Map.  In this regard, Santoro testified that he provided a copy of the proposed map to Petrarca and/or his representatives as early as June of 2006 and discussed the changes with them during subsequent meetings while Petrarca denied any such knowledge, including that these meetings occurred.[17]  (Docket No. 73 at ¶ 34, 35; Docket No. 74-6, Pltf Ex. 6, p. 75).

While this evidence, viewed in the light most favorable to Plaintiffs, suggests possible impropriety on behalf of non-defendant Santoro and a factual dispute concerning whether Plaintiffs were aware of the proposed changes to the reserved road prior to the Township's adoption of same, these disputes are not material to resolution of Defendant's motion for summary judgment because Plaintiffs have failed to demonstrate that they were entitled to any

---

[16]     *See* n.2, *supra*; *see also* 65 Pa.C.S. § 1103.

[17]     Of course, other evidence supplied by Plaintiffs, including the testimony of their own engineer, discloses that Plaintiffs' attorney Victor Hull, at least, was aware of the proposed changes in the Summer of 2006.  (Docket No. 81-15, Pltf Ex 89).

further predeprivation procedure other than that which was provided by the Township.  *See Anderson*, 477 U.S. at 248 ("only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  Section 10401 of the Pennsylvania MPC grants a governing body "the power to make or cause to be made an official map" of the municipality and set forth, among other things, "proposed public streets" on same.  53 P.S. § 10401.  Section 10402 provides that prior to the adoption of an official map, a governing body must: submit the proposed map and ordinance to the planning agency for review; hold a public hearing pursuant to public notice; hold a vote on the proposed changes; and, record the official map with the recorder of deeds in the appropriate county.  53 P.S. §§ 10402(a), (b), and (c).  In this case, Plaintiffs do not contest that all of these conditions were met prior to the enactment of the 2007 Official Map.[18]  Indeed, they have not disputed that public notice was provided in local newspapers, including the Butler Eagle; that the proposed changes to the map were discussed openly at public hearings, during one of which before the Board of Supervisors a vote was taken approving the changes; an ordinance was later adopted;

---

[18]    The Township conclusions of law submitted along with their denial of Plaintiffs' applications state the same.  Specifically, the Township's decision states:

> B-3.    The adoption of the Official Map followed the public process prescribed by Section 402 of the Municipalities Planning Code, which includes public notice, planning agency review, a 45-day review period, a public hearing and record of the final ordinance and official map.

> B-4.    The Developer and its representatives were provided all required statutory notice of the official map process and could have participated in said process prior to the March 1, 2007 adoption of the final Official Map and prior to the Developer's submission of the Preliminary Land Development Application on August 7, 2007.

> B-5    The Developer did not submit comments during the public review period for the Township Official Map (Ordinance 2007-376), nor has the Developer utilized statutory or any other administrative relief available.

(Docket No. 71-24, Def Ex. V at 6).

and, the 2007 Official Map was appropriately recorded.  (Docket Nos. 74-8, Pltf Ex. 8 at 2).[19]

Plaintiffs have also failed to specifically argue that the supposed impropriety by non-defendant Santoro or the alleged lack of notice of the proposed changes could not be sufficiently challenged by appealing the decision to adopt the 2007 Official Map or by following any other available postdeprivation process available to them.   Indeed, the record evidence shows that Plaintiffs did not file an appeal challenging the adoption of the 2007 Official Map.  *See* 53 P.S. § 11002-A(b) ("Challenges to the validity of a land use ordinance raising procedural questions or alleged defects in the process of enactment or adoption shall be raised by appeal taken directly to the court of common pleas … in accordance with 42 Pa.C.S. § 5571.1 (relating to appeals from ordinances, resolutions, maps, etc.).").   Instead, as is more fully explained in the following paragraphs, Plaintiffs employed a different strategy to attack the Township's adoption of the 2007 Official Map, albeit an unsuccessful one, by filing preliminary land use applications with the Township in an effort to void or negate the relocation of the reserved road on their properties.[20]  (*See* Docket No. 90 at 7).  Plaintiffs did not, however, include an application for a special encroachment permit along with their land use applications in accord with state law.[21]

---

[19]     Specifically,

> Q. So he gave you the plan for the map road and said I want you to take this through the administrative process? [A]dministrative process, what did that involve?
>
> A. It went through an authorization to advertise, which was done early January. Then we advertised in the Butler Eagle, I believe, two times in January and early -- maybe early February. And then there was a public hearing, I believe, in late February and then an adoption in, I believe, March.

(Docket No. 74-8, Pltf. Ex. 8 at 2).

[20]     Specifically, Plaintiffs argue that "the Pa. MPC and the Cranberry Township Ordinances provide that the filing of a land development application with a road that differs from the official map can be used to challenge the application of an official map road. See Ex. 45, Cranberry Ordinance 27-315."  (Docket No. 90 at 7).

[21]     Plaintiffs' in-house counsel, Victor Hull, Esquire, testified that a special encroachment permit was not filed based on the advice of their former counsel, Aaronson.  (Docket No. 74-19, Pl Ex. 19 at 3).

(Docket No. 74-19 at 3).  They also filed an action for Mandamus and Declaratory relief against the Township seeking a ruling that the reserved road was "void" under the MPC.  (Docket No. 32-1 at 2-3).  So, the record discloses that postdeprivation processes were available to Plaintiffs to challenge the Township's adoption of the 2007 Official Map.  As a consequence, the Court discerns no evidence of a procedural due process violation arising from the adoption of the 2007 Official Map by the Township.

With respect to Plaintiffs' procedural due process claim challenging the procedures employed by the Township during its denial of Plaintiffs' land use applications in 2009, the Court agrees with Defendants that this claim must fail because Plaintiffs have not pursued their appeals before the Court of Common Pleas of Butler County but sought a stay of those proceedings in favor of this federal action.  The United States Court of Appeals for the Third Circuit has held that in order to sustain a "'claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate.'"  *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008) (quoting *Alvin*, 227 F.3d at 116).  In addition, the Court of Appeals has "upheld as reasonable Pennsylvania's post-deprivation judicial remedies for challenging administrative land use decisions."  *Perano v. Township of Tilden*, 423 Fed.Appx. 234, 237 (3d Cir. 2011) (citations omitted).  Those remedies include the filing of an appeal from adverse land use decisions to the Court of Common Pleas under 53 P.S. § 11001-A.  *Id.*

Here, the postdeprivation remedy of an appeal was certainly available as Plaintiffs actually filed an appeal of the Township's denial of their applications to the Court of Common

Pleas.  (Docket No. 73 at ¶¶ 7, 8).  However, Plaintiffs pursued the litigation strategy[22] of filing multiple lawsuits against the Township (including the present federal case) and then unilaterally moved to have the state appeals stayed over the Township's objections.[23]  (*Id.* at ¶ 8).

Plaintiffs summarily state that the judicial appeal procedures were "patently inadequate" because they were unable to obtain discovery or money damages in those proceedings.  (Docket Nos. 72, 79).  The Court disagrees that the judicial appeal procedures are patently inadequate. Pursuant to 53 P.S. §§ 11001-A, et seq., the Court of Common Pleas is granted the authority to: review the decision by the Township denying the land use applications; hold a hearing on the appeal; accept additional evidence from the parties, if warranted; and to reverse, in whole or in part, the decisions denying their applications.  *See* 53 P.S. §§ 11001-A, 110015-A, 11006-A.  As a consequence, Plaintiffs were provided the opportunity to challenge all aspects of the Township's decision denying their applications and, if successful, could have obtained a reversal of said decisions.  *See id.*  The Defendants "cannot be held to have violated due process requirements when it has made procedural protection available and [Plaintiffs] have simply refused to avail [themselves] of [the procedural protections]."  *Alvin*, 227 F.3d at 116 (citations omitted); *see also Perano*, 423 Fed.App'x at 237-38 (holding that an appeal under 53 P.S. §§ 11001-A provides a reasonable state remedy and a procedural due process claim is deficient if a plaintiff fails to pursue such an appeal).  For these reasons, summary judgment is appropriate as to Plaintiffs' procedural due process claim.

---

[22]     This litigation strategy was fully disclosed by Plaintiffs' former counsel, Joel Aaronson, Esquire in a letter dated March 4, 2008.  (Docket No. 78-5, Def Ex. YY at 4).  The entirety of this letter is summarized in § II.F., *supra*.

[23]     The Court notes that the fact that the Commonwealth Court quashed the Defendants' appeal of the order staying the state court actions has no bearing on the decision of whether the procedural due process claim survives summary judgment.

b.   Substantive Due Process

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the [ … ] due process clause and the government's deprivation of that protected interest shocks the conscience."   *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists*, 316 F.3d at 400-02).   Defendants again do not challenge that the Township's decision to deny their land use applications constituted a deprivation of a protected interest.   Therefore, the Court need not fully analyze same.   The parties' dispute lies with the second aspect of this test, i.e., whether the official action taken in this case shocks the conscience.   Of course, Defendants maintain that the evidence is deficient while Plaintiffs contend that genuine issues of fact preclude summary judgment.

At the motion to dismiss stage, this Court entertained similar arguments from the parties, but denied the Defendants' motion to dismiss, noting that "Plaintiffs' allegations of the Defendants' fraud, extortion and self-dealing arguably *could* rise to the level of 'conscience shocking.'"   *Cranberry*, 2010 WL 653915, at *6 (emphasis in original).   Having fully considered the evidence of record, in the light must favorable to Plaintiffs, the Court finds that evidence adduced during discovery does not support Plaintiffs' substantive due process claim as the evidence does not show that the Defendants engaged in behavior which would "shock the conscience" as Plaintiffs initially alleged.

"Land use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives."   *United Artists*, 316 F.3d at 402.   Rather, the government officials' conduct must "shock the conscience," a demanding standard reserved for only "the most egregious official conduct."   *Vorum v. Canton Township*, 308 Fed.App'x 651,

38

654 (3d Cir. 2009) (not precedential).   The test to determine whether official conduct shocked

the conscience is "not precise" and "varies depending on the factual context."   *Eichenlaub v.*

*Township of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004) (quotations omitted).   To this end,

conduct such as self-dealing, corruption of government officials, intentional bias against an

ethnic group, interference with constitutionally protected activities or other sufficiently egregious

conduct has been held to constitute a violation of substantive due process.   *Id.*   On the other

hand, actions by government officials that violate state law in a manner that rises to the level of

negligence or is akin to state law tort standards does not shock the conscience.   *Id.*   And, of

course, actions by government officials which further a legitimate government purpose would

not shock the conscience.   *Id.*   The Court of Appeals has recognized that the conscience-

shocking test is "designed to avoid converting federal courts into super zoning tribunals."   *Id.*

Further,

> every appeal by a disappointed developer from an adverse ruling of
> the local planning board involves some claim of abuse of legal
> authority, but "it is not enough simply to give these state law
> claims constitutional labels such as 'due process' or 'equal
> protection' in order to raise a substantial federal question under
> section 1983."

*United Artists*, 316 F.3d at 402 (quoting *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 833

(1st Cir. 1982)).

Plaintiffs rely primarily on four decisions in support of their position that they have

submitted sufficient evidence to sustain their substantive due process claim.   (*See* Docket Nos.

72, 79).   Each of the cited decisions is factually distinguishable from this matter and otherwise

constitutes non-binding precedent which this Court declines to follow.   First, in *Lonzetta*

*Trucking & Excavating Company v. Schan*, 144 Fed.App'x. 206 (3d Cir. Mar. 31, 2005) (not

precedential), the Court of Appeals merely affirmed the decision by the trial court finding that

issues of fact precluded the entry of summary judgment on the substantive due process claim brought in that case. The *Lonzetta* decision does not fully describe the evidence in that case nor discuss in detail how that evidence met the "shocks the conscience" standard. *Id.* Thus, *Lonzetta* is not persuasive to this Court in its analysis of the instant case.

Second, in *Collier v. Town of Harvard*, Civ. A. No. 95-11652, 1997 WL 33781338 (D. Mass. Mar. 28, 1997), the Court found that the "shocks the conscience" standard was met because one of the board members used his position to attempt to extort an easement from the developer to be used for his own personal benefit. Therefore, the factual scenario in *Collier* presented a clear case of "self-dealing." *Id.* Those types of facts are simply not present in this case as there is no evidence that any of the Individual Defendants[24] personally profited by denying the Plaintiffs' applications.

Third, in *Frompvicz v. Township of South Manheim*, Case No. 3:06CV 2120, 2007 WL 2908292 (M.D. Pa., Oct. 4, 2007), the Court merely held that the allegations in the complaint, taken as true, supported a finding that public corruption influenced the land use decision, possibly rising to the level of a substantive due process violation. Fourth, in *Beard v. Borough of Duncansville*, 652 F.Supp.2d 611 (W.D. Pa. 2009), the court found that a reasonable jury could conclude that the actions of government officials "shocked the conscience." Specifically, the Court found that the government officials acted in deliberate indifference to the applicable state laws by condemning the plaintiff's property because the Borough was directly advised by its solicitor at a public meeting that there was no statutory basis for condemning the property and the board members were also aware that the plaintiff had successfully defended a prior taking of the property in litigation. *Id.* There is no such evidence in the present record.

---

[24] Again, Daniel Santoro is not a defendant in this case.

Boiled down to its essence, the evidence in this case depicts a fairly run-of-the-mill dispute between a developer and local government officials.  *See Maple Properties*, 151 Fed.App'x at 179.  The parties clearly have conflicting interpretations of the pertinent local ordinances and the provisions of the MPC and the application of these laws to the Plaintiffs' proposed development. Such a legal dispute does not "shock the conscience" so as to violate Plaintiffs' substantive due process rights.  At most, the evidence shows that the Township possibly denied Plaintiffs' applications in violation of these state and local laws.  *See Whittaker v. County of Lawrence*, 2011 WL 2745815, at *2 (3d Cir. 2011) ("a state official's failure to follow state law does not, by itself, shock the conscience in the absence of additional facts.").  Of course, whether Defendants actually violated these laws remains an open question due to the fact that Plaintiffs failed to pursue their appeals of the denials of their land use applications in the Court of Common Pleas.

The record shows that the Township ultimately denied Plaintiffs' applications based, in part, on Plaintiffs' failure to conform its development proposals to the 2007 Official Map.   The Township advised Plaintiffs in the first of its Development Reports submitted on October 26, 2007 that Plaintiffs' applications were deficient because their development plans did not include the reserved road set forth on the 2007 Official Map.   (Docket No. 1-1).  Plainly, the development report sent by Henshaw to Plaintiffs on October 26, 2007, stated that the developer needed to: "Identify Official Map Road on the site plan as adopted by Township Ordinance (Ordinance 2000-39, as amended by 2007-376)" and further noted that "[t]he connecting road, as proposed[,] is not in alignment and does not serve the intended purpose of the Official Road Map." (*Id.*).  Similar deficiencies were noted in subsequent Development Reports submitted on October 30, 2007, January 21, 2008, January 25, 2008, February 5, 2008, February 7, 2008,

April 24, 2008, June 24, 2008, and August 27, 2008.  (Docket Nos. 1-1, 1-2).  These deficiencies

were never rectified and are cited as the bases for the denials of the applications in February and

March of 2009.  (Docket Nos. 1-3, 1-4).

The evidence clearly shows that Plaintiffs were aware of the problems with their

applications throughout the entire planning process.   Indeed, Plaintiffs' former counsel,

Aaronson,[25] acknowledged the deficiencies in a March 4, 2008 letter to the Township in response

to one of these Development Reports.  In that letter, Aaronson states that:

> 3.  A Portion of the Proposed Shoppes of the Woods
> Development Is Shown to be Constructed on a Proposed Street
> Included on the Township's Recently Amended Official Map.
>
> The Township's recent approval of the amendment to the
> Township's official map laying out the referenced proposed street,
> was, and is, intended to benefit and accommodate the proposed
> Simon major shopping center development.  It is all too obvious,
> regardless of any Township assertions to the contrary, that the
> Township's obstruction of the Shoppes at the Woods development
> and the Township's sterilization of the Petrarca property is driven
> by the Township's single minded intention to "use" my client's
> property to accommodate the nearby proposed major Simon
> shopping center development, access to which has been designed
> by Simon's consultants to cut a swath through the middle of my
> client's property in the same location that the Township
> subsequently designated in its recent official map amendment.

(Docket No. 78-5, Def Ex. YY at 4).   Aaronson also threatened to initiate lengthy litigation

against the Township and its employees in both federal and state courts if the applications were

denied in an effort to defeat any forthcoming condemnation proceedings.  (*Id.*).  Given the record

before this Court, this appears to be the only communication in which Plaintiffs directly

acknowledge the problem with the reserved road.  After this letter was sent, Plaintiffs remained

---

[25]    The Court notes that "generally an attorney is to be considered the agent of the client."  *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996).  As such, Plaintiffs are bound by the actions of their former attorney, Aaronson.  *See Marcangelo v. Boardwalk Regency*, 47 F.3d 88, 90 (3d Cir. 1995) (quoting *Pioneer Investment Servs. Co. v. Brunswick Assoc.*, 507 U.S. 380 (1993) ("A party is deemed bound by the acts of his lawyer-agent…")).

steadfast in their refusal to change the location of the reserved road to conform to the 2007

Official Map and every subsequent development report notes the same deficiencies.  (Docket

Nos. 1-1, 1-2).

Plaintiffs maintain at this stage that the Township lacked legal authority to deny their

applications because the Township had not acted to condemn their property within one year of

the filing of their land use applications with the Township, as is allegedly required under local

ordinance § 27-315.  (Docket Nos. 72, 79, 89 at 56).  In denying the applications, the Township

refuted this contention and instead relied on section 10406 of the MPC, which provides that:

> The governing body **may** fix the time for which **streets**,
> **watercourses** and **public grounds** on the official map shall be
> deemed reserved for future taking or acquisition for public use.
> However, the reservation for **public grounds** shall lapse and
> become void one year after an owner of such property has
> submitted a written notice to the governing body announcing his
> intentions to build, subdivide or otherwise develop the land
> covered by the reservation, or has made formal application for an
> official permit to build a structure for private use, unless the
> governing body shall have acquired the property or begun
> condemnation proceedings to acquire such property before the end
> of the year.

53 P.S. § 10406 (emphases added).  The Township noted that this statute granted it discretion to

place a time limitation on the reserved road but the Township declined to do so with respect to

the reserved road on the 2007 Official Map.  (Docket No. 1-4 at 15).  This finding is consistent

with the ordinance adopting the 2007 Official Map, which explicitly states that "[t]he properties

depicted as proposed township property and/or rights-of-way shall be reserved for future taking

or acquisition for public use **in perpetuity until actually acquired by the township.**"  (Docket

No. 71-15, Def. Ex. N, Ord. No. 2007-376 at § 2 (emphasis added)).  The Township further

found that none of the land identified on the 2007 Official Map was reserved for "public

grounds" purposes.  (Docket No. 1-4 at 15).  Thus, the Township concluded that the reserved

road on the 2007 Official Map was enforceable against Plaintiffs and denied their applications. (*Id.* at 15-6). In this Court's estimation, this is an appropriate interpretation of these provisions of the MPC. Indeed, "public grounds" and "street" are both specifically defined in the statute. *See* 53 P.S. § 10107. **"Public grounds,"** includes:

> (1) parks, playgrounds, trails, paths and other recreational areas and other public areas;
> (2) sites for schools, sewage treatment, refuse disposal and other publicly owned or operated facilities; and
> (3) publicly owned or operated scenic and historic sites.

*Id.* (emphasis in original). On the other hand, **"'Street,'** includes street, avenue, boulevard, road, highway, freeway, parkway, lane, alley, viaduct and any other ways used or intended to be used by vehicular traffic or pedestrians whether public or private." 53 P.S. § 10107 (emphasis in original). Considering these definitions and the plain language of the statutory provisions, it appears that the one year limitation which requires condemnation proceedings to be initiated within one year applies only to "public grounds" and not the reserved road on the 2007 Official Map; therefore, the application denials seem appropriate under the MPC.

In contrast, Plaintiffs' position is that Cranberry Township local ordinance § 27-315 granted them enhanced rights that are not included in the MPC. (Docket Nos. 72, 79, 89 at 56). Specifically, § 27-315 provides that:

> All traffic circulation including ingress and egress to any use shall comply with the Official Map. No zoning approval shall be issued nor conditional use nor use by special exception be approved for any traffic circulation which does not comply with the Official Map or for any building within the lines of any street, watercourse or public ground shown or laid out on the Official Map except as follows:
>
> A. The developer has obtained a special encroachment permit as provided in § 27-1111.

> B. The Supervisors have failed to acquire the property or
> begin condemnation proceedings to acquire the property
> before the end of one year after the owner of the property
> has submitted a written notice to the Supervisors
> announcing his intentions to build, subdivide or otherwise
> develop the land covered by the reservation, or has made
> formal application for an official approval to build a
> structure for private use.

(Docket No. 75-25, Pltf Ex. 45, § 27-315 (Ord. 96-267, 5/2/1996)).   While Plaintiffs admit that

they never sought a special encroachment permit as is stated under subsection A, they contend

that subsection B of this ordinance prevented the Board of Supervisors from denying their

applications.   (Docket No. 74-19, Pltf Ex. 19).   The ordinance is drafted similarly to section

10406 of the MPC but the one year condemnation language applies to "property" rather than

only "public grounds" as is required to trigger the one year limitation in the MPC.   Admittedly,

Plaintiffs have proffered a plausible interpretation of the local ordinance that certainly favors

their position.

As discussed previously, the parties' competing interpretations of the potentially

applicable local ordinances and state laws were not fully litigated in the state courts, even though

Plaintiffs filed several legal challenges to the conduct complained of here, including a

Mandamus and Declaratory Judgment action which explicitly sought an interpretation of the

aforementioned laws.   (*See* Docket No. 32-1 at 2-3).   The state courts are clearly able to resolve

these types of disputes surrounding the interpretation of the MPC and local Cranberry Township

ordinances.   However, even assuming that the laws were violated, the Court believes that the

record viewed in the light most favorable to Plaintiffs does not show that the Plaintiffs'

applications were denied by the Township in a manner that "shocks the conscience."   In this

Court's estimation, this case is akin to *Eichenlaub*, wherein:

> the Eichenlaubs assert[ed] that zoning officials applied subdivision requirements to their property that were not applied to other parcels; that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; that they improperly increased tax assessments; and that they maligned and muzzled the Eichenlaubs.

*Eichenlaub v. Township of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004).   The Court of Appeals found that "these complaints [were] examples of the kind of disagreement that is frequent in planning disputes" and were not sufficient to prove a violation of substantive due process.   *Id.* The same is true here.

Plaintiffs' specific arguments supporting their substantive due process claim are that certain evidence demonstrates self-dealing or corruption by Santoro, who is not named as a Defendant, and/or the "Defendants" generally.   (Docket Nos. 72, 79).   Plaintiffs contend that Santoro violated the Pennsylvania Ethics Law by appearing before the Board on Simon-related matters within one year of his departure from his position with the Township.   (*Id.*).   Plaintiffs ignore, however, that Santoro is not named as a Defendant in this case and that even if he had violated the cited provisions of the Ethics Law, he possibly would face criminal penalties for same, including a fine or imprisonment.   *See* 65 Pa.C.S. § 1109(b) (detailing penalties for violations of such statute).   But, no such penalties could be assessed against the Township or any of the Board members for Santoro's alleged crime.   *Id.*   Plaintiffs cite no authority placing liability on the Township and Individual Defendants in such circumstances.   Thus, this Court is not convinced that a non-party's actions, even if contrary to the Ethics Law, can be imputed to either the Township or the Individual Defendants to establish liability against them under § 1983.[26]   Moreover, the evidence as to Santoro shows, at most, that he acted with an "improper

---

[26]        The Court notes that it is well settled that "[t]o establish personal liability against a defendant in a section 1983 action, that defendant must have *personal* involvement in the alleged wrongs; liability cannot be predicated

motive" in advocating that the 2007 Official Map be adopted while seeking to attain a position with the consulting firm. *Eichenlaub*, 385 F.3d at n.9. Even so, Santoro obtained his consulting job with Delta <u>before</u> the 2007 Official Map was adopted and was <u>not present</u> before the Board of Supervisors on the day the final vote was taken. (Docket No. 71-14, Def Ex. M).

With respect to the conduct of the Individual Defendants, in their substantial briefing and at oral argument, Plaintiffs were unable to point to any specific action taken by the Individual Defendants in this suit which even arguably "shocks the conscience." (Docket Nos. 72, 79, 89, 90). Plaintiffs have not presented any evidence of self-dealing, personal financial gain, or other corruption by any of the Individual Defendants. *See Maple Properties, Inc. v. Township of Upper Providence*, 151 Fed.App'x 174, 179-80 (3d Cir. 2005) ("There is no evidence that individual members of the Township Board of Supervisors enjoyed financial gain from the ordinance or that the rezoning decision otherwise redounded to their personal advantage. Nor is there any suggestion that [plaintiff] suffered an infringement of a fundamental liberty as a result of the Township's action."). Instead, Plaintiffs' evidence focuses on the denial of their land use applications.

The specific evidence that Plaintiffs have cited does not demonstrate "conscience shocking behavior," although Plaintiffs make much of the electronic communications between Township employees, particularly Trant, and Kathy Shields of Simon and her consultants in an effort to show wrongdoing on the part of the Township. Plaintiffs infer from the aggressive stance taken by Shields in email traffic promoting the proposed Simon Development including her directions to her subordinates and consultants to approach the Township about potential problems with Plaintiffs' development proposals and the Township's subsequent action denying

---

solely on the operation of *respondeat superior*." *Norris v. Davis*, Civ. A. No. 10-1118, 2011 WL 5553633, at *2 (W.D.Pa. Nov. 15, 2011) (citing *Rizzo v. Goode*, 423 U.S. 362 (1976)) (emphasis in original).

their applications, that a conspiracy to defraud them of their property must have occurred. However, Plaintiffs' conspiracy theories are not supported by the evidence.[27]

For instance, Plaintiffs continually argue that the Defendants' actions were made in furtherance of their desire to take the portion of their property designated by the reserved road "without just compensation." (Docket No. 79). However, they point to no evidence which suggests that the Township sought to take their property without compensating them for it. Rather, the emails they rely on prove the opposite – both Simon and the Township always intended to compensate Plaintiffs for the portion of their property located on the reserved road regardless of whether Simon purchased the property from Plaintiffs or if the Township was forced to condemn it and acquire it through its eminent domain power. (Docket Nos. 124-27). In fact, this litigation has always surrounded the parties' disagreement regarding the *value* of the reserved road. Plaintiffs admit in their Complaint that:

> In 2005 and again in 2006 Simon offered to purchase the portion of the Subject Property from Plaintiffs that included the area of the Simon Mall Access. Those offers were declined by the Plaintiffs because selling the area of the proposed Simon Mall Access would not have allowed an economically feasible development of the remainder of the Subject Property.

(Docket No. 1 at ¶ 55). Then, on December 1, 2007, Kathy Shields wrote to her consultant, Bob Goetz, and stated that she had met with Trant who advised her that the Township may be able to condemn a larger portion of the reserved road but could not take any additional property, which could only be acquired "as part of a settlement negotiation." (Docket No. 77 at ¶ 124). Later, on March 28, 2008, Trant wrote to Shields that the alignment of the road had changed significantly and the road issue needed to be resolved prior to Simon approaching Petrarca to negotiate.

---

[27]     As is discussed in § V.B.2., *infra*, Plaintiffs have also failed to meet their burden to present sufficient evidence supporting their RICO and RICO conspiracy claims which rely on the same broad conspiracy arguments.

(Docket No. 77 at ¶ 126).   Next, on April 11, 2008, Trant responded to another email from

Shields and advised her that the Township had no desire to change the Official Map again.

(Docket No. 77 at ¶ 126; Pltf Ex. 39).  He explained that:

> [w]e wouldn't change the official map because there is no benefit
> in doing [so] because it would be subsequent to Petrarca's
> submission of his plan. **A change in alignment wouldn't affect
> our ability to condemn the property, but it will likely affect the
> value attached to the ROW. We can talk at length later, but the
> best scenario is one in which you negotiate the purchase of the
> ROW from Petrarca following the new alignment.** I wouldn't
> structure it as a change on our end, rather an option that is more
> sensitive to what Petrarca wants to do on his site. If there is any
> perception that we changed our mind, he will seize on that. The
> alternative is reverting back to the current official map alignment,
> which will force dealing with the self storage property.

(*Id*.; Pltf Ex. 39) (emphasis added).  On April 17, 2008, Shields wrote again to Goetz, informed

him that she was meeting with Petrarca soon and expressed concern that he was building a case[28]

against the Township that the reserved road served Simon's purpose and not the Township's.

(Docket No. 77 at ¶ 127).

The negotiations referenced throughout these communications were obviously not

fruitful.  But, these communications represent a typical dispute between competing developers

and the Township where they each sought to develop property, including a dispute concerning

the value of a right of way.   *See Eichenlaub*, 385 F.3d at 286.  Neither development was ever

completed.   Indeed, Simon's proposed development did not materialize beyond the planning

stage and a formal application to the Township was not submitted by Simon.  The Township, in

turn, never formally initiated an action to condemn any portion of Plaintiffs' property.  Plaintiffs

later lost their properties in a foreclosure action brought by their financial institution.

---

[28]    Plaintiffs make much of the paranoia expressed by these individuals in their emails about possible litigation
to be initiated by Petrarca.  However, they completely ignore the fact that <u>before</u> these emails were sent, on March 4,
2008, Plaintiffs, through Aaronson, threatened the Township with tying up the property in litigation in order to
defeat any condemnation proceedings.

Plaintiffs also have maintained throughout this litigation that the location of the reserved road "sterilized" their ability to economically develop their properties and that the denial of their applications forced the plaintiffs into foreclosure. Their "sterilization" argument is wholly undermined by the fact that Echo is in the process of developing the same site and proposes a road on its property that is generally located in the area of the reserved road on the 2007 Official Map. (Docket Nos. 71-32, Def Ex CC; 71-33, Def. Ex. DD; 71-34, Def. Ex. EE). Plaintiffs complain that Echo's proposed road is not as wide as the area reserved on the 2007 Official Map. But, the size of the road is of no moment because Plaintiffs' applications were not denied because they submitted a plan with a reserved road that was not as large as that depicted on the 2007 Official Map. Again, Plaintiffs repeatedly refused to amend their development plans to include a road anywhere near this location and their applications were denied for their failure to account for the location of the road.

Considering all the evidence in this case, the Court finds that Plaintiffs are, at best, aggrieved former property owners, simply dissatisfied with the decisions denying their applications.[29] *Skiles v. City of Reading*, 2011 WL 5101492, at *4 (3d Cir. Oct. 27, 2011) ("[I]t is not the role of federal courts to provide a remedy for merely aggrieved landowners."); *see also Kriss v. Fayette County*, 2011 WL 515 3815, at *10 (W.D. Pa. Jun. 17, 2011) (quoting *Maple Props.*, 151 F.App'x at 180)) ("The alleged corruption and self-dealing amount to nothing more than 'the politics and animosities that often animate local decision-making.'"). These are insufficient bases from which one can sustain a substantive due process claim. Thus, the Court will enter summary judgment in favor of Defendants and against Plaintiffs on their substantive due process claim.

---

[29] As is further discussed below, with respect to Plaintiffs' RICO claims, the Court discerns no criminal conduct by the Individual Defendants in this case. *See* § V.B.3, *infra*.

c.   Equal Protection

The Equal Protection Clause provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., AMEND. XIV, § 1. The Equal Protection Clause "creates no substantive rights." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). "Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Id.* Plaintiffs' equal protection claim relies on a "class of one" theory as set forth in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).[30]  Under the "class of one" theory, Plaintiffs have the burden to demonstrate that they were "treated differently from others *similarly situated* and that there was *no rational basis* for such disparate treatment."  *Whittaker*, 674 F.Supp.2d at 691-92 (emphasis in original).   They must show that they were subject to "intentionally different treatment [that] is 'irrational and wholly arbitrary.'" *Eichenlaub*, 385 F.3d at 286 (quoting *Village of Willowbrook*, 528 U.S. at 564)).  The Court of Appeals has recognized that "[t]he 'irrational and wholly arbitrary' standard is doubtless difficult for a plaintiff to meet in a zoning dispute." *Eichenlaub*, 385 F.3d at 287. Further, "[t]hese challenges fail when 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Highway Materials, Inc. v. Whitemarsh Tp.*, 386 Fed.App'x 251, 259 (3d Cir. 2010) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Such difficulty is likewise present in the instant land use disputes as Plaintiffs have failed to present sufficient evidence from which a reasonable jury could find in their favor on their equal protection claim.

Plaintiffs argue that they are similarly situated to the other developments which are in the general area of their properties, i.e., the MSA/Westinghouse development at Cranberry Woods,

---

[30]      To this end, the Court notes that Plaintiffs do not allege that they have been classified pursuant to a suspect or quasi-suspect trait, nor do they allege a classification which has burdened their exercise of a fundamental right. (*See* Docket No. 1).

which is across SR 228 from the site, Cranberry Commons, which is adjacent to Plaintiffs' properties and Simon's proposed development.  (Docket Nos. 72, 79).  The similarities between these four separate commercial developments are few.  (Def Ex. G, P, Q, CC, DD, EE, Pltf Ex 21).  The development plans, traffic studies, maps and other documents in the record disclose that each of these developments involved separate and unique parcels of land situated in different locations along SR 228.  (*Id.*).  The land use applications for MSA/Westinghouse, Cranberry Commons and Plaintiffs' project were filed at different times, sought different uses of these properties and generated vastly different amounts of traffic – as described by the multitude of reports generated by traffic experts and engineers which are present in the record.  While the MSA/Westinghouse and Cranberry Commons developments were approved by the Township, there are simply too many differences in the proposals for a reasonable jury to conclude that they were "similarly situated" to Plaintiffs.  Simon never even submitted a formal land use application to the Township and, thus, is not similarly situated to Plaintiffs who did file such applications for the development of their land.  The Court does not mean to suggest that two separate land developments within a municipality could never be "similarly situated" under the law.  *See Whittaker*, 2011 WL 2745815, at *3.  However, it is clear that Plaintiffs' proposed development is not "similarly situated" to MSA/Westinghouse, Cranberry Commons nor Simon's proposed mall given the numerous disparities in the developments.

In this Court's estimation, the evidence shows that the only property owners who are "similarly situated" in this case were the owners of the five parcels of land affected by the reserved road on the 2007 Official Map, i.e., the Plaintiffs in this action, Thomas Petrarca, Cranberry Promenade, Inc., NAP Associates, Inc. and NAP Associates 2, Inc.   These entities filed the joint applications for land use and conditional use of the properties and all of these

entities were treated similarly by the Township as their joint applications were denied.   *See Whittaker*, 2011 WL 2745815, at *3 ("there was no arbitrary singling out of the properties in question in the present case. Instead, the properties were chosen because they were the only properties not purchased within the Millennium Park area, meaning that all similarly situated individuals were treated similarly in this case.").   Thus, Plaintiffs' equal protection claim has no merit.

Even if any of the proposed developments were deemed to be "similarly situated" to Plaintiffs' proposed development, the evidence does not support a finding that the Township acted in a manner which was "wholly arbitrary" and without a rational basis by denying Plaintiffs' land use applications.  *Eichenlaub*, 385 F.3d at 286.  The Township provided evidence supporting valid reasons for denying the applications, primarily, that the applications failed to account for the reserved road in the 2007 Official Map and further failed to provide for traffic mitigation required under Township ordinances.

With respect to the reserved road issue, the MPC grants local governments the authority to develop road systems that best serve the interests of their municipalities and to amend an official map in furtherance of same.   Local ordinances likewise specify such authority.[31]  Indeed, Trant testified that the purpose of the alignment of the 2007 Official Map road was to provide the most efficient access to 185 acres of potential development in the area, which included the property Simon sought to develop, 63 acres to the north and the 23 acres which was comprised of

---

[31]          § 27-412 C-S Regional Commercial District
          1.   Development Criteria.  Prior to the approval of any development of land within
               the C-3 Regional Commercial District, the prospective developer shall
               adequately demonstrate the following:
          C.   The plan provides for adequate ingress, egress and circulation of all
               contemplated vehicular activity both internal to the site and external.
(Docket No. 71-45, Def Ex. PP at 2).

Plaintiffs' former properties.  (Docket No. 78-16, Def Ex. LLL at 8).  Local politicians touted Simon's proposed development given its expected impact on the community including job creation and increasing the tax base.  The Township believed that relocating the reserved road was necessary to secure the Simon development and these community-wide benefits.  Hence, the Court finds that the Township has provided a rational basis for denying the applications.  Indeed, the promotion of "economic development is a traditional and long-accepted function of government."  *Kelo v. City of New London*, 545 U.S. 469, 484 (2005).

Plaintiffs continue to maintain that the reserved road system in the 2007 Official Map benefited only Simon and not the Township.  To this end, they latch on to the apparent paranoia of Simon's representatives that Plaintiffs were "building a case" that the reserved road served Simon's purposes during the pendency of their applications.  However, the conduct of the Township after the failure of both Simon's and Plaintiffs' developments undermines much of this argument.  There are presently no plans to build a lifestyle mall or other large development akin to the Simon proposal on the nearly 200 acres of land that would benefit from the location of the reserved road.  But, Echo, the purchaser of Plaintiffs' properties out of the foreclosure sale, is in the process of developing a strip mall similar to that initially proposed by Plaintiffs on the same land.  (Docket No. 71-34, Def Ex. EE at 3).  Echo's applications have in large part honored the location of the reserved road on the 2007 Official Map, with a northwesterly road which connects SSR 228 with Mars Road.[32]  (*Id.*).  On the other hand, Plaintiffs refused to work

---

[32]     Plaintiffs further argue that the size of the reserved road on ECHO's applications, approximately 60 feet wide, does not completely conform to the 300 foot reserved road on the 2007 Official Map.  (Docket No. 79).  However, Plaintiffs admit that none of their development plans followed the location of the reserved road on the 2007 Official Map and Defendants presented evidence indicating that the size of the road within the reserved road was negotiable.  (Docket No. 73 at ¶ 41).  Thus, because they did not even attempt to propose a development which followed the 2007 Official Map and negotiate the size of the road with the Township, any inference that such negotiations would be unfruitful would be purely speculative and insufficient to defeat summary judgment.  *See Ridgewood Bd. of Ed. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999) (noting that "speculation and conclusory allegations" are insufficient to survive summary judgment).

within the strictures of the 2007 Official Map and instead pursued a litigation strategy in an unsuccessful attempt to force the Township to approve their proposed development, including their proposed location of the connector road.  The Court discerns no constitutional violation of Plaintiffs' rights under the Equal Protection Clause stemming from this scenario.

Regarding the traffic mitigation issue, Plaintiffs generally point to alleged deficiencies in the approved applications vis-à-vis those that were present in their own applications which were denied.  (Docket Nos. 72, 79).   To this end, Plaintiffs contend that Westinghouse/MSA and Cranberry Commons were not required to strictly conform to the Township's requirements for traffic mitigation but argue that their applications were denied because they did not strictly conform to same.  (*Id.*).  The applicable local ordinances require traffic studies to be completed and traffic mitigation for commercial developments that will have an increase in traffic in the general area.[33] (Docket No. 71-45, Def Ex. PP at 1).  Plaintiffs highlight that Westinghouse/MSA did not provide an updated traffic study in conjunction with the application to develop Westinghouse's headquarters but instead relied on a former study produced when MSA initiated the project for the Cranberry Woods development over a decade ago.  (Docket No. 72 at 32-34). They further argue that the development of Cranberry Commons was permitted to include a number of "curb cuts" along SSR 228 that they allegedly were denied along with their applications on grounds that these were a traffic hazard.  (*Id.*).   Again, Plaintiffs had the opportunity to challenge the application of state law and local ordinances during their appeals to the Court of Common Pleas but chose not to pursue those appeals.  Further, they argue only that

---

[33]        Specifically, § 12-108(3), provides that:
> Mitigation.  Applicants for new development that generate 1,000 or more new p.m. peak hour trips, less pass by trips will be required to mitigate the traffic impact of the new development on the affected roads, highways and streets per the traffic study to maintain the pre-development conditions.

(Docket No. 71-45, Def Ex. PP at 1).

they were treated differently than the other developers; therefore, they have failed to meet their burden to show that the Township did not have a rational basis for treating the other developers differently.

Indeed, the facts of this case are very similar to *Highway Materials, Inc. v. Whitemarsh Tp.*, 386 Fed.App'x. 251 (3d Cir. 2010), and the Court of Appeals found that similar evidence and allegations were insufficient to support an equal protection claim in *Highway Materials*.   In so holding, the Court of Appeals stated that:

> Further, although HMI has introduced evidence that the Township intentionally refused to work with HMI, it failed to demonstrate that the Township had "no rational basis" for denying HMI's proposal. *Vill. of Willowbrook*, 528 U.S. at 564, 120 S.Ct. 1073. As noted above, the Township had a number of valid reasons for denying the proposal, including the deficiencies relative to Township ordinances that Zarko identified, concerns about the increased traffic burden that the proposed development would produce, and concerns about how the project would conform with the surrounding area. HMI alleges that these reasons should be viewed as "mere pretext" for the Township's alleged goal of "block[ing] HMI's vested right to develop" its property. The parties, however, do not dispute that HMI's proposal would increase the traffic burden in the surrounding area. Also, Zarko reported to the Board that HMI's proposal did not comply with Township ordinances. Even if the ordinances were incorrectly interpreted, deficiencies in the proposal provided a rational basis for denying it. HMI perhaps has demonstrated a dispute as to whether the ordinances were correctly applied, but such a dispute is not material to HMI's equal protection claim, for which HMI must show that the Board had no rational basis for denying HMI's proposal.

*Highway Materials, Inc. v. Whitemarsh Tp.*, 386 Fed.Appx. 251 (3d Cir. 2010).  The evidence presented by Plaintiffs in this case is likewise deficient and the Court finds that no reasonable juror, viewing the evidence in light most favorable to Plaintiffs, could conclude that Plaintiffs' equal protection rights were violated in this case.

### d.  Conclusion as to § 1983 Claims

For the reasons stated above, the Court will enter summary judgment in favor of all of the Defendants, including the Township and the Individual Defendants, and against Plaintiffs as to their § 1983 claims asserting violations of their rights to procedural due process, substantive due process, and equal protection under the laws.[34]

## 2.   RICO Claims

The Court now turns to Plaintiffs' RICO claims against Individual Defendants Richard Hadley, John Skorupan, John W. Milius, Dave Root, Bruce Mazzoni, Ron Hensaw, and John K. Trant, Jr.[35]   (Docket No. 1).   Plaintiffs claim that these Defendants are civilly liable for participating in a RICO enterprise which committed the predicate acts of mail fraud, wire fraud, extortion and theft of honest services.   (*Id.*).   They further allege that these Defendants acted as part of a conspiracy with Simon, Delta Development and Daniel Santoro.   (*Id.*).   Section 1964(c) of the federal RICO Act, 18 U.S.C.1961, *et seq.*, authorizes civil actions for RICO violations. Specifically, section 1964(c) provides, in pertinent part that:

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...

18 U.S.C. § 1964(c). There are four separate causes of action under section 1962.   *See* 18 U.S.C. § 1962(a)-(d).   At issue in this case are subsections (c) and (d), which provide that:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

---

[34]   Because the Court finds that summary judgment is appropriate against Plaintiffs, the Court need not reach the issue of whether the Individual Defendants met their burden to establish qualified immunity.   *See Gannaway v. Karetas*, 438 Fed.App'x 61, 67 (3d Cir. 2011) ("As there was no constitutional violation, we need not engage in an analysis of qualified immunity.").

[35]   The RICO claim against Cranberry Township was previously dismissed.

>(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c), (d). Section 1961 defines "racketeering activity" to include a host of so-called predicate acts, "chargeable" or "indictable" under enumerated state and federal laws, including state-law murder, arson, and bribery statutes, federal mail and wire fraud statutes, and the anti-fraud provisions of federal securities laws. 18 U.S.C. § 1961(1). Section 1961 further provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

Defendants Hadley, Skorupan, Milius, Root, Mazzoni, Hensaw, and Trant argue that Plaintiffs' RICO claims are barred by the applicable statute of limitations and, alternatively, maintain that Plaintiffs have failed to meet their burden to present evidence sufficient to prove any of the elements of their RICO claims. (Docket No. 69). They ask that summary judgment be entered in their favor as to Plaintiffs' claims. (*Id.*). Plaintiffs meanwhile contend that the evidence presented in opposition to summary judgment creates genuine issues of material fact that these individuals are liable under RICO. (Docket Nos. 72, 79). Having fully considered the parties' arguments and all of the evidence of record, the Court finds that the RICO statute of limitations does not bar all of Plaintiffs' RICO claims. The Court, however, holds that the evidence advanced by Plaintiffs is woefully deficient, failing to support any of the elements of their alleged RICO claims. Specifically, Plaintiffs have not met their burden to establish that any of the alleged predicate felonies were committed by the Individual Defendants. Thus, their RICO claims must fail. In support of this decision, the Court will first discuss the statute of limitations defense and then address Plaintiffs' claim under section 1962(c) and Plaintiffs' RICO conspiracy claim under 1962(d).

a.   RICO Statute of Limitations

Defendants first argue that Plaintiffs' claims are barred by the statute of limitations for RICO actions. (Docket No. 69). The statute of limitations for civil RICO claims is four years, *see e.g., Agency Holding Corp. v. Malley-Duff Assocs.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Forbes v. Eagleson*, 228 F.3d 471, 483 (3d Cir. 2000), but the statute of limitations is not triggered until Plaintiffs "knew or should have known of their injury" as well as the source of their injury, *Prudential Ins. Co. of America v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004) (citing *Forbes*, 228 F.3d at 485). The RICO statute of limitations may also be tolled if Plaintiffs demonstrate fraudulent concealment. *Forbes*, 228 F.3d at 486-87.

Defendants' argument is premised on the fact that Plaintiffs knew or should have known of their injuries by virtue of the Township's denial of the 2003 land use applications submitted by Thomas Petrarca, Inc. (Docket No. 69). Plaintiffs counter by stating unequivocally that "Plaintiffs are not asserting a claim against the Defendants concerning the 2003 [a]pplications" and specify that they are asserting claims arising from the denial of their 2007 applications, only. (Docket No. 72 at 18). In support, Plaintiffs point out the following: (1) the 2003 applications were filed by Thomas Petrarca, Inc. rather than all of the three named Plaintiffs in this case; (2) the 2003 applications related to a proposal to develop only one of the five parcels of property Plaintiffs later came to obtain; and (3) they could not have been harmed by the Township's adoption of the 2007 Official Map in conjunction with the 2003 application denials because the 2007 Official Map had yet to be adopted. (*Id.*).

The Court agrees with Plaintiffs' position that their claims directed to the 2007 application process are not barred by the four-year statute of limitations applicable to RICO claims. Plaintiffs assert in this action that they were harmed by the Township's denial of their

applications in March of 2009 and filed the instant lawsuit in September of 2009 – well within the four year limitations period.  (Docket No. 1).  Moreover, the Township's denials of Thomas Petrarca, Inc.'s 2003 applications, in and of themselves, do not demonstrate that Plaintiffs "knew or should have known" of the injuries that they would allegedly suffer stemming from their later 2007 applications.  (Docket No. 77 at ¶¶ 77, 78).  These applications were not filed until August 7, 2007 – after Plaintiffs had purchased three additional contingent properties and sought to develop all of that land.  (Docket No. 73 at ¶ 5).  In addition, Plaintiffs complain that their 2007 applications were denied, in part, due to their failure to provide for a reserved road traversing their properties as set forth on the 2007 Official Map.  This version of the official map was not adopted by the Township until February of 2007.  (Docket Nos. 71-14; 71-15).  Plaintiffs could not have anticipated the harms they alleged that they suffered any earlier than February of 2007. They timely filed their RICO claims within four years of that date.  For these reasons, it is clear that the four-year statute of limitations does not bar Plaintiffs' RICO claims and the Court will explore the merits of those claims.

b.   Substantive RICO Claim Under 1962(c)

A "violation of § 1962(c) … requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L., v. Imrex Co.*, 473 U.S. 479, 496 (1985). As to their § 1962(c) claims which rely on the predicate acts of mail and wire fraud, Plaintiffs have the burden to "produce evidence that there was a 'scheme or artifice to defraud.'"  *Camiolo v. State Farm Fire and Cas. Co.*, 334 F.3d 345, 364-65 (3d Cir. 2003). "While innocent mailings or wire communications may supply the necessary communication element for these criminal offenses, there must be 'some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'"  *Camiolo*, 334 F.3d at

364 (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.1991), *which quoted United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978)). "[T]he scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicanery or overreaching.'" *Id.* (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.3d 1406, 1415 (3d Cir. 2003)); *see also Carpenter v. United States*, 484 U.S. 19, 26 (1987). Moreover, "the defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those larger objectives be achieved." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908-09 (3d Cir. 1991) (citing *United States v. Pearlstein*, 576 F.2d 531, 541 (3rd Cir. 1978)).

From this Court's view, there is simply no evidence that Hadley, Skorupan, Milius, Root, Mazzoni, Hensaw, and/or Trant knowingly and willfully engaged in an illegal scheme to defraud Plaintiffs of their property by trick, deceit, chicanery or overreaching. *See Camiolo*, 334 F.3d at 364. Thus, the predicate acts of mail fraud and wire fraud have not been established.

At the motion hearing, the Court challenged Plaintiffs' counsel to provide the factual basis of their RICO claims. (Docket No. 89 at 17-43). In response, Plaintiffs cited a few email communications which allegedly showed a widespread conspiracy against them involving Simon, Delta Development, Dan Santoro and the Township officials/employees. (Docket No. 75-15, Pltf. Ex. 35; 75-34, Pltf Ex. 54; Docket No. 75-7, Pltf Ex. 27; Docket No. 75-10, Pltf Ex. 30; Docket No. 75-12, Pltf Ex. 32; Docket No. 75-19, Pltf Ex. 39; Docket No. 81-14, Pltf Ex. 88). But, Plaintiffs overstate the significance of these emails and other communications. Many are merely communications from Shields to her consultants plotting an aggressive strategy to support Simon's own development and do not indicate any wrongdoing by the Township or its officials and employees. Others show very little when the exchanges are considered in context.

61

For instance, in a November 1, 2007 email, Shields asks the Township for copies of Plaintiffs' applications so that they can provide comments on same. (Docket No. 77 at ¶¶ 122-124). However, by that time, the Township had already advised Plaintiffs that their applications were deficient because of their failure to include the reserved road in the first of many Development Reports. (Docket No. 1-1). Likewise, in a series of emails in March and April of 2008, Shields and Trant discuss the location of the reserved road and their words indicate some trepidation regarding same because of problems with Plaintiffs' site. (Docket No. 77 at ¶¶ 126-127). Plaintiffs suggest that Shields' and Trant's acknowledgement of such problems implies the workings of a broad conspiracy against them. But, Plaintiffs fail to note that these emails were sent <u>after</u> they threatened the Township with lengthy litigation in Aaronson's March 4, 2008 letter. (Docket No. 78-5, Def. Ex. YY at 4).

Moreover, for the reasons fully explained above, the 2007 Official Map was adopted by the Township pursuant to the statutorily required procedures. *See* § V.B.1.a, *supra*. In the Commonwealth of Pennsylvania, local government officials are granted the discretion to engage in land use planning within their municipalities and are empowered with the authority to set aside private property for future roads. Plaintiffs were aware of the adoption of the 2007 Official Map, at a minimum, in March of 2007, but they made no effort to directly challenge such adoption by appealing the ordinance or filing a special encroachment permit along with their land use applications. (Docket No. 89 at 33). Instead, they proceeded deliberately in an effort to void the road location on the 2007 Official Map consistent with their interpretation of local ordinances. They lost the first round of this fight before the Township but failed to pursue appeals of those decisions. Given same, there is simply no evidence from which a reasonable jury could conclude that any crimes were committed by the Individual Defendants.

In any event, Plaintiffs admit that the communications which allegedly support their RICO claims sounding in mail/wire fraud were largely innocent but they argue that the communications further the overall scheme to defraud them of their property. (Docket No. 79). The Court disagrees.  Indeed, the communications challenged by Plaintiffs, the Development Reports and other documents regarding their applications, consistently conveyed the same message to Plaintiffs, i.e., that their land use applications were deficient because their development plans did not conform to the 2007 Official Map. (Docket Nos. 1-1, 1-2).  To this end, Plaintiffs were aware of the 2007 Official Map when they filed their initial land use applications on August 7, 2007.  (Docket No. 89 at 33; Docket No. 73 at ¶ 5).  They were then advised by the Township in a Development Report dated October 26, 2007 that their plans were not acceptable because they did not contain the road system identified on the 2007 Official Map. (Docket No. 1-1).  Subsequent communications on October 30, 2007, January 21, 2008, January 25, 2008, February 5, 2008, February 7, 2008, April 24, 2008, June 24, 2008, August 27, 2008 and the February and March 2009 denials all include very similar – if not identical – language describing the problems with the application.  (Docket Nos. 1-1, 1-2, 1-3, 1-4).  Plaintiffs have pointed to no evidence which shows that anyone from the Township retreated from the position initially taken by the Township that the applications were deficient.   In all, no one misrepresented to Plaintiffs that the applications would be granted without accounting for the reserved road and Plaintiffs, amply represented by counsel, trudged forward with their deficient applications despite repeated admonitions from the Township to the contrary.  Accordingly, there is no evidence from which a reasonable jury could conclude that any fraud was committed.

It is this Court's opinion that the evidence shows the opposite of fraud, that Plaintiffs knew full well that their applications were deficient but engaged in a deliberate strategy to

challenge the reserved road based on their interpretation of the one year exception set forth in local ordinance 27-315.  (Docket No. 89 at 56).  Plaintiffs argue that this ordinance required the Township to initiate condemnation proceedings against the portion of their land encumbered by the reserved road within one year of the filing of their applications on August 7, 2007 or by August 7, 2008.  (*Id.*).  Plaintiffs believe that because the Township failed to act within this time period, the reserved road requirement is void.  (*Id.*).  The evidence of record clearly shows that Plaintiffs successfully avoided addressing the issue of the reserved road in any of their applications as they presented multiple revised development plans to the Township but made no effort to comply with the 2007 Official Map or directly challenge same.  (Docket No. 1-2).  The only evidence of record which shows that Plaintiffs even acknowledged their proposals' deficiencies is Aaronson's letter of March 4, 2008, threatening to sue the Township if the applications were denied.  (Docket No. 78-5, Def Ex. YY at 4).

While their applications were pending, Plaintiffs repeatedly agreed to delay the time period for the Township's consideration of their applications, signing waivers executed by Aaronson on August 30, 2007, October 22, 2007, November 15, 2007, December 11, 2007, January 24, 2008, February 11, 2008, June 3, 2008, September 8, 2008, and September 24, 2008. (*See* Docket No. 1-2).  All of these delays – which Plaintiffs requested – supported their legal strategy of attacking the reserved road one year after their applications were filed as void under the local ordinance.

In sum, Plaintiffs have failed to set forth sufficient evidence from which a reasonable jury could conclude that the predicate acts of mail fraud or wire fraud were committed by Hadley, Skorupan, Milius, Root, Mazzoni, Hensaw, and/or Trant. A legal conflict between the parties concerning the application of local ordinances and the MPC does not equal fraud sufficient to

indict these individuals under the federal mail fraud and wire fraud statutes. *See Teti, et al. v. Towamencin Township, et al.*, Civ. A. No. 96-CV-5402, 2001 WL 1168102, at *7 (E.D.Pa. Aug. 17, 2001) ("Merely offering disputed interpretations of local ordinances does not constitute fraud or intentional misconduct such as to constitute a violation of RICO"); *see also Camiolo v. State Farm Fire and Cas. Co.,* 334 F.3d 345, 365 (3d Cir. 2003) ("there was a justifiable dispute between an insured and an insurer as to whether a loss caused by a fire was covered by the policy and a legitimate investigation by law enforcement officials into the cause and origin of the fire."). Therefore, Plaintiffs have failed to demonstrate that the predicate acts of mail fraud and wire fraud were committed.

Plaintiffs' RICO claims also rely on the Defendants' alleged commission of the predicate acts of honest services fraud, 18 U.S.C. § 1346[36] and extortion, 18 U.S.C. § 1951.[37] This record is also devoid of evidence of either crime given binding Supreme Court precedent limiting the scope of these crimes.

As to honest services fraud, the United States Supreme Court's decision in *United States v. Skilling*, --- U.S. ---, 130 S.Ct. 2896, 2928 (2010), limited the scope of the theft of honest services statute to proscribe only schemes involving bribery and kickbacks. *See also United States v. Riley*, 621 F.3d 312, (3d Cir. 2010) ("In light of *Skilling*, … the failure to limit honest

---

[36]    Section 1346 provides that "[f]or the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

[37]    Section 1951(a) provides that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).  "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   18 U.S.C. § 1951(b)(2).

services fraud to 'bribes and kickbacks' now constitutes legal error."); *Aliucci v. United States*, Civ. A. No. 10-1297, Crim. No. 08-69, 2011 WL 635264, (W.D.Pa. Feb. 11, 2011).  There is no evidence of bribery or kickbacks by any of the Individual Defendants in this record.  The only individual who arguably obtained any type of personal benefit in this case was Santoro – who left the Township in 2007 for a position with consulting firm Delta.  Santoro, however, is not a defendant.  Likewise, Delta and Simon are not defendants.  Thus, because there is no evidence of any bribery or kickbacks, the crime of theft of honest services cannot support a RICO claim in this case.

Regarding the crime of extortion set forth in 18 U.S.C. § 1951, in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 404 (2003), the Supreme Court held that "we have construed the extortion provision of the Hobbs Act … to require not only the deprivation but also the acquisition of property."  Here, the Individual Defendants merely voted to preclude Plaintiffs from using their property in the manner they proposed and/or recommended that such action be taken to the Board of Supervisors.  Defendants did not initiate eminent domain proceedings or act in any other manner to "take" Plaintiffs' property.  Indeed, Pennsylvania law explicitly states that a local government's act of reserving a road on an official map does not constitute a taking.  *See* 53 Pa.C.S. § 10104.  Therefore, because Plaintiffs' property was never obtained by the Township, the Individual Defendants, or Simon, legally or otherwise, there is no evidence of extortion in this record.[38]

---

[38]     Plaintiffs summarily state, without any citation to authority, that their claim should survive summary judgment because the Hobbs Act incorporates "attempts" to commit extortion.  (Docket No. 72 at n. 93).  "An attempt conviction 'requires evidence that [the defendants] (1) acted with the requisite intent to violate the statute, and (2) performed an act that, under the circumstances as [they] believe[ ] them to be, constitute[d] a substantial step in the commission of the crime.'"  *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011) (quoting *United States v. Tykarsky*, 446 F.3d 458, 469 (3d Cir. 2006)).  Just as there is no evidence that the Individual Defendants actually obtained Plaintiffs' property, there is likewise no evidence that they attempted to do so.

For these reasons, the Court concludes that summary judgment is appropriate as to Plaintiffs' RICO claims under section 1962(c).  Plaintiffs have failed to set forth sufficient evidence from which a reasonable jury could conclude that any of the alleged predicate felonies have been committed by Hadley, Skorupan, Milius, Root, Mazzoni, Hensaw, and/or Trant.[39]  In sum, because there is no evidence that any crime was committed, Plaintiffs have failed to demonstrate that these individuals engaged in two predicate acts constituting a "pattern of racketeering activity" as is required to establish RICO liability under § 1962(c).  *See* 18 U.S.C. § 1961(5) (a "'pattern of racketeering activity' requires at least two acts of racketeering activity.").

### c.  RICO Conspiracy Claim Under 1962(d)

Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate section 1962(c).  18 U.S.C. § 1962(d).  "The essential elements of a § 1962(d) conspiracy include: (1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities." *The Knit With v. Knitting Fever, Inc.*, 2011 WL 1161716, at *3 (citing *Salinas v. United States*, 522 U.S. 52, 66 (1997)).  "[A] defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."  *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001).  "In certain circumstances, a defendant may be held liable under § 1962(d) even where [his or her] own actions would not amount to a substantive RICO violation."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 372 (3d Cir. 2010).  However, "those who innocently provide services will not incur § 1962(d) liability; rather 'liability will only arise from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity.'"

---

[39]     Given the Court's finding that evidence as to the commission of any predicate acts by the Individual Defendants is lacking, the Court need not fully consider Defendants' other well-founded arguments concerning Plaintiffs' failure to raise a genuine issue of material fact regarding the remaining elements required to sustain a § 1962(c) RICO claim.  (*See* Docket No. 69).  Since no reasonable jury could conclude that any crimes were committed, any further discussion of the remaining elements would be purely academic.

*The Knit With v. Knitting Fever, Inc.*, 2011 WL 1161716, at *3 (E.D.Pa. Mar. 30, 2011) (quoting *Smith*, 247 F.3d at 538, n.11)).

Here, Plaintiffs have failed to present sufficient evidence from which a reasonable jury could conclude that Hadley, Skorupan, Milius, Root, Mazzoni, Hensaw, and/or Trant knowingly agreed with the alleged non-party conspirators, Simon, Delta and Santoro, to participate in an illegal enterprise "directed at facilitating a criminal pattern of racketeering activity." *The Knit With*, 2011 WL 116171716, at *3. To the contrary, the evidence shows that the Individual Defendants merely acted within their respective roles as employees and officials of the Township by evaluating Plaintiffs' applications and later denying them. Indeed, as is described in the preceding section, the alleged fraudulent and extortionate acts by these Individual Defendants do not qualify as fraud or extortion as a matter of law. There is likewise no evidence that these individuals reached an agreement to commit any criminal offenses. Therefore, as Plaintiffs have failed to present evidence from which all of the elements of a RICO conspiracy claim can be found, summary judgment on these claims in favor of Hadley, Skorupan, Milius, Root, Mazzoni, Hensaw, and Trant is appropriate.

3.   State Law Civil Conspiracy Claims

The Court last turns to its evaluation of Plaintiffs' civil conspiracy claims. (Docket No. 1). Plaintiffs assert in their Complaint that the only basis for jurisdiction over these claims is supplemental jurisdiction pursuant to 28 U.S.C. 1367(a). (*Id.*). The Individual Defendants argue that they are entitled to summary judgment as to Plaintiffs' civil conspiracy claims because they maintain that such claims are barred by the applicable statute of limitations under Pennsylvania law and they further argue that they are otherwise immune from such claims under 42 Pa.C.S. § 8850.

This Court has discretion to "decline to exercise supplemental jurisdiction over a claim if … the claim raises a novel or complex issue of State law" or if the Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. §§ 1367(c)(1), (c)(3). Here, this Court has granted summary judgment in favor of the Defendants as to all of Plaintiffs' federal claims. Therefore, the only remaining claims against these Defendants are state law civil conspiracy claims. In this Court's opinion, further evaluation of Plaintiffs' civil conspiracy claims would necessarily involve the application of state law because Plaintiffs' claims and the defenses raised, i.e., the statute of limitations and qualified immunity, all arise under Pennsylvania law. Pennsylvania courts are well-equipped to adjudicate such disputes. Moreover, there are no extraordinary reasons for this Court to exercise supplemental jurisdiction over such claims in the absence of any federal claims properly before the Court. Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' civil conspiracy claims. Said claims are therefore dismissed, without prejudice.[40]

## VI. CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment is granted as to Plaintiffs' § 1983 and civil RICO claims and the Court declines to exercise supplemental jurisdiction over the remaining state law civil conspiracy claim. In the end, Petrarca was merely a "sophisticated odds maker" (as he deemed himself) who – along with his experienced counsel– gambled on a legal strategy to force their preferred development plans on Cranberry Township and lost. There is simply no evidence that the Township or its agents committed any

---

[40]     The Court notes that pursuant to 28 U.S.C. § 1367(d) any state period of limitations applicable to Plaintiffs' state law claims "shall be tolled while the claim is pending [before the district court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see also Whittaker v. County of Lawrence*, 674 F.Supp.2d 668 (W.D.Pa. Dec. 7, 2009), *aff'd*, 437 Fed.App'x 105 (3d Cir. 2011). Thus, the Plaintiffs' right to bring such claims is preserved while this matter was pending in this Court. However, Defendants have raised a statute of limitations defense to these claims. The Court expresses no opinion concerning whether Plaintiffs' claims were timely filed in the first instance, leaving such decision to the state tribunal.

constitutional violations or engaged in conduct which would subject them to liability under the RICO Act.  With that said, summary judgment will be entered in favor of all of the Defendants as to Plaintiffs' § 1983 claims and in favor of the Individual Defendants as to Plaintiffs' RICO claims.  Finally, Plaintiffs' state law civil conspiracy claims against the Individual Defendants will be dismissed, without prejudice.  An appropriate order follows.


_s/Nora Barry Fischer_
Nora Barry Fischer
U.S. District Judge


cc/ecf:  All counsel of record

Date:   December 29, 2011